FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 2 0 2018 ★

LONG ISLAND OFFICE

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

LONG ISLAND HOUSING SERVICES, INC.; SUFFOLK INDEPENDENT LIVING ORGANIZATION, INC.; AND DOREEN KERNOZEK,

INDEX NO. Case No. _____

**CV-18 3583**

Plaintiffs,

**COMPLAINT AND DEMAND FOR JURY TRIAL**

vs.

NPS HOLIDAY SQUARE LLC; NORTHWOOD VILLAGE, INC.; BRIGHTWATERS GARDENS, INC.; LAKESIDE GARDEN APARTMENTS LLC; AND NPS PROPERTY CORP.,

**AZRACK, J.**

**BROWN, M. J.**

Defendants.

Plaintiffs Long Island Housing Services, Inc., Suffolk Independent Living Organization, Inc., and Doreen Kernozek, by and through their undersigned attorneys, allege as follows:

**I.      NATURE OF ACTION**

1.      In open defiance of federal, state and county fair housing laws, the owner of at least nine apartment complexes in Suffolk County limits the availability of apartments to African American renters, renters with disabilities, and renters with public sources of income.

2.      Plaintiffs seek to end Defendants' discriminatory housing practices and remove the illegal barriers preventing Suffolk County residents from renting Defendants' apartments.

**II.      INTRODUCTION**

3.      This action is brought by a fair housing organization, a disability rights organization, and an individual with disabilities.  Plaintiff Long Island Housing Services, Inc., the fair housing organization, conducted extensive testing at four properties owned and operated

by Defendant NPS Property Corp., and uncovered egregious intentional discrimination towards African Americans, individuals with disabilities, and those on public sources of income.

4.      Separately, Plaintiff Suffolk Independent Living Organization, Inc., the disability rights organization, attempted to obtain housing for individuals with disabilities at one of the apartments owned and operated by Defendant NPS Property Corp., but was turned away because the prospective renters had disabilities and participated in housing voucher programs dedicated to serving persons with disabilities.

5.      Separately, Plaintiff Doreen Kernozek, a woman with disabilities living in Suffolk County, New York, attempted to rent an apartment at a complex owned and operated by Defendant NPS Property Corp. The property's representative not only turned Ms. Kernozek away because of her disability, but also made disparaging remarks about people with disabilities, and stated that an effort was being made to limit the number of tenants in the apartment who had disabilities.

6.      All three plaintiffs witnessed nearly-identical discriminatory behavior at the properties owned and operated by Defendant NPS Property Corp. Specifically, NPS Property Corp. maintains a policy of using a quota system to limit the number of apartments it will make available to individuals with disabilities. The facts uncovered by the professional testers at Long Island Housing Services, Inc. are consistent with the discriminatory treatment Plaintiff Doreen Kernozek experienced, as well as the discriminatory behavior witnessed by Suffolk Independent Living Organization, Inc.

7.      By these and other discriminatory and illegal acts, Defendants have violated Plaintiffs' rights under the Fair Housing Act, 42 U.S.C. § 3604 *et seq.*, the New York State

Human Rights Law, N.Y. Exec. Law § 296(5), and the Suffolk County Human Rights Law, Suffolk County Code § 528 *et seq.*

## III.    JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over Plaintiffs' federal Fair Housing Act claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 3613. This Court has supplemental jurisdiction over Plaintiffs New York State Human Rights Law and Suffolk County Human Rights Law claims pursuant to 28 U.S.C. § 1367.

9.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants are located in and conduct business in this District, the events or omissions giving rise to the claims herein occurred in this District, and the properties at issue are situated in this District.

## IV.    PARTIES

**Plaintiffs**

10.    Plaintiff **Long Island Housing Services, Inc. ("LIHS")** is a non-profit fair housing organization serving Long Island, New York and is organized under the laws of New York. Its principal place of business is in Bohemia, Suffolk County, New York.

11.    LIHS's mission is to (a) promote equal housing opportunity and racial and economic integration, and (b) reduce and eliminate housing discrimination. This mission includes ensuring that people of all races and ages, as well as those with disabilities, have equal access to housing in Long Island. LIHS pursues these goals by providing counseling services to individuals and families about fair housing, fair lending, and landlord/tenant rights, homelessness prevention, mortgage default, mortgage rescue scams, pre-purchase and rental strategies, and government assisted housing programs. LIHS also provides foreclosure prevention counseling and legal services.

3

12.     LIHS promotes compliance with fair housing laws by (a) conducting fair housing investigations, including testing, gathering evidence, and assessing claims; (b) assisting victims of discrimination to file administrative complaints or judicial complaints and making referrals for legal representation; (c) providing education and outreach for both housing consumers and industry-related providers; and (d) serving as a clearinghouse for housing-related information.

13.     LIHS employs individuals as "testers": persons who pose as prospective renters or homebuyers for the purpose of obtaining information about the conduct of landlords, real estate agents, and property owners to determine whether illegal housing discrimination is taking place.

14.     During all times relevant to this Complaint, the testers described below were employed by LIHS.  Prior to conducting the tests described below, they received training from LIHS, which included instructions on conducting tests, preparing tester report forms, and using concealed digital audio recorders during tests.

15.     LIHS has expended time and resources to monitor and counteract the effects of Defendants' discriminatory conduct, including but not limited to conducting fair housing testing at Defendants' properties and investigating the circumstances under which Defendants deny housing opportunities on the basis of race, disability, or lawful source of income.

16.     Defendants' actions have frustrated LIHS's mission by interfering with the rights of people in Suffolk County to equal housing opportunity and racially integrated housing. LIHS's mission has been directly harmed by Defendants' continued efforts to unlawfully prevent African Americans, individuals with disabilities, and those individuals on housing assistance programs from residing at Defendants' properties.

17.     Plaintiff **Suffolk Independent Living Organization, Inc. ("SILO")** is a non-profit disability rights organization serving Suffolk County, New York and is organized under

the laws of New York. Its principal place of business is in Holtsville, Suffolk County, New York.

18.    SILO's mission is to provide programs and services to people with disabilities in Suffolk County, and to ensure that people with disabilities have the same rights and responsibilities as their peers who do not have disabilities. SILO provides comprehensive services to individuals with disabilities in communities throughout Suffolk County. As an advocacy agency, SILO works with individuals, businesses, and other government and private agencies to promote equal access and equal housing opportunities for people with all disabilities.

19.    SILO provides a multitude of services to individuals with disabilities, including (a) addressing benefit needs associated with independent living options, such as housing voucher programs to assist individuals with disabilities; (b) consultation on support services for those transitioning into independent living; (c) providing housing advocacy for those on governmental housing programs because of their disabilities; (d) finding available and affordable housing opportunities for persons with disabilities.

20.    SILO has expended time and resources addressing Defendants' discriminatory conduct, including but not limited to attempting to place individuals with disabilities into Defendants' properties, even though Defendants had no intention of permitting these individuals to live at these properties because of their disabilities. SILO must therefore spend more money and resources in order to place these individuals with disabilities into other properties where they are not turned away because of their disabilities.

21.    Defendants' actions have frustrated SILO's mission by interfering with the rights of people with disabilities in Suffolk County to equal housing opportunity. SILO's mission has been directly harmed by Defendants' continued efforts to unlawfully prevent individuals with

5

disabilities, and those individuals using housing assistance programs dedicated to serving persons with disabilities, from residing at Defendants' properties.

22.     Plaintiff **Doreen Kernozek** is a 60-year-old woman with disabilities who resides in Suffolk County, New York.  Ms. Kernozek suffers from severe osteoporosis and high blood pressure, as well as other physical health issues.  Since early 2016, Ms. Kernozek has used a subsidy under the Nursing Home Transition and Diversion Medicaid Waiver ("NHTD") program to rent an apartment.

**Defendants**

23.     Defendant **NPS Holiday Square LLC** is a New York corporation with its principal place of business located within the Eastern District of New York, at 789 North Monroe Avenue, Lindenhurst, Suffolk County, New York.  Upon information and belief, NPS Holiday Square LLC is the owner of Holiday Square, a residential rental building with 144 units located at 10 Muncy Avenue, West Babylon, Suffolk County, New York, during all times relevant to this complaint.

24.     Defendant **Northwood Village, Inc.,** is a New York corporation with its principal place of business located within the Eastern District of New York, at 789 North Monroe Avenue, Lindenhurst, Suffolk County, New York.  Upon information and belief, Northwood Village, Inc., is the owner of Northwood Village, a residential rental building with 65 units located at 167 Weeks Road, North Babylon, Suffolk County, New York, during all times relevant to this complaint.

25.     Defendant **Brightwaters Gardens, Inc.,** is a New York corporation with its principal place of business located within the Eastern District of New York, at 789 North Monroe Avenue, Lindenhurst, Suffolk County, New York.  Upon information and belief,

Brightwaters Gardens, Inc., is the owner of Brightwaters Gardens, a residential rental building with 24 units located at 9-15 Hiawatha Drive, Brightwaters, Suffolk County, New York, during all times relevant to this complaint.

26. Defendant **Lakeside Garden Apartments LLC** is a New York corporation with its principal place of business located within the Eastern District of New York, at 789 North Monroe Avenue, Lindenhurst, Suffolk County, New York. Upon information and belief, Lakeside Garden Apartments LLC is the owner of Lakeside Garden Apartments, a residential rental building with 55 units located at 25 Cedar Court, Copiague, Suffolk County, New York, during all times relevant to this complaint.

27. Defendant **NPS Property Corp.** is a New York corporation with its principal place of business located within the Eastern District of New York, at 789 North Monroe Avenue, Lindenhurst, Suffolk County, New York. Upon information and belief, NPS Property Corp. is the owner of NPS Holiday Square LLC, Northwood Village, Inc., Brightwaters Gardens, Inc., and Lakeside Garden Apartments LLC, during all times relevant to this complaint.

28. NPS Property Corp. and/or Northwood Village, Inc. employed a man named "Agim" as the superintendent of the Northwood Village apartment complex in at least April through October 2016. Agim has authority to show apartments at Northwood Village to prospective tenants and to provide rental application information.

29. NPS Property Corp. and/or Lakeside Garden Apartments LLC employed a man named "Shaban" as the superintendent of the Lakeside Garden apartment complex in at least September through October 2016. Shaban has authority to show apartments at Lakeside Garden to prospective tenants and to provide rental application information.

7

30.     NPS Property Corp. and/or NPS Holiday Square LLC employed a woman named "Linda" in at least October through November 2016, who had authority to provide information regarding apartments at the Holiday Square apartment complex to prospective tenants and to provide rental application information.

31.     NPS Property Corp. and/or NPS Holiday Square LLC employed a woman named "Deirdre" in at least May through September 2017, who had authority to provide information regarding apartments at the Holiday Square apartment complex to prospective tenants and to provide rental application information.

## V.     FACTS

32.     Defendant NPS Property Corp. manages at least nine residential apartment buildings in Suffolk County, New York, including the Holiday Square, Northwood Village, Brightwaters Gardens and Lakeside Garden Apartments complexes. NPS Property Corp. employs a staff of rental agents, property managers and superintendents who, among other duties, provide information to prospective tenants regarding vacant or soon-to-be available apartments owned by NPS Property Corp.

### A.     LIHS Uncovers Race Discrimination at Northwood Village and Brightwaters Gardens

33.     Northwood Village is a residential apartment building with 65 units in North Babylon, Suffolk County, New York. Brightwaters Gardens is a residential apartment building with 24 units in Brightwaters, Suffolk County, New York. Both Northwood Village and Brightwaters Gardens are owned and managed by Defendant NPS Property Corp.

34.     Due to Plaintiff LIHS's concern with eliminating discriminatory practices related to racial segregation and race discrimination and the impact of such practices on prospective home seekers and Long Island communities, LIHS periodically monitors housing industry

8

practices for race discrimination.  In April 2016, LIHS began testing the Northwood Village

apartments to determine whether African Americans seeking housing at Northwood Village were

being treated any differently than White prospective renters.

        **1.**     **Testers A and B**

      35.    <u>Protected Tester A</u>.  On April 19, 2016, Protected Tester A, an African American

female, went to Northwood Village to inquire about a one-bedroom apartment.  She could not

locate a rental office and called the telephone number on the sign posted in the complex.  The

number went directly to a recording stating that the number was not in service.  The recording

stated that various leasing agents could be reached, but none of the information provided was for

Northwood Village.

      36.    Protected Tester A encountered an individual believed to be a tenant and was told

to talk to the superintendent who lived in the apartment next to the laundry room.  Protected

Tester A rang the doorbell of the superintendent's apartment.  A Caucasian woman spoke to

Protected Tester A through the upstairs window and informed Protected Tester A that the

superintendent was unavailable, and began giving Protected Tester A the superintendent's cell

phone number.  While Protected Tester A was writing the number down, a man who identified

himself as the superintendent spoke to Protected Tester A.  He told Protected Tester A his name

was "Agim."  Protected Tester A asked if there were any available one-bedroom units in the

complex, and he informed her there were none.  When Protected Tester A asked for an

application, Agim abruptly told her that he does not give out applications if there are no

apartments available.

      37.    <u>Comparison Tester B</u>.  On April 20, 2016—one day after Protected Tester A's

visit—Comparison Tester B, a White female, went to Northwood Village to inquire about a one-

bedroom apartment.  Upon entering the complex, she approached an open laundry room and

found the superintendent, Agim.  She asked him whether there was a one-bedroom apartment available and he replied in the negative, but immediately, and without prompting, began telling her about an available studio apartment in a complex in Brightwaters.  Comparison Tester B asked if there was a number she could call to inquire about the apartment, and Agim looked up a telephone number from his cell phone and provided it to Comparison Tester B.

38.    That same day, April 20, 2016, Comparison Tester B called the leasing agent regarding the Brightwaters apartment.  The leasing agent, named "Linda," told Comparison Tester B she should make the appointment to see the apartment with Agim, and gave her Agim's telephone number.  Comparison Tester B asked if there were any other available units, and Linda told her about an apartment located in West Babylon, as well as another apartment in Copiague. Linda confirmed that Comparison Tester B was speaking to the office of Defendant NPS Property Corp.

39.    Immediately following the conversation with the leasing agent, Comparison Tester B called Agim to set up an appointment to see the Brightwaters Gardens apartment.  Agim informed her that she could see the apartment that day.  Agim texted Comparison Tester B the address of the Brightwaters Gardens apartment complex.

40.    Comparison Tester B and Agim met at the Brightwaters Gardens complex, and Agim showed her the apartment, describing in detail the advantages of the apartment.  He answered all of Comparison Tester B's questions, provided her with information about the application process, and retrieved an application from his car for her to fill out.

41.    Treatment of Protected Tester A vs. Comparison Tester B.  Agim was unresponsive to Protected Tester A, refusing to provide her an application or additional

information regarding the Brightwaters Gardens apartment, or to refer Protected Tester A to the leasing agent who could provide information on several other available apartments.

42.     In contrast Agim without hesitation informed Comparison Tester B about the Brightwaters Gardens apartment and provided the number of the leasing agent for Defendant NPS Property Corp.

### 2.     Testers C and D

43.     <u>Comparison Tester C</u>. On September 1, 2016, Comparison Tester C, a White female, went to Northwood Village to inquire about a one-bedroom apartment. Upon arrival at the property, Comparison Tester C was directed to superintendent Agim's apartment.

44.     Upon arriving at Agim's apartment, Agim informed Comparison Tester C that there would be a one-bedroom apartment available in a couple of weeks, and he proceeded to give her information about the one-bedroom apartment. Agim then volunteered to show Comparison Tester C a two-bedroom apartment to give her a sense of the space of the one-bedroom apartment. Agim gave Comparison Tester C a tour of the two-bedroom apartment, describing in detail various renovations and how the apartment compared to the one-bedroom unit. Without prompting, Agim told Comparison Tester C about an available two-bedroom apartment in the Brightwaters Gardens complex. Comparison Tester C asked if she should call the number posted at the front of the apartment complex. Agim said no, and provided Comparison Tester C his cell phone number to call regarding the Brightwaters apartment.

45.     Comparison Tester C called Agim later that day to inquire about the two-bedroom apartment in Brightwaters. Agim stated that the rent for the two-bedroom apartment in Brightwaters cost less than the one-bedroom in Northwood Village because the two-bedroom apartment was smaller. Agim also stated that the Lakeside Garden complex in Copiague was very nice. Agim then handed his cell phone to the person who was with him, a man named

"Shaban" (the superintendent at the Lakeside Garden apartment complex, *see* ¶ 56 below). Shaban told Comparison Tester B about the Lakeside Garden apartments, describing the complex's renovations, convenient location, and amenities. When Comparison Tester C asked about the amount of the rent, Shaban asked whether she was renting under Section 8. When she answered no, Shaban stated the amount of the rent. Shaban then provided his cell phone number.

46.    Protected Tester D. On September 2, 2016—a day after Comparison Tester C's visit—Protected Tester D, an African American female, arrived at Northwood Village to inquire about the availability of a one-bedroom apartment. Protected Tester D asked a tenant regarding the location of the superintendent and was directed towards an apartment. Protected Tester D found Agim at that apartment and asked him about an available one-bedroom apartment in the complex. Agim replied that nothing was available. Protected Tester D then inquired whether any other apartments were available, but Agim said no and told her to call the office number on the sign. When Protected Tester D asked for a card or a telephone number, Agim repeated his earlier statement about calling the office number on the sign, which was not functional.

47.    Treatment of Comparison Tester C vs. Protected Tester D. Agim, without hesitation, provided Comparison Tester C with information regarding a one-bedroom apartment at Northwood Village that would be available in a couple of weeks, and then showed Comparison Tester C a two-bedroom apartment, even though it was not the apartment she had been looking for. Agim also provided unsolicited information regarding a two-bedroom apartment in Brightwaters Gardens.

48.    In contrast, Agim did not mention any available apartments to Protected Tester D, and was not forthcoming with any additional information. Agim intentionally misrepresented the availability of housing when he told Protected Tester D that no apartments were available

when, given what he told Comparison Tester C, there were in fact apartments becoming available at Northwood Village and currently available in Lakeside Garden and Brightwaters Gardens.

### 3.   Testers E and F

49.   <u>Comparison Tester E</u>.  On October 5, 2016, Comparison Tester E, a White female, visited Northwood Village to inquire about an available one-bedroom apartment. Comparison Tester E found Agim, who told her that the apartment had been rented the day before. Agim seemed sympathetic towards Comparison Tester E for not inquiring about the apartment sooner.  Comparison Tester E then asked about a two-bedroom apartment in Brightwaters, and Agim replied that it would be available in about 40-45 days.  Agim also stated that there would be a two-bedroom apartment available at Northwood Village in a couple of weeks.  When Comparison Tester E asked Agim for his cell phone number, he willingly provided it.

50.   <u>Protected Tester F</u>.  On October 6, 2016—the day after Comparison Tester E's visit—Protected Tester F, an African American female, went to Northwood Village to ask about a one-bedroom apartment.  Upon arrival, Protected Tester F saw an open apartment door next to the laundry room and saw Agim sitting at the top of the stairs.  She asked Agim to direct her toward the leasing office, and Agim responded that they did not have any available apartments. Protected Tester F Agim she was looking for either a one- or two-bedroom apartment, or any other available apartments in other locations.  Agim did not answer her questions and stated she should call the office number.  Protected Tester F requested a business card, and Agim again told her to call the office; he did not offer his cell phone number.

51.   On the same day, October 6, 2016, Protected Tester F called the office number provided by Agim and spoke with a woman named "Deirdre."  Protected Tester F asked whether

there was an apartment available at Northwood Village, and Deirdre responded that Protected Tester F should check with superintendent Agim because there might be a one-bedroom available. Deirdre gave Protected Tester F Agim's cell phone number so that she could inquire into the availability of apartments.

52.     <u>Treatment of Comparison Tester E vs. Protected Tester F</u>. Agim provided information to Comparison Tester E regarding two soon-to-be-available apartments at Northwood Village and Brightwaters Gardens. In direct contrast, Agim did not volunteer any information regarding the upcoming availability of any apartments to Protected Tester F, but instead merely stated that nothing was available. When Protected Tester F inquired about other possible locations for a one- or two-bedroom apartment, Agim was unresponsive, and misrepresented the availability of housing when he failed to disclose the information he provided Comparison Tester E about apartments at Northwood Village and Brightwaters Gardens. In addition, Agim did not offer his cell phone number to Protected Tester F, even though she had asked him for his contact information.

53.     In sum, Protected Testers A, D and F were provided false or misleading information regarding the availability of housing. Protected Testers A, D and F were similarly-situated to Comparison Testers B, C and E in their desire and willingness to rent an apartment at Northwood Village, except for the fact that the Protected Testers are African American and the Comparison Testers are White.

**B.      LIHS Uncovers Race Discrimination at Lakeside Garden Apartments**

54.     Lakeside Garden Apartments is a residential apartment building with 55 units in Copiague, Suffolk County, New York. Lakeside Garden Apartments is owned and managed by Defendant NPS Property Corp.

55.     Because Agim, the superintendent at the Northwood Village apartments, steered a White tester to Lakeside Garden Apartments, LIHS began testing at Lakeside Garden Apartments in October 2016 to determine whether African Americans seeking housing at Lakeside Garden Apartments were being treated differently than White prospective renters.

56.     <u>Comparison Tester A</u>. On October 26, 2016, Comparison Tester A, a White male, went to Lakeside Garden Apartments to inquire about renting an apartment. He met with a man named "Shaban" who introduced himself as the superintendent of the complex. Comparison Tester A asked Shaban about any available apartments, and Shaban immediately informed Comparison Tester A about a one-bedroom apartment at the complex. They immediately went to view the unit together. While doing so, Shaban asked Comparison Tester A whether he was in the Section 8 housing subsidy program, to which Comparison Tester A responded in the negative.

57.     As soon as they entered the apartment, Shaban described the apartment in detail to Comparison Tester A without any prompting. Upon request, Shaban informed Comparison Tester A about the rental price and the application process. Shaban stated that, with a good enough credit score, he would accept a deposit of *one month's security and one month's rent*.

58.     After taking a tour of the apartment, Shaban escorted Comparison Tester A to the clubhouse, describing the clubhouse lounge and highlighting its positive attributes. Shaban was talkative and continuously described the various amenities that the complex offered to its residents.

59.     While Comparison Tester A was leaving the complex, Shaban stated that the apartment would be taken quickly and encouraged Comparison Tester A to submit an application as soon as possible so that Shaban could hold it for him. Shaban then went back to his apartment

15

and provided Comparison Tester A with an application. Shaban voluntarily gave Comparison Tester A his cell phone number and encouraged Comparison Tester A to call him with any questions or to make an appointment for any future apartment tours.

60.     Protected Tester B. On October 26, 2016—the same day as Comparison Tester A's visit—Protected Tester B, an African American female, also went to Lakeside Garden to inquire about any available apartments. Protected Tester B knocked on a screen door which was opened by Shaban's wife. She gave Protected Tester B Shaban's phone number, and Protected Tester B went back to her car, called Shaban, confirmed that a one-bedroom apartment was available, and arranged to meet Shaban at the apartment later that day.

61.     Shaban arrived at the complex at the arranged time and proceeded to look in the passenger side window of Protected Tester B's vehicle. When Protected Tester B introduced herself as the caller, Shaban did not respond but started to walk around the car and peer into the window of the passenger seat. He then proceeded to walk away, and Protected Tester B followed Shaban down the sidewalk and into the available one-bedroom apartment.

62.     Shaban did not describe the apartment. He did not introduce himself, and only spoke when asked questions about the apartment. Shaban informed Protected Tester B that the deposit would require *two month's security and one month's rent* (while Comparison Tester A was told he only needed one month's security, *see* ¶ 57 above).

63.     Shaban did not volunteer any information to Protected Tester B; Protected Tester B was the only one who made comments regarding the apartment and the complex. When Protected Tester B inquired about a way to reach him directly with a card or a phone number, Shaban did not provide her with his phone number or any further information. When they were leaving the apartment, Shaban stated that the apartment had a pending application.

64.     <u>Comparison Tester C</u>.  On October 27, 2016—the day after Comparison Tester A's and Protected Tester B's visits—Comparison Tester C, a White male, called Shaban regarding the availability of an apartment at Lakeside Garden.  Comparison Tester C spoke directly with Shaban and was informed that there was an available apartment and that Comparison Tester C should come view the apartment as soon as possible.  When Comparison Tester C repeatedly asked questions about the availability of the apartment, Shaban clearly stated that the apartment was available now and that Comparison Tester C should come see the apartment at any time during the week.  Approximately 10 minutes after the first call to Shaban, Comparison Tester C called him again to inquire about the details of the rental price.  Shaban did not state that there was a pending application for the apartment.

65.     <u>Treatment of Comparison Tester A vs. Protected Tester B</u>.  While Shaban volunteered unsolicited information to Comparison Tester A, he did not volunteer any information to Protected Tester B.  Nor did Shaban inform Protected Tester B of the possibility of a smaller security deposit, information he provided without prompting to Comparison Tester A.

66.     Furthermore, Shaban told Protected Tester B that the unit may be unavailable because there was a pending application.  However, when Protected Tester B had spoken with Shaban on the phone before meeting in person and asked if the apartment was available, Shaban had not mentioned the pending application.  Only after seeing Protected Tester B did Shaban say anything about the apartment becoming unavailable.  And in fact, the day after Comparison Tester A's and Protected Tester B's site visits at Lakeside Garden, Comparison Tester C confirmed that the unit was available for rent.

67.     Both testers were similarly-situated in their desire and willingness to rent an apartment at Lakeside Garden, except for the fact that Comparison Tester A is White and Protected Tester B is African American.

**C.     LIHS Uncovers Source-of-Income Discrimination at Holiday Square**

68.     Holiday Square is a residential apartment building with 144 units in West Babylon, Suffolk County, New York.  Holiday Square is owned and managed by Defendant NPS Property Corp.

69.     In 2016, an employee of Plaintiff LIHS was informed that Holiday Square was discriminating against prospective renters based on source of income.  In October 2016, LIHS began testing the Holiday Square apartments to determine whether those seeking housing who used public sources of income were being treated any differently than those not using such programs.

70.     Protected Tester A.  On October 27, 2016, Protected Tester A called Holiday Square apartments.  Protected Tester A spoke with rental agent "Linda" to inquire about an apartment for her mother.  Linda informed Protected Tester A that units were available at Holiday Square, and that Protected Tester A's mother would need $1,324 for the security deposit.  Protected Tester A informed Linda that she would need to go to the Suffolk County Department of Social Services ("DSS") to obtain the security deposit as a "one-shot deal"—a one-time grant issued by DSS to assist low-income persons with the cost associated with a rental security deposit fee.  Linda informed Protected Tester A that Holiday Square would not accept the "one-shot deal" for a security deposit.

71.     Protected Tester B.  On November 3, 2016, Protected Tester B called Holiday Square and spoke with Linda about renting an apartment.  Protected Tester B explained that she would need to move by mid-December 2016.  Protected Tester B volunteered that she had a

Section 8 voucher, and also that she had been told by the Community Development Corporation of Long Island ("CDC") that DSS would pay her security deposit (the "one-shot deal"). At that point, Linda interrupted Protected Tester B to say that there was a hold on renting to any Section 8 voucher holders while the property awaited a building inspection. Linda stated that she did not know if anything would become available by mid-December, but that Protected Tester B would not be able to move in at that time because the building inspection would not take place until after mid-December.

72.     Linda suggested looking for an apartment elsewhere because Holiday Square could not process rental applications from Section 8 voucher holders, but said she did not know of any other properties that would accept Section 8 payments. Linda stated that the problem was the amount of the Section 8 voucher compared to the fair market value of the apartment. Protected Tester B recited the voucher amount, which was more than the rent for a unit at Holiday Square (*see* Comparison Tester C, ¶ 75, below).

73.     Protected Tester B was not directed to contact Defendant NPS Property Corp. or directed to any other complexes owned by NPS Property Corp. such as Lakeside Garden, Northwood Village or any of the nine residential properties owned by NPS Property Corp.

74.     Comparison Tester C. On November 15, 2016, Comparison Tester C called Holiday Square and spoke with Linda. Comparison Tester C was not using a "one-shot deal" or a Section 8 voucher. Like Protected Tester B, Comparison Tester C stated that she was looking to move by mid-December. Linda told Comparison Tester C that she had just received some notices from people who were moving out of other complexes and that there would be units available in January 2017.

75.    Linda told Comparison Tester C that the rent for an upstairs apartment at Holiday Square was $1,324, and $1,424 for a ground-floor unit.  Linda invited Comparison Tester C to come to the complex to see a model apartment, and described the application process and requirements.

76.    Linda did not say anything to Comparison Tester C about a building inspection or rental permit.  In fact, Plaintiff LIHS contacted the Town of Babylon Department of Planning and Development, and was informed that no one in that department would have told Defendant NPS Property Corp. that they could not rent to a person with a Section 8 voucher at Holiday Square during the course of an inspection and renewal of a rental permit.

77.    Thus, Linda provided false information to Protected Testers A and B regarding the availability of apartments at Holiday Square, both by stating that Holiday Square could not rent to voucher holders during the rental permit renewal process, and that no other apartments were available.

**D.    Plaintiff Doreen Kernozek Is Denied Housing at Holiday Square Because of Her Disability**

78.    Plaintiff Doreen Kernozek is a resident of Suffolk County who has disabilities and participates in the Nursing Home Transition and Diversion Medicaid Waiver ("NHTD") program to rent an apartment.  In November 2016, Ms. Kernozek visited the Holiday Square apartment complex to inquire about an apartment.  Ms. Kernozek was accompanied by a service coordinator who, through the SILO network of service providers, was helping Ms. Kernozek obtain an apartment.  Ms. Kernozek has a number of debilitating health issues, but does not immediately appear to have any physical disabilities.  After being shown the apartment by a Holiday Square rental agent, Ms. Kernozek and her service coordinator went to the rental office to fill out an application.  The rental agent appeared eager to rent the apartment to Ms. Kernozek.

20

79.     While filling out the application, and before the rental agent was aware that Ms. Kernozek was a person with disabilities, the rental agent stated that tenants at Holiday Square with disabilities "bring their own set of problems" to the complex, and stated that efforts were being made to limit the number of individuals with disabilities living there.

80.     The rental agent then looked at Ms. Kernozek's application and realized that Ms. Kernozek was a person with disabilities and using a NHTD housing voucher. The rental agent's attitude immediately changed, and she stated that the voucher would not be enough to pay the rent on the apartment. In fact, Ms. Kernozek's voucher, along with her income, was sufficient to pay the rent. The next day, Holiday Square contacted Ms. Kernozek's service coordinator to tell her Ms. Kernozek was not approved for the apartment.

81.     Ms. Kernozek was deeply affected by the treatment she experienced at Holiday Square due to her disability. Ms. Kernozek was unable to find and move into a new apartment for three months after the incident at Holiday Square, and during that time remained in housing that had significant obstacles to her mobility.

**E.    LIHS Uncovers Disability Discrimination at Holiday Square**

82.     In early 2017, SILO contacted LIHS to assist in addressing issues involving Holiday Square's treatment of renters with disabilities. Holiday Square had been ticketing vehicles of the home health aides who parked at the complex to assist individuals with disabilities living there. SILO had also received complaints that renters with disabilities were having difficulty renewing their leases. LIHS subsequently received complaints that Holiday Square had refused to accept applications from prospective tenants with disabilities, explaining that the complex had "reached its quota" on accepting such applications.

83.    In response, LIHS initiated testing at Holiday Square in May 2017 to determine whether people with disabilities seeking housing at Holiday Square were being treated differently than individuals without disabilities.

84.    <u>Protected Tester A</u>.  On May 11, 2017, Protected Tester A called Holiday Square and spoke to a representative named "Deirdre" about renting an apartment.  Deidre informed Protected Tester A that apartments were available.  Protected Tester A then informed Deidre that the apartment would be for his mother who would be transitioning from a nursing home.  Deidre asked if Protected Tester A's mother was on any programs, to which Protected Tester A responded that his mother was on a waiver program for head injury and nursing home transition.  Deirdre responded that she was familiar with the program, and stated that Holiday Square would not accept an application from Protected Tester A's mother because they had "met their quota" for such programs.

85.    <u>Comparison Tester B</u>.  On May 12, 2017—the day after Protected Tester A called Holiday Square—Comparison Tester B called Holiday Square to inquire about renting an apartment.  Comparison Tester B spoke with Deirdre, and was told that units were available.  Comparison Tester B stated that he was searching on behalf of an uncle.  Comparison Tester B did not describe his uncle as having disabilities or using any housing voucher programs for individuals with disabilities.  Deirdre told Comparison Tester B about available apartments at Holiday Square and South Shore Commons (another NPS Property Corp. apartment complex).  Comparison Tester B then made an appointment to meet with Deirdre.

86.    Thus, Deirdre, acting on behalf of and with direction from NPS Property Corp., stated that Holiday Square has a "quota" on the number of tenants it will accept who have disabilities and who rely on government assistance programs dedicated to serving persons with

22

disabilities.  This quota system was undertaken with an intent to discriminate and had an adverse

effect in individuals with disabilities.

### F.     SILO Attempts to Obtain Housing at Holiday Square for Individuals with Disabilities

87.     Plaintiff SILO is contracted to administer grants for the New York State

Education Department, the New York State Office for the Aging, and the New York State

Department of Health.  For the New York State Department of Health, SILO provides oversight

and supervision through its Regional Resource and Development Center ("RRDC") for two

waiver services: the Nursing Home Transition and Diversion Medicaid Waiver ("NHTD"), and

the Traumatic Brain Injury Waiver ("TBI").  SILO also subcontracts with the New York

Association for Independent Living ("NYAIL") to administer the Olmsted Housing Subsidy

("OHS") in the Long Island Region.  Under these programs, SILO is responsible for identifying

suitable rental housing for individuals with disabilities, and to assist those individuals through

the rental application process.  In fulfilling this obligation, SILO saves the State of New York

millions of dollars a year: these individuals are able to move into private housing with the

assistance of various subsidy programs, which is far less expensive for the state than having them

remain in state-run facilities.

88.     In or around July 2017, the SILO employee in charge of finding housing for

individuals with disabilities on the OHS program contacted Holiday Square to inquire about the

availability of units.  She spoke with an individual named "Deirdre," and was informed that she

would need to call back in September or October because the apartment complex had "reached

its quota" for admitting tenants who rely on public assistance dedicated to serving persons with

disabilities.

89.    Around one month after making this call, the same SILO employee called Holiday Square to inform their office that they had an obligation under Suffolk County law to accept applicants regardless of their participation in any housing voucher programs. The representative of Holiday Square responded that they had no available apartments.

90.    SILO seeks housing for approximately 60 individuals through the OHS program at any given time, and Holiday Square's denial of housing to individuals with disabilities caused SILO to expend additional resources finding properties that would grant housing to people with disabilities.

91.    In or around February 2018, another SILO employee tasked with finding housing for individuals with disabilities on the OHS program contacted Holiday Square, this time to inquire about available apartments for a specific individual with a disability who would use the DSS "one-shot deal" for assistance in paying the security deposit. This SILO employee was told that Holiday Square does not accept applicants who use the "one-shot deal." SILO is still attempting to locate appropriate housing for this individual.

### G.    LIHS Files HUD Complaints

92.    On August 8, 2017, LIHS filed a complaint with the Department of Housing and Urban Development ("HUD") charging Defendants NPS Property Corp. and NPS Holiday Square LLP with disability discrimination.

93.    On August 9, 2017, LIHS filed a complaint with the Suffolk County Human Rights Commission charging Defendants NPS Property Corp. and NPS Holiday Square LLP with source-of-income discrimination.

94.    On August 14, 2017, LIHS filed a HUD complaint charging Defendants NPS Property Corp., Northwood Village, Inc., and Brightwaters Gardens, Inc. with race discrimination.

95.     Also on August 14, 2017, LIHS filed a HUD complaint charging Defendants NPS

Property Corp. and Lakeside Garden Apartments LLC with race discrimination.

96.     In September 2017, HUD referred these complaints to the New York State

Division of Human Rights.

97.     Because LIHS has elected to bring its claims in this Court, it made a formal

request to withdraw the complaints on June 8, 2018 from the New York State Division of Human

Rights and HUD.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Fair Housing Act, 42 U.S.C. § 3604 *et seq.*
### LIHS Against All Defendants
### SILO and Doreen Kernozek Against Defendants NPS Property Corp. and NPS
### Holiday Square LLC

98.     Plaintiffs repeat and reallege the allegations in the paragraphs above as if fully set

forth herein.

99.     As described above, Defendants' acts, policies and practices have made and

continue to make housing unavailable because of race or color in violation of the Fair Housing

Act, 42 U.S.C. § 3604(a), and because of disability in violation of 42 U.S.C. § 3604(f).

100.    As described above, Defendants' conduct constitutes a deprivation of the terms,

conditions and privileges of sale or rental of a dwelling, or in the provision of services or

facilities in connection therewith, on the basis of race or color in violation of the Fair Housing

Act, 42 U.S.C. § 3604(b), or on the basis of disability in violation of 42 U.S.C. § 3604(f).

101.    As described above, Defendants' conduct constitutes the making of statements

with respect to rental of a dwelling that indicates a preference, limitation, or discrimination based

on race, color or disability, or an intention to make such preference, limitation or discrimination, in violation of the Fair Housing Act, 42 U.S.C. § 3604(c).

102.    As described above, Defendants' conduct constitutes representations made because of race, color or disability that a dwelling is not available for inspection or rent when such dwelling is in fact so available, in violation of the Fair Housing Act, 42 U.S.C. § 3604(d).

103.    Plaintiffs are aggrieved person as identified in 42 U.S.C. § 3602(d) and (i), have been injured by the Defendants' discriminatory conduct, and have suffered damages as a result.

104.    Defendants' conduct as described above was intentional, willful, and made in disregard for the rights of others.

**SECOND CAUSE OF ACTION**
**New York State Human Rights Law, N.Y. Exec. Law § 296(5)**
**LIHS Against All Defendants**
**SILO and Doreen Kernozek Against Defendants NPS Property Corp. and NPS Holiday Square LLC**

105.    Plaintiffs repeat and reallege the allegations in the paragraphs above as if fully set forth herein.

106.    As described above, Defendants' conduct constitutes an unlawful discriminatory practice to refuse to sell, rent, or otherwise deny or withhold from any person a housing accommodation because of race, color or disability, or to falsely represent that a housing accommodation is not available for rental based on race, color or disability in violation of § 296(5)(a)(1) of the New York Human Rights Law.

107.    As described above, Defendants' conduct constitutes an unlawful discriminatory practice to discriminate in the terms, conditions, or privileges of a rental on the basis of race, color or disability in violation of § 296(5)(2) of the New York Human Rights Law.

108.   As described above, Defendants' conduct above was intentional, willful, and made in disregard for the rights of others.

### THIRD CAUSE OF ACTION
**Suffolk County Human Rights Law, Suffolk County Code § 528 *et seq.***
**LIHS Against All Defendants**
**SILO and Doreen Kernozek Against Defendants NPS Property Corp. and NPS Holiday Square LLC**

109.   Plaintiffs repeat and reallege the allegations in the paragraphs above as if fully set forth herein.

110.   As described above, Defendants' conduct constitutes a denial of or withholding from any individual or group of individuals any housing accommodation because of race, color, disability or lawful source of income in violation of § 528-9(A)(1) of the Suffolk County Code.

111.   As described above, Defendants' conduct constitutes discrimination in the terms, conditions or privileges of the rental or lease of a housing accommodation and in the furnishing of facilities or services in connection therewith because of race, color, disability or lawful source of income in violation of § 528-9(A)(2) of the Suffolk County Code.

112.   As described above, Defendants' conduct constitutes discrimination in making available a residential real estate transaction because of race, color, disability or lawful source of income in violation of § 528-9(A)(3) of the Suffolk County Code.

113.   As described above, Defendants' conduct constitutes the making of statements which express, directly or indirectly, a limitation, specification, or discrimination based on race, color, disability or lawful source of income in violation of § 528-9(A)(7) of the Suffolk County Code.

114.   Defendants' unlawful conduct was intentional, willful, and made in disregard for the rights of others.

27

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

115.   Declaring Defendants' discriminatory practices violate the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq.*; the New York State Human Rights Law, N.Y. Exec. Law § 296(5); and the Suffolk County Human Rights Law, § 528 *et seq.*;

116.   Enjoining Defendants, Defendants' agents, employees and successors, and all other persons in active concert or participation from:

    a.   Withholding housing, or otherwise making housing unavailable on the basis of race, color, disability or lawful source of income;

    b.   Representing to any person that a dwelling is not available for inspection or rental when such dwelling is in fact so available, or will become available in the future, because of race, color, disability or lawful source of income;

    c.   Refusing to rent to individuals or households using Section 8 vouchers, the Suffolk County Department of Social Services "one-shot" deal, the New York State Medicaid Waiver Program, the Nursing Home Transition and Diversion Medicaid Waiver, and the Traumatic Brain Injury Waiver, the Olmsted Housing Subsidy, or any other type of lawful public sources of income as defined by the Suffolk County Human Rights Law;

    d.   Aiding, abetting, inciting, compelling or coercing the doing of any of the acts forbidden by the federal Fair Housing Act, the New York State Human Rights Law, or the Suffolk County Human Rights Law;

117.   Enjoining Defendants and their agents, employees, and successors, and all other persons in active concert or participation to:

     a.     Make all necessary modifications to their policies, practices and procedures to comply with fair housing laws;

     b.     Train all management, agents and employees on fair housing laws;

     c.     Advertise apartments available for rent in a non-discriminatory manner, including displaying an Equal Housing Opportunity logo (or statement to that effect) on all print and internet advertisements and displaying in all offices and rental buildings appropriate fair housing law posters;

     d.     Allow monitoring of their application and rental process;

     e.     Retain advertising and rental records to allow for appropriate monitoring;

     f.     Develop written procedures on rental process and fair housing policy to be distributed to all employees, agents, tenants and rental applicants; and

     g.     Establish a system for testing agents and employees for unlawful discriminatory practices;

118.     Awarding such damages to Plaintiffs LIHS and SILO as will fully compensate for the diversion of resources and frustration of mission caused by Defendants' unlawful practices;

119.     Awarding compensatory damages, including damages for emotional distress, to Plaintiff Doreen Kernozek;

120.     Awarding punitive damages to Plaintiffs;

121.     Awarding Plaintiffs reasonable attorneys' fees, costs and expenses incurred in prosecuting this action; and

122.     Granting Plaintiffs such other further relief as may be just and proper.

## VIII.  JURY DEMAND

123.     Plaintiffs hereby demand a trial on the merits by jury pursuant to Federal Rule of Civil Procedure 38.

Dated:   June 19, 2018

/s/ EJ Torres

EJ Torres
Long Island Housing Services, Inc.
640 Johnson Avenue
Bohemia, NY 11716
(631) 567-5111


ejtorres@lifairhousing.org


*Attorney for Plaintiffs*

/s/ Joseph M. Sellers

Joseph M. Sellers
Brian Corman
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600

jsellers@cohenmilstein.com
bcorman@cohenmilstein.com

*Attorneys for Plaintiffs*