UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
Long Island Housing Services, Inc.; Suffolk
Independent Living Organization, Inc.; Doreen
Kernozek; Lori Gerardi; and others similarly
situated,

                    Plaintiffs,

      -against-

NPS Holiday Square LLC; Northwood Village,
Inc.; Brightwaters Gardens, Inc.; Lakeside Garden
Apartments LLC; South Shore Gardens, LLC; and
NPS Property Corp.,

                  Defendants.
------------------------------------------------------------X

**MEMORANDUM & ORDER**
18-CV-03583 (DG) (JMW)

DIANE GUJARATI, United States District Judge:

      Plaintiffs Long Island Housing Services, Inc., a fair housing organization; Suffolk

Independent Living Organization, Inc., a disability rights organization; and Doreen Kernozek

and Lori Gerardi, two individuals with disabilities (collectively, "Plaintiffs"), bring this action

against Defendant NPS Property Corp. and five additional defendants (collectively,

"Defendants" or "NPS"), alleging various claims arising from their housing policies and

practices.  *See* Second Amended Complaint ("SAC"), ECF No. 73.  Defendant NPS Property

Corp. – the owner of Defendants NPS Holiday Square LLC, Northwood Village, Inc.,

Brightwaters Gardens, Inc., Lakeside Garden Apartments LLC, and South Shore Gardens, LLC –

owns and/or manages at least nine apartment complexes on Long Island in Suffolk County, New

York.  *See* SAC ¶¶ 1, 26-31, 36.

      Plaintiffs commenced this action on June 20, 2018.  Complaint, ECF No. 1.  Plaintiffs

filed the operative Second Amended Complaint on November 5, 2020, alleging violations of the

Fair Housing Act ("FHA"), 42 U.S.C. § 3604 *et seq.*, the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law § 296(5), and the Suffolk County Human Rights Law ("SCHRL"), Suffolk County Code § 528 *et seq.*  *See* SAC ¶¶ 140-57.  Plaintiffs seek declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees, costs, and expenses.  *See id.* ¶¶ 158-64.  As relevant here, Plaintiffs allege that NPS's rental application policies and practices have had an unlawful disparate impact on applicants with disabilities, in violation of the FHA, NYSHRL, and SCHRL, as well as on applicants using housing subsidies, in violation of the NYSHRL and SCHRL.  *See id.* ¶¶ 125, 140-57.

Now before the Court are three motions pursuant to Federal Rule of Evidence 702 ("Rule 702") and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), seeking to preclude the testimony of various proposed expert witnesses.  *First*, Defendants have moved to preclude the testimony of Plaintiffs' expert, Nancy McArdle, who has been proffered to testify regarding the disparate impact of NPS's rental application policy on users of housing vouchers, including users with disabilities.  *See* Defendants' Motion to Preclude Nancy McArdle ("McArdle Motion"), ECF No. 92; Defendants' Memorandum in Support of the McArdle Motion ("Defs.' McArdle Mem."), ECF No. 92-1; Declaration of Rachel Rodriguez in Support of the McArdle Motion and Accompanying Exhibits, ECF Nos. 92-2 to 92-10; Plaintiffs' Opposition to the McArdle Motion ("Pls.' McArdle Opp'n"), ECF No. 94; Defendants' Reply in Support of the McArdle Motion, ECF No. 100.

*Second*, Plaintiffs seek to preclude the testimony of Defendants' expert, Dr. Michael Salve, who has been proffered to testify – in rebuttal to McArdle's testimony – regarding purported flaws in McArdle's disparate impact analysis.  *See* Plaintiffs' Motion to Exclude Dr. Michael Salve ("Salve Motion"), ECF No. 86; Plaintiffs' Memorandum in Support of the Salve Motion ("Pls.' Salve Mem."), ECF No. 87; Declaration of Brian Corman in Support of the Salve

Motion and Accompanying Exhibits, ECF No. 88; Defendants' Opposition to the Salve Motion ("Defs.' Salve Opp'n"), ECF No. 96; Plaintiffs' Reply in Support of the Salve Motion, ECF No. 98.

*Third*, Plaintiffs have moved to preclude the testimony of Defendants' expert, John Rollins, who has been proffered to testify on the issues of whether NPS's rental application policy serves a legitimate business interest and the adequacy of Plaintiffs' proposed alternative policy. *See* Plaintiffs' Motion to Exclude John Rollins ("Rollins Motion"), ECF No. 89; Plaintiffs' Memorandum in Support of the Rollins Motion ("Pls.' Rollins Mem."), ECF No. 90; Declaration of Brian Corman in Support of the Rollins Motion and Accompanying Exhibits, ECF No. 91; Defendants' Opposition to the Rollins Motion ("Defs.' Rollins Opp'n"), ECF No. 97; Plaintiffs' Reply in Support of the Rollins Motion, ECF No. 99.[1]

Also before the Court is Plaintiffs' unopposed motion for leave to file under seal exhibits in support of their opposition to Defendants' motion to preclude McArdle's testimony, which exhibits contain personally identifying information of applicants to NPS's properties. *See* ECF No. 95.

For the reasons set forth below, (1) Defendants' motion to preclude the testimony of Nancy McArdle is denied, (2) Plaintiffs' motion to preclude the testimony of Michael Salve is granted, (3) Plaintiffs' motion to preclude the testimony of John Rollins is denied, and (4) Plaintiffs' motion to file exhibits under seal is granted.

---

[1] Although the parties indicate that they seek to preclude the reports of their opponents' experts (as well as the testimony), the proponents of the experts appear only to seek admission of testimony.

## BACKGROUND

### I.    NPS's Income-to-Rent Policy

NPS has employed variations of an income-to-rent policy as an applicant screening tool at their apartment complexes.  Under the most recent iteration, NPS utilizes a two-to-one income requirement, which generally requires applicants without housing vouchers to have an income double the monthly rent.  *See* Pls.' Salve Mem. at 4; *see also* Defs.' Salve Opp'n at 3.  For applicants with housing vouchers, NPS allegedly credits the voucher as one month's rent and requires applicants to have an income equal to between 80% and 100% of one month's rent.  *See* Pls.' Salve Mem. at 4 & n.2; *see also* Defs.' Salve Opp'n at 3.  There is allegedly some flexibility to the income requirement based on factors such as vacancy rates, referral by other tenants, high credit scores, and large savings.  *See* Pls.' Salve Mem. at 4 n.2; *see also* Defs.' Salve Opp'n at 3.

### II.    The Proffered Experts

In connection with their disparate impact claims, Plaintiffs seek to introduce McArdle's testimony in order to help establish a *prima facie* case that NPS's income-to-rent requirement has "a significantly adverse or disproportionate impact" on housing voucher users.  *See Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016).  Defendants seek to introduce Salve's testimony in order to undermine Plaintiffs' attempt at establishing a *prima facie* case.  *See id*.  Defendants further seek to introduce Rollins's testimony – in the event that Plaintiffs establish a *prima facie* case of disparate impact – to help demonstrate that NPS's income-to-rent requirement is necessary to achieve one or more substantial, legitimate, nondiscriminatory businesses interests.  *See id.*  In the event that Defendants establish that NPS's

income-to-rent requirement is a business necessity, Defendants seek to introduce Rollins's

testimony to critique the adequacy of Plaintiffs' proposed alternative policy.  *See id.*

## APPLICABLE LAW

### I.      Federal Rule of Evidence 702 and *Daubert*

Federal Rule of Evidence 702 assigns district courts a "gatekeeping role," *Daubert v.*

*Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *see also United States v. Jones*, 965 F.3d

149, 161 (2d Cir. 2020), in which they have "broad discretion" to permit or exclude expert

testimony, *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016).  That gatekeeping role

applies to all expert testimony, not just scientific testimony.  *Kumho Tire Co., Ltd. v. Carmichael*,

526 U.S. 137, 141, 147 (1999).

Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help
>> the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert has reliably applied the principles and methods to the facts of the
>> case.

Fed. R. Evid. 702; *accord Daubert*, 509 U.S. at 588-95.  The United States Court of Appeals for

the Second Circuit has "distilled Rule 702's requirements into three broad criteria: (1)

qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact."  *In re*

*Namenda Indirect Purchaser Antitrust Litig.*, No. 15-CV-06549, 2021 WL 2403727, at *7

(S.D.N.Y. June 11, 2021) (quotation marks omitted); *see also Nimely v. City of New York*, 414

F.3d 381, 396-97 (2d Cir. 2005).  "[T]he proponent of expert testimony has the burden of

establishing by a preponderance of the evidence that the admissibility requirements of Rule 702

are satisfied." *Jones*, 965 F.3d at 161 (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)); *see also Disabled in Action v. City of New York*, 360 F. Supp. 3d 240, 243 (S.D.N.Y. 2019).

As a "threshold question" then, a district court must determine whether the proffered expert witness "qualifie[s] as an expert by knowledge, skill, experience, training, or education." *Nimely*, 414 F.3d at 396 n.11 (quoting Fed. R. Civ. P. 702). "To determine whether a proffered witness is qualified, a court must ascertain whether the proffered expert has the educational background or training in a relevant field by looking at the totality of the witness's background," *SEC v. Revelation Cap. Mgmt., Ltd.*, 215 F. Supp. 3d 267, 273 (S.D.N.Y. 2016) (quotation marks omitted), and then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony," *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). "Courts within the Second Circuit have liberally construed expert qualification requirements when determining if a witness can be considered an expert." *Revelation Cap. Mgmt.*, 215 F. Supp. 3d at 273 (quotation marks omitted) (collecting cases). "[Q]uibbles" with an expert's qualifications "are properly explored on cross-examination" and "go to the weight, not admissibility" of an expert's testimony. *Id*. at 274.

Next, a district court must determine "whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered." *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184-85 (2d Cir. 2001) (quoting *Daubert*, 509 U.S. at 597). "In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos v. Nat'l R.R. Passenger*

6

*Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702).  "Although Rule 702 sets forth specific criteria for the district court's consideration, the *Daubert* inquiry is fluid and will necessarily vary from case to case."  *Id.* at 266.  To that end, the Supreme Court, in *Daubert*, identified a number of factors that a district court may consider in evaluating whether a proffered expert opinion has the required indicia of reliability, such as: "(1) whether a theory or technique 'can be (and has been) tested;' (2) 'whether the theory or technique has been subjected to peer review and publication;' (3) a technique's 'known or potential rate of error,' and 'the existence and maintenance of standards controlling the technique's operation;' and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community."  *Id.* (quoting *Daubert*, 509 U.S. at 593-94); *see also Nimely*, 414 F.3d at 396.  "But the inquiry is a 'flexible one,' and the 'factors [*Daubert*] mentions do *not* constitute a definitive checklist or test.'"  *Restivo v. Hessemann*, 846 F.3d 547, 576 (2d Cir. 2017) (alteration in original) (first quoting *Daubert*, 509 U.S. at 594; then *Kumho Tire*, 526 U.S. at 150).  Rather, a district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Kumho Tire*, 526 U.S. at 152; *see also In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 28 (S.D.N.Y. 2020).

Finally, "[e]ven after determining that a witness is 'qualified as an expert' to testify as to a particular matter, and that the opinion is based upon reliable data and methodology, Rule 702 requires the district court to make a third inquiry: whether the expert's testimony (as to a particular matter) will 'assist the trier of fact.'"  *Nimely*, 414 F.3d at 397 (citation omitted) (quoting Fed. R. Evid. 702).  "[E]xpert testimony must be helpful to the [trier of fact] in comprehending and deciding issues beyond the understanding of a layperson."  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013) (second alteration in original)

(quoting *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005)).  "This condition goes primarily to relevance," *Daubert*, 509 U.S. at 591, as "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful," *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 n.5 (2d Cir. 1997) (alteration in original) (quoting *Daubert*, 509 U.S. at 591).  "Relevance, in turn, is assessed with respect to Rule 401 of the Federal Rules of Evidence: 'whether it ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 469 (S.D.N.Y. 2018) (alteration in original) (quoting *Campbell*, 239 F.3d at 184).  "Although relevant evidence is generally admissible, district courts 'may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" *Tardif v. City of New York*, 991 F.3d 394, 409 (2d Cir. 2021) (alteration in original) (citation omitted) (quoting Fed. R. Evid. 403).  "The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995).

## II. Disparate Impact

The FHA provides that it is unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1).  The NYSHRL and SCHRL prohibit housing discrimination "because of the . . . lawful source of income" of a prospective tenant, in addition to prohibiting housing discrimination because of "disability." *See* N.Y. Exec. Law § 296(5)(a)(1); Suffolk County Code §§ 528-9(A)(1), 528-6.

A plaintiff may demonstrate unlawful housing discrimination under a disparate impact theory. *See Mhany Mgmt.*, 819 F.3d at 616-17 (citing *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015)) (FHA); *Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F. Supp. 3d 145, 178 & n.28 (E.D.N.Y. 2019) (NYSHRL). "A disparate impact analysis examines a facially-neutral policy or practice . . . for its differential impact or effect on a particular group." *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 933 (2d Cir. 1988), *superseded by regulation on other grounds as recognized in Mhany Mgmt.*, 819 F.3d at 617, *aff'd*, 488 U.S. 15 (1988).

Disparate impact claims are analyzed under a burden-shifting framework. *Mhany Mgmt.*, 819 F.3d at 617. First, a plaintiff must establish a *prima facie* case by showing "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Id.* (quoting *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 52-53 (2d Cir. 2002), *superseded by statute on other grounds as recognized in Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 46 (2d Cir. 2015)); *see also Winfield v. City of New York*, No. 15-CV-05236, 2016 WL 6208564, at *5-7 (S.D.N.Y. Oct. 24, 2016). To establish a *prima facie* case involving fair housing discrimination, plaintiffs typically offer statistical evidence to show disparity in outcome between groups. *See Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575-76 (2d Cir. 2003), *superseded by regulation on other grounds as recognized in Mhany Mgmt.*, 819 F.3d at 617.

If a plaintiff presents a *prima facie* case of disparate impact, the burden shifts to the defendant to prove that the "challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" of the defendant. *Mhany Mgmt.*, 819 F.3d at 617

(quoting 24 C.F.R. § 100.500(c)(1)-(2) (2013)); *see also Connecticut Fair Hous. Ctr v.*

*CoreLogic Rental Prop. Sols., LLC*, No. 18-CV-00705, 2021 WL 1186604, at *7 (D. Conn. Mar.

30, 2021).  If the defendant meets its burden, "the burden of proof shifts back to the *plaintiff* to

show that the 'substantial, legitimate, nondiscriminatory interests supporting the challenged

practice could be served by another practice that has a less discriminatory effect.'"  *Mhany*

*Mgmt.*, 819 F.3d at 617 (quoting 24 C.F.R. § 100.500(c)(3) (2013)); *see also Fortune*, 388 F.

Supp. 3d at 173.

## DISCUSSION

**I.    Under Rule 702 and *Daubert*, the Testimony of Nancy McArdle is Admissible and the Testimony of Michael Salve is not Admissible**

Although no party challenges the qualifications of the opposing expert, Plaintiffs and

Defendants fundamentally disagree about the appropriate methodology under which to evaluate a

disparate impact claim.  As a result, each party challenges the opposing expert on the grounds

that the methodology used by the expert is unreliable and irrelevant.

For the reasons that follow, the Court finds that McArdle's expert opinion is relevant and

sufficiently reliable to be admissible as evidence of possible disparate impact on the basis of

source of income and disability.  Conversely, the Court finds that Salve's expert opinion is

unreliable and not relevant to evaluating the possible disparate impact on the basis of source of

income or disability.  To the contrary, Salve's opinion speaks to a disparate *treatment* claim.

Plaintiffs allege that NPS's income-to-rent requirement disparately impacts individuals

with housing vouchers, including individuals with disabilities who use housing vouchers.  As set

forth above, in order to establish a *prima facie* case of disparate impact, a plaintiff must show

that a defendant's facially neutral policy or practice produces "a significantly adverse or

disproportionate impact" on a protected class.  *See Mhany Mgmt.*, 819 F.3d at 617 (quoting *City*

10

*of Middletown*, 294 F.3d at 52-53). "Whether using statistics or some other analytical method, plaintiffs [in disparate impact cases] must . . . utilize the appropriate comparison groups. They must first identify members of a protected group that are affected by the neutral policy and then identify similarly situated persons who are unaffected by the policy." *Tsombanidis*, 352 F.3d at 576-77.

Here, McArdle used, *inter alia*, Census and Public Housing Authority data to compare prospective tenants using housing vouchers (hereinafter, "subsidized renters") – including subsidized renters with disabilities – to the general population of all renters in the relevant geographic area in order to determine the rate of acceptance of each group under NPS's income-to-rent policy. *See* McArdle Report ¶¶ 6, 7(A)-(B), 8(A)-(Q), ECF No. 88-7. McArdle controlled for "certain characteristics which may impact potential renters' likelihood of renting NPS units" – including market area, number of bedrooms needed, and whether renters were elderly and/or disabled – in order to account for age- and/or disability-restricted properties. *See, e.g.*, McArdle Rebuttal Report ¶ 16.[2] McArdle's analysis, which compared "the share of renters with tenant-based housing vouchers in Suffolk and Nassau Counties who could meet NPS's written or stated income-to-rent requirements to the share of all renters who could meet these requirements in the market area of NPS's properties," concluded that NPS's income-to-rent requirement results in "a significant disparity adverse to renters utilizing housing voucher subsidies."[3] McArdle Report ¶ 7(A). McArdle also concluded that, where found, "the significant disparities . . . are more pronounced for households that have one or more persons

---

[2] Defendants do not appear to challenge the reliability of McArdle's data set, nor do they appear to challenge the particular factors for which she controlled.

[3] McArdle's conclusion applied to each iteration of NPS's income-to-rent policy. *See* McArdle Report ¶ 7(A).

with disabilities" because of a "disproportionately large representation of households having one or more persons with disabilities among households with rental subsidies" combined with "the lower incomes of such households relative to those without a person with a disability." *Id.* ¶ 7(B).

McArdle's analysis thus evaluated NPS's income-to-rent requirement (a facially neutral policy) for any disparate impact on housing voucher users (a protected class), including individuals with disabilities (a protected class), as compared to all renters, who generally have a higher income level given that housing voucher holders must have lower incomes (a non-protected characteristic) in order to qualify for vouchers. *See id.* ¶ 11 n.4 (discussing income requirements to qualify for a housing voucher).[4]

Defendants seek to preclude McArdle's testimony based on Salve's opinion that McArdle should have controlled for income level. *See* Salve Report ¶¶ 10-14, ECF No. 88-8. In Defendants' view, in order to correctly measure for the effects of NPS's income-to-rent policy, McArdle should have compared subsidized renters to unsubsidized renters with similar income levels to the subsidized renters, rather than having compared subsidized renters to all renters. *See* Defs.' McArdle Mem. at 1-2.[5] Salve states that, without this type of comparison, "Ms. McArdle is not able to properly assess the *direct impact*, if any, of income-to-rent requirements on renters with housing subsidies." Salve Report ¶ 10; *see also id.* ¶ 15 ("Ms. McArdle's

---

[4] Due to data constraints, McArdle compared *subsidized* renters to *all* renters, rather than a narrower group of *unsubsidized* renters. McArdle Report ¶ 7(A). However, because a group of all renters includes both subsidized (*i.e.*, lower income) and unsubsidized renters (*i.e.*, higher income), McArdle's estimates of disparate impact are likely more conservative than they would have been had she compared subsidized renters to only higher-income, unsubsidized renters.

[5] McArdle submitted a second report in response to Salve's expert report. *See* McArdle Rebuttal Report, ECF No. 88-10.

methodology . . . do[es] not allow Ms. McArdle to identify any impact that is *unique* to renters with housing subsidies.").

But that critique fundamentally misunderstands a disparate *impact* methodology (*i.e.*, analyzing a facially neutral policy with adverse discriminatory effects) and, instead, relates to a disparate *treatment* methodology (*i.e.*, analyzing intentional discrimination). "Unlike a disparate treatment claim, . . . a disparate impact claim does not require the plaintiff to show that the defendant *intended* to discriminate against a particular group." *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 207 (2d Cir. 2020) (citing *Ricci v. DeStefano*, 557 U.S. 557, 577-78 (2009)); *see also* Ramona Paetzold & Jason Bent, *The Statistics of Discrimination: Using Statistical Evidence in Employment Discrimination Cases* § 1:1 (Thomson Reuters ed., 2020) (stating that disparate impact and disparate treatment methodologies "reflect two different conceptions of the behaviors and processes that produce discriminatory results"). And indeed, Salve relies in his report on two sources that appear to address disparate treatment, not disparate impact. *See* Salve Report ¶¶ 23-24; *id.* at 21 (listing "Information Considered"); *see also* McArdle Rebuttal Report ¶¶ 7-8 (noting that both sources "clearly analyze *disparate treatment* discrimination, not *disparate impact* discrimination"); Salve Dep. 82:12-21, 91:21-92:1; 93:8-20, ECF No. 88-9 (Salve indicating uncertainty about whether the two sources relate to disparate impact and, when asked specifically about whether one of the sources "deals with disparate impact or disparate treatment," responding: "I don't know one way or the other, and it is irrelevant for the purposes of my analysis.").

As Plaintiffs correctly argue, a plaintiff alleging disparate *treatment* must ultimately demonstrate that "the disparity in the treatment she faced was caused by the defendant's intentional discrimination directed toward the plaintiff's protected group, and not based on some

other legitimate, nondiscriminatory factor." Pls.' Salve Mem. at 13 (citing *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003)). To do so, plaintiffs often proffer expert testimony that identifies "all of the possible 'legitimate' (*i.e.*, nondiscriminatory) factors that are likely to significantly affect the dependent variable and which could account for disparities in the treatment" of individuals in- and outside of the protected class. *See Ottaviani v. State Univ. of New York at New Paltz*, 875 F.2d 365, 367 (2d Cir. 1989). A disparate treatment analysis must then control for "confounding factors" – that is, factors other than the factor being analyzed (*e.g.*, the protected characteristic) that may be contributing to the observed effect – in order to demonstrate intentional discrimination as to the protected group. *See Gulino v. Bd. of Educ. of the City of N.Y.*, 236 F. Supp. 2d 314, 340 (S.D.N.Y. 2002) ("In order to demonstrate the specific racial motivation in a disparate treatment case . . . plaintiffs must control for multiple variables, to eliminate the likelihood that the employment action was the result of non-discriminatory factors."), *aff'd in part, vacated in part, rev'd in part sub nom. Gulino v. New York State Educ. Dep't*, 460 F.3d 361 (2d Cir. 2006); *see also Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 432 (E.D.N.Y. 2011).

In contrast, the underlying premise of disparate impact theory is that certain neutral characteristics closely correlate with protected class status and, thus, facially neutral policies that employ those neutral characteristics may have a disparate impact on protected groups. Had McArdle controlled for income level here, she would have been controlling for the very factor for which she was measuring,[6] and such an analysis – assuming other relevant variables were

---

[6] McArdle did control for several confounding factors. For example, she controlled for number of bedrooms, market area, and certain age and disability restrictions on some buildings, *see* McArdle Rebuttal Report ¶ 16, and Defendants do not dispute that such controls were proper. Nor do Defendants suggest that McArdle should have addressed any additional factors other than income.

14

controlled for – would ultimately have analyzed whether NPS *intentionally* discriminated against subsidized renters, including those with disabilities. In other words, it would have compared voucher and non-voucher holders who are otherwise identically situated. But a plaintiff bringing a disparate impact claim need not prove intent. *See Tsombanidis*, 352 F.3d at 575 ("A [disparate impact] plaintiff need not show the defendant's action was based on any discriminatory intent.").

Several Supreme Court and Second Circuit cases shed light on the type of analysis that is appropriate in disparate impact cases and demonstrate that McArdle's analysis comports with controlling disparate impact jurisprudence, while Salve's does not.

For example, in *Griggs v. Duke Power Co.* – a seminal disparate impact case – a group of black employees alleged that their employer's high school diploma and standardized test requirements disparately impacted black employees as compared to white employees, in violation of Title VII of the Civil Rights Act of 1964. 401 U.S. 424, 425-26 (1971). There, based on Census data and EEOC data, the Supreme Court recognized that white employees "register[ed] far better" under the high school diploma and standardized test requirements, a fact likely attributable to black individuals having "long received inferior education in segregated schools" in North Carolina. *Id.* at 430. In particular, "while 34% of white males had completed high school, only 12% of [black] males had done so," and "use of a battery of tests . . . resulted in 58% of whites passing the tests, as compared with only 6% of . . . blacks." *Id.* at 430 n.6. Accordingly, because there was no evidence that the diploma or test requirements bore a relationship to successful job performance, the Supreme Court prohibited the high school diploma requirement (a facially neutral policy) and the standardized test requirement (a facially neutral policy) because black employees (a protected class) were less likely to have completed high school or to pass the requisite tests (non-protected characteristics) than white employees.

15

*See id.* at 431-33; *see also Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975) (diploma and test requirements).[7]

Likewise, in *Dothard v. Rawlinson*, a class of women alleged that an Alabama statute that set a 5'2" minimum height and 120-pound minimum weight requirement to qualify for a prison guard position in Alabama's correctional facilities disparately impacted female applicants as compared to male applicants in violation of, *inter alia*, Title VII.  433 U.S. 321, 323-24, 327-30 (1977).  There, the Supreme Court held that the female applicants established a *prima facie* case of discrimination by demonstrating, based on "generalized national statistics," that "approximately 99.76% of the men and 55.87% of the women meet both [of the] physical qualifications."  *Id.* at 329-31 & n.12.  Thus, the Supreme Court recognized that a height and weight requirement (a facially neutral policy) disproportionately impacted female applicants (a protected class) as compared to male applicants because women are, generally, smaller than men (a non-protected characteristic).  *See id.*

And in *Geller v. Markham*, a class of teachers alleged that a Connecticut school board's cost-cutting policy of hiring only teachers with fewer than five years of experience disparately impacted teachers who were over 40 and under 65 years old (hereinafter, "over-40 teachers"), in violation of the Age Discrimination in Employment Act of 1967.  635 F.2d 1027, 1030, 1032-34 (2d Cir. 1980).  There, the Second Circuit concluded that, based on expert statistical testimony, the over-40 teachers had established a *prima facie* case by demonstrating that "92.6% of all teachers over 40 years of age have five or more years of teaching experience" "while only 62% of teachers under 40 have taught more than five years."  *Id.* at 1030, 1032-33.  Accordingly, the

---

[7] "Courts, including the Second Circuit, have consistently relied on Title VII cases in their analysis of housing discrimination under the FHA."  *Lax v. 29 Woodmere Blvd. Owners, Inc.*, 812 F. Supp. 2d 228, 234 n.4 (E.D.N.Y. 2011) (citing *Tsombanidis*, 352 F.3d at 575).

Second Circuit held that the school board's policy of only hiring teachers with fewer than five years of experience (a facially neutral policy) disproportionately impacted teachers over the age of 40 and under 65 (a protected class under the ADEA at the time) as compared to teachers under the age of 40 because over-40 teachers generally have more years of experience (a non-protected characteristic) than under-40 teachers. *See id.*

The difference between disparate impact and disparate treatment explains why the *Griggs* plaintiffs did not control for education level when they were measuring the disparate effects of the defendant's high school diploma and standardized testing requirements on black employees as compared to white employees. Likewise, the *Dothard* plaintiffs did not control for height and weight levels when they were measuring the disparate effects of the defendant's minimum height and weight requirement on female applicants as compared to male applicants. And the *Geller* plaintiffs did not control for age when measuring the disparate effects of the defendant's cost-cutting policy (of only hiring teachers with fewer than five years of experience) on over-40 teachers as compared to under-40 teachers. *See, e.g.*, *Anderson v. Zubieta*, 180 F.3d 329, 342 (D.C. Cir. 1999) ("If we were to require that the very factor that causes disparate impact be included in the comparison for purposes of establishing a prima facie case, we would effectively define disparate impact analysis out of existence."); *see also* Paetzold & Bent, *The Statistics of Discrimination* § 5.3 ("[P]laintiffs bear the burden of isolating the particular factor that causes a disparate impact . . . . The general rule is . . . that plaintiffs must demonstrate that a particular factor causes a disparate impact.").

In *Griggs*, for example, it would have been impossible to demonstrate a disparate impact of the high school diploma requirement by only comparing black and white employees of a similar education level; none of the non-high school educated individuals would have met the

diploma requirement.  Similarly, in *Dothard*, the plaintiffs would have been unable to show the disparate effects of the defendant's height and weight requirement by only comparing female applicants and male applicants of similar height and weight; once again, presumably none of the male candidates who failed to meet the height and weight requirements would have qualified for a position.  And in *Geller*, the disparate impact of the defendant's cost-cutting policy would have been nonexistent if the plaintiffs were forced to compare only over-40 teachers and under-40 teachers with under five years of teaching experience.

\* \* \*

McArdle's methodology, which aligns with controlling disparate impact precedent, "is the product of reliable principles and methods;" McArdle has "has reliably applied the principles and methods to the facts of the case;" and McArdle's testimony will be relevant in that it will assist a trier of fact in determining whether Plaintiffs have demonstrated a *prima facie* case of disparate impact.  *See* Fed. R. Evid. 702.[8]  Moreover, the Court finds based on the record before

---

[8] In connection with Plaintiffs' claim that NPS's income-to-rent requirement disparately impacts *individuals with disabilities* as a protected class in violation of the FHA, NYSHRL, and SCHRL, Plaintiffs seek to proffer the testimony of McArdle regarding whether NPS's policy "create[s] a significant disparity adverse to *individuals with disabilities who use housing subsidies to assist in the payment of rent.*"  McArdle Report ¶ 6 (emphasis added).  As noted above, McArdle concluded that the disparities identified as to all subsidized renters are "more pronounced for [subsidized] households that have one or more persons with disabilities" due to a "disproportionately large representation of households having one or more persons with disabilities among households with rental subsidies" and due to "the lower incomes of such households relative to those [subsidized households] without a person with a disability."  *Id.* ¶ 7(B).  In addition to their larger relevancy argument, discussed above, Defendants challenge the relevancy of this opinion specifically, on the basis that "although Ms. McArdle asserts that '[h]ouseholds with a member with a disability make up a disproportionately high share of subsidized renter households,' she offers no proof that [a] disproportionately high share of disabled-renter households use subsidies."  *See* Defs.' McArdle Mem. at 17.  At this stage, the Court concludes that McArdle's expert opinion regarding whether NPS's policy disparately impacts *subsidized renters with a disability* (*i.e.*, a portion of the protected class) is relevant evidence as to whether NPS's policy disparately impacts *all renters with a disability* (*i.e.*, the full protected class), regardless of whether such evidence is sufficient by itself to prove a *prima*

it that McArdle satisfies the qualification requirement of Rule 702, *see* McArdle Report ¶¶ 1-5, which Defendants do not appear to dispute.[9]

By contrast, although Salve's proposed methodology may be relevant to establishing disparate *treatment*, it does not find support in the relevant academic literature or the Supreme Court and Second Circuit's caselaw regarding disparate *impact* claims. Accordingly, his analysis is not reliable and will not assist a trier of fact – indeed, it could very well confuse or mislead a trier of fact. *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 582 (S.D.N.Y. 2007) (excluding expert testimony due to "severely flawed methodology" that was unreliable and might "mislead the jury").[10]

Accordingly, Plaintiffs' motion to preclude Salve's testimony is granted, and Defendants' motion to preclude McArdle's testimony is denied.

## II.   Under Rule 702 and *Daubert*, the Testimony of John Rollins is Admissible

In the event that Plaintiffs meet their burden of demonstrating a *prima facie* case of disparate impact, Defendants seek to offer the testimony of John Rollins in order to help support

---

*facie* case. For example, it may be the case that at a later stage, Plaintiffs will provide statistical evidence concerning the correlation between subsidized renters with a disability and all renters with a disability.

[9] In addition, contrary to Defendants' argument, *see* Defs.' McArdle Mem. at 18-21, and substantially for the reasons set forth by Plaintiffs, *see* Pls.' McArdle Opp'n at 17-25, McArdle's testimony as proffered will not usurp the role of the jury or of the Court.

[10] Additionally, in arguing that Salve's testimony should be admissible, Defendants appear to rely on a proposed federal regulation to suggest that a *prima facie* case of disparate impact requires a greater causal link between the facially neutral policy and the discriminatory effect on the protected class than is required under *Mhany*. *See, e.g.*, Defs.' Salve Opp'n at 5 (quoting 24 C.F.R. § 100.500(b)(3) (2020)). That regulation, however, was enjoined prior to its implementation. *See Mass. Fair Hous. Ctr. v. HUD*, 496 F. Supp. 3d 600, 603, 612 (D. Mass. 2020), *appeal dismissed*, No. 21-1003 (1st Cir. Feb. 18, 2021); *River Cross Land Co., LLC v. Seminole Cnty.*, No. 18-CV-01646, 2021 WL 2291344, at *23 & n.34 (M.D. Fla. June 4, 2021); Reinstatement of HUD's Discriminatory Effects Standard, 86 Fed. Reg. 33590-01 (June 25, 2021).

their argument that NPS's income-to-rent requirement is necessary to achieve one or more substantial, legitimate, nondiscriminatory businesses interests.  *See Mhany Mgmt.*, 819 F.3d at 617.  In the event that Defendants carry their burden of demonstrating a legitimate, nondiscriminatory business interest, Defendants further seek to offer Rollins's testimony in order to show that Plaintiffs' alternative tenant-screening proposal – *i.e.*, a two-to-one ratio based on the subsidized renter's personal rent obligation, *see* Rollins Report ¶¶ 47-56, ECF No. 91-8 – is an inadequate substitute for NPS's current income-to-rent requirement.  *See Mhany Mgmt.*, 819 F.3d at 617.

Rollins submitted an expert report summarizing his analysis and conclusions.  *See* Rollins Report.  After McArdle submitted a rebuttal report, *see* McArdle Rollins Rebuttal Report, ECF No. 91-14, Rollins submitted a supplemental declaration, *see* Rollins Decl., ECF No. 91-15.  As an initial matter, the parties appear to disagree about the scope of testimony for which Rollins has been proffered.  Plaintiffs appear to argue that Rollins should not be permitted to testify regarding why NPS's income-to-rent requirement *in fact* serves a substantial and legitimate business purpose.  *See, e.g.*, Pls.' Rollins Mem. at 20 ("Rollins's opinion that the minimum income requirement is *necessary* to the NPS business is wholly unsupported . . . .").  However, Defendants seek to offer Rollins's testimony only to "explain the use of [NPS's] 'income-to-rent' ratio policy as a screening mechanism for assessing a prospective tenant's ability to pay rent obligations," and to "compare Plaintiffs' proposed alternative 'income-to-residual rent' ratio calculation to [NPS's] 'income-to-rent' policy."  Rollins Report ¶ 9; *see also* Defs.' Rollins Opp'n at 1-2.  To that end, Rollins's expert opinion is that: (1) "NPS's ability to successfully operate its business depends, in part, on identifying prospective tenants who are able to pay their rent obligations on time each month;" (2) "To screen prospective tenants, NPS uses an 'income-

20

to-rent' ratio requirement that includes an 'income buffer' capped at 1.0x the rent obligation, where the 'income buffer' is the amount of income available to pay for non-rent living expenses;" (3) "Consideration of such an 'income buffer' is consistent with housing affordability standards on 'rent burdens' and industry 'income-to-rent' ratio benchmarks, both of which consider the amount of a tenant's income consumed by rent and/or housing costs, as well as non-rent living expenses;" and (4) "Plaintiffs' alternative 'income-to-residual-rent' ratio calculation does not provide an equivalent screening metric to NPS's 'income-to-rent' requirements because Plaintiffs' calculation effectively eliminates any requirement that a prospective tenant demonstrate an 'income buffer' over and above the rent obligation to pay for other basic and essential non-rent living expenses such as food, transportation, medical care, and clothing." Rollins Report ¶ 14.

Turning to the *Daubert* analysis, as a threshold matter, Plaintiffs argue that Rollins is not qualified to testify in this case.  *See* Pls.' Rollins Mem. at 16.  Plaintiffs contend that Rollins has no meaningful training, education, or experience related to "housing policy or public benefits programs," that he did not educate himself regarding, *inter alia*, industry guidance on "how landlord screening processes should be applied *to people using housing vouchers*," and that his relevant expertise was not applied in this case.  *Id.* at 16-18.  The Court is not persuaded.

With an MBA concentration in Quantitative Finance, Finance, and Economics, multiple certifications in the areas of fraud and forensic investigations, and over 17 years of combined business advisory and financial analysis experience, including after-the-fact risk assessment, *see* Rollins Report ¶¶ 3-5; Rollins I Dep. 19:14-16, ECF No. 91-12, Rollins is qualified through his education, knowledge, and experience to offer his expert opinion regarding the use of financial ratios as a risk management policy, *see* Fed. R. Evid. 702.  Given Rollins's education,

knowledge, and experience, he is qualified to provide a "quantitative description of the calculation and components of (a) the income-to-rent ratio component of NPS's screening policy and (b) Plaintiffs' income-to-residual-rent ratio, and then assess whether or not Plaintiffs' alternative method would provide an equivalent screening metric."  Defs.' Rollins Opp'n at 12. Rollins is qualified to testify regarding business risk polices, even though he is not an expert (and has not been proffered as such) in housing policy or public benefits programs specifically.  *See Tardif v. City of New York*, 344 F. Supp. 3d 579, 598 (S.D.N.Y. 2018) ("If an expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." (quotation marks omitted)); *cf. Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80, 82 (2d Cir. 1997) (finding error where trial court excluded testimony concerning defects in baggage claim design from a witness who lacked specific expertise in airport terminal design or baggage claim systems, but who was an expert on human-machine interaction and noting, "where, as here, well-trained people with somewhat more general qualifications are available, it is error to exclude them").  To the extent that knowledge of such policy and programs bears on Rollins's analysis, those matters can be "properly explored on cross-examination" and "go to the weight, not admissibility" of Rollins's testimony.  *See Revelation Cap. Mgmt.*, 215 F. Supp. 3d at 274.  Rollins is qualified to testify within the scope of his proffered opinion.

Plaintiffs also argue that Rollins's proffered testimony is not relevant to analyzing Plaintiffs' disparate impact claims because Rollins failed to account for the application of NPS's policy *in practice*, including accounting for potential differences in applying such policy to applicants with housing vouchers.  Pls.' Rollins Mem. at 18-22.  But as noted above, Defendants

22

do not proffer Rollins as an expert on the application of NPS's income-to-rent policy, but instead to address "the policy as it functions from a mechanical and from an economic perspective." Rollins I Dep. 178:12-16; *see also* Rollins II Dep. 16:12-17:5, ECF No. 97-2 ("[M]y opinion in this case deals more with economics and financial issues.").  Thus, even if his opinion does not address NPS's application of the income-to-rent policy "in practice," including how it applies to voucher holders, his testimony is relevant to the question of its application "*in theory*."  *See Mhany Mgmt.*, 819 F.3d at 617 (emphasis added) (quoting *Tsombanidis*, 352 F.3d at 575); *see also, e.g.*, Fed. R. Evid. 401(a)-(b) ("Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action.").  As Defendants correctly argue, Rollins's opinion may assist a trier of fact in determining whether NPS's policy qualifies as a business necessity because "[a] juror who has rented housing might know that income-to-rent ratios exist, without fully understanding their purpose or function."  Defs.' Rollins Opp'n at 12.  Thus, Rollins's proffered testimony is relevant.

Finally, Plaintiffs challenge Rollins's expert opinion as unreliable, contending that the methodology undergirding Rollins's "effective rent burden" concept is unsupported and/or contradicted by the literature on the subject.  Pls.' Rollins Mem. at 24.[11]  In particular, Plaintiffs argue that because Rollins counts the value of a housing voucher as both the tenant's income (the numerator) and as part of the rent owed by the tenant (the denominator), even though the

---

[11] Plaintiffs also make various arguments challenging the *application* of an "income buffer" to subsidized renters.  *See* Pls.' Rollins Mem. at 22-24 (arguing, *inter alia*, that Rollins failed to exercise "independent judgment" or provide "empirical evidence" that an income buffer of 80-100% of the rental amount is a "necessity").  Because Rollins has not been proffered as an expert regarding whether the application of NPS's income-to-rent policy is necessary *in practice*, this argument is unavailing.

voucher represents a portion of the rent that the subsidized tenant is not personally responsible for as it is paid directly from a government authority to NPS, the calculation results in an artificially high "effective rent burden" above the industry recommendation of 30%. *See id.* at 11-13. Rollins's methodology, however, appears to be consistent with housing affordability standards cited in his report. *See* Rollins Report ¶¶ 34-42. Rollins cites authorities including HUD, Harvard University, New York University, and various landlord associations in support of his use of an income-to-rent ratio. *See id.* And he cites authority that utilizes gross rent – not "a household's own contribution to rent" – to calculate rent burden. *See* Rollins Rebuttal ¶¶ 57-59 (discussing the Pew Charitable Trust report). Rollins's methodology and proffered opinions do not fall "outside the range where experts might reasonably differ." *Kumho Tire*, 526 U.S. at 153. Plaintiffs' challenge to Rollins's reliability therefore fails. Plaintiff's criticism of Rollins's inclusion of the housing subsidy in his expert opinion regarding an "effective rent burden," rather than inclusion of only the subsidized renter's personal obligation, speaks to the weight, if any, that should be afforded to Rollins's testimony, rather than its admissibility.

Plaintiffs' motion to preclude Rollins's testimony is denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion to preclude Nancy McArdle's testimony (ECF No. 92) is DENIED; Plaintiffs' motion to preclude Michael Salve's testimony (ECF No. 86) is GRANTED; and Plaintiffs' motion to preclude John Rollins's testimony (ECF No. 89) is DENIED.

Further, Plaintiffs' unopposed motion (ECF No. 95) for leave to file under seal exhibits in support of their opposition to Defendants' motion to preclude the testimony of Nancy McArdle is

GRANTED, the Court having found good cause for sealing because the exhibits contain

personally identifying information of non-parties.

     SO ORDERED.

                                              */s/ Diane Gujarati*
                                              DIANE GUJARATI
                                              United States District Judge

Dated:  September 9, 2021
         Brooklyn, New York