UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
LONG ISLAND HOUSING SERVICES, INC.,
SUFFOLK INDEPENDENT LIVING
ORGANIZATION, INC., DOREEN
KERNOZEK, AND LORI GERARDI,

                Plaintiffs,

          -against-

NPS HOLIDAY SQUARE LLC,
NORTHWOOD VILLAGE, INC.,
BRIGHTWATERS GARDENS, INC.,
LAKESIDE GARDEN APARTMENTS LLC,
SOUTH SHORE GARDENS, LLC, AND NPS
PROPERTY CORP,

                Defendants.
------------------------------------------------------------------------X

**FILED**
**CLERK**

January 24, 2023

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**REPORT AND**
**RECOMMENDATION**

18-cv-03583 (DG) (JMW)

**A P P E A R A N C E S:**

Joseph M. Sellers
Brian Corman
Megan Reif
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Ave. NW, 5th Floor
Washington, DC 20005
*Attorneys for Plaintiffs*

Thomas Silverstein
Edward G. Caspar
**Lawyers' Committee for Civil Rights Under Law**
1500 K St. NW, Ste. 900
Washington, DC 20005
*Attorneys for Plaintiffs*

Ilene Jaroslaw
Rachel J. Rodriguez
Jeremy Siegfried
**Phillips Nizer LLP**
485 Lexington Ave, Ste 7th Floor
New York, New York 10017-0084
*Attorneys for Defendants*

Alisha L. McCarthy
**Harris St. Laurent & Wechsler LLP**
40 Wall Street, 53rd Floor
New York, New York 10005
*Attorney for Defendants*

**WICKS,** Magistrate Judge:

Plaintiffs Long Island Housing Services ("LIHS"), Suffolk Independent Living Organization ("SILO"), Doreen Kernozek, and Lori Gerardi bring this putative class action against NPS Holiday Square LLC ("Holiday Square"), Northwood Village, Inc. ("Northwood"), Brightwaters Gardens, Inc. ("Brightwaters"), Lakeside Garden Apartments LLC ("Lakeside"), South Shore Garden Apartments LLC ("South Shore") (collectively, "Defendant Properties"), and NPS Property Corp. ("NPS") (collectively, "Defendants") alleging violations of (1) the Fair Housing Act ("FHA"), 42 U.S.C. § 3604 *et seq*.; (2) New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296(5); and Suffolk County Human Rights Law ("SCHRL"), Suffolk County Code § 528-9 *et seq*. (collectively "Fair Housing Laws "). (*See* DE 73.)

LIHS is a fair housing organization, SILO is a disability rights organization, and Doreen Kernozek and Lori Gerardi are individuals with disabilities that unsuccessfully applied for housing at Defendant Properties using housing vouchers. Plaintiffs allege that Defendants discriminate on the basis of race, disability, and source of income, by limiting the availability of apartments against applicants and, in particular, against those who intend to use rental housing vouchers designed for persons with disabilities. (*See* DE 73.)

Before the Court on referral from the Hon. Diane Gujarati, are Plaintiffs LIHS, SILO, and Gerardi's motion for summary judgment[1] on their disparate treatment and disparate impact claims as to discrimination based on disability and source of income (*see DE* 115), and Defendants' cross-motion for summary judgment to dismiss the following: (i) Plaintiffs' disparate treatment and disparate impact claims premised on NPS's income-to-rent policies; (ii) Plaintiffs' injunctive relief request regarding the policies; (iii) LIHS and SILO's claims of disparate treatment related to the use of the word "quota"; (iv) Plaintiff Kernozek's source of income and disability discrimination claims; and (v) LIHS's race discrimination claim (*see* DE 119 at 2 n.2; DE 116). (*See* Electronic Order dated Aug. 22, 2022.)

For the reasons that follow, the undersigned respectfully recommends that the District Judge deny in part and grant in part the parties' motions consistent with this Report and Recommendation. Each claim is considered in turn, and for ease of reference, a table of contents is provided below.

---

[1] Plaintiff Doreen Kernozek did not move for summary judgment on her disparate treatment claims. (*See* DE 115-37 at 15 n.4.)

**Table of Contents**

I. BACKGROUND ..................................................................................................5
    A. Undisputed Material Facts .........................................................................5
        i.     NPS and Defendant Properties...........................................................6
        ii.    Application Process.............................................................................6
            a.  Written Policy.........................................................................6
            b.  Verbally Communicated Policy..............................................7
            c.  The "80% Rule"......................................................................7
            d.  Policy in Practice...................................................................8
        iii.   Housing Vouchers...............................................................................9
        iv.   Plaintiff Gerardi ...............................................................................12
        v.    Plaintiff Kernozek .............................................................................13
        vi.   NPS Statements.................................................................................13
            a.  LIHS Testing at Northwood, Brightwaters and Lakeside.....16
                i.     April 19 and 20, 2016 Tests.......................................17
                ii.    September 1 and 2, 2016 Tests ..................................17
                iii.   October 5 and 6, 2016 Tests .......................................18
                iv.   October 26 and 27, 2016 Tests ...................................18
        vii.  Expert Testimony...............................................................................20
            a.  Plaintiffs' Expert..................................................................20
            b.  Defendants' Expert................................................................21
    B. Relevant Procedural History ......................................................................22

II. LEGAL STANDARD .......................................................................................23

III. DISCUSSION .................................................................................................24
    A. Plaintiffs' Claims as to the Quota Statements............................................24
        i.    The Statements Themselves...............................................................27
        ii.   Rejection of Applicants.....................................................................32
    B. Plaintiff Doreen Kernozek's Claims ..........................................................39
    C. Plaintiffs' Claims Related to the Policy......................................................43
        i.    Standing ............................................................................................44
        ii.   New York State Human Rights Law ..................................................47
        iii.   Disparate Impact ...............................................................................51
            a.  Prima Facie Case..................................................................53
            b.  Business Necessity Defense and Less Discriminatory Alternative ........61
        iv.   Disparate Treatment..........................................................................73
        v.    Permanent Injunctive Relief ..............................................................78
    D. LIHS' Race Discrimination Claims ............................................................81

IV. CONCLUSION................................................................................................94

# I. BACKGROUND

## A. Undisputed Material Facts[2]

### i. NPS and Defendant Properties

NPS manages nine properties in Suffolk County, New York including the five Defendant Properties. (DE 115-39 at ¶ 1). NPS has been operating under the authority of NPS President Sandra Liu since 2007 and has only three full-time employees. (DE 117-34 at 1, ¶¶ 2-3.) NPS manages the rental application process for all nine properties and has one main office where Liu, Property Manager Linda Penna and Rental Agent Deidre Lekic work. (DE 117-34 at 1, ¶¶ 2-4.) Penna and Liu are responsible for reviewing rental applications. (DE 115-39 at 1, ¶ 5). Penna reviews all rental applications, both from applicants who participate in government rental assistance programs and those who do not. (DE 115-39 at 1, ¶ 6). Penna can go to Liu if she has questions about any particular application, but she has the authority to approve or deny

---

[2] Unless otherwise noted, a standalone citation to a party's Rule 56.1 statement throughout this Report and Recommendation means that the Court has deemed the underlying factual allegation undisputed. Any citation to a Rule 56.1 statement incorporates by reference the documents cited in it. Where relevant, however, the Court may cite directly to an underlying document. The Court has deemed true undisputed facts averred in a party's Rule 56.1 statement to which the opposing party cites no admissible evidence in rebuttal. *See Stewart v. Fashion Inst. of Tech.,* No. 18-cv-12297 (LJL), 2020 WL 6712267, at *8 (S.D.N.Y. Nov. 16, 2020) ("'[P]ursuant to Local Civil Rule 56.1 [the movant's] statements are deemed to be admitted where [the non-moving party] has failed to specifically controvert them with citations to the record.'") (quoting *Knight v. N.Y.C. Hous. Auth.,* No. 03 Civ. 2746(DAB), 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007)); *Lumbermens Mut. Cas. Co. v. Dinow,* No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything."). "Additionally, to the extent [a party's] 56.1 statement 'improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts,' the Court has disregarded [such] statement[s.]" *McFarlane v. Harry's Nurses Registry,* No. 17-CV-06350 (PKC) (PK), 2020 WL 1643781, at *1 n.1 (E.D.N.Y. Apr. 2, 2020) (quoting *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012)).

applications without oversight or approval from Liu.  (DE 115-39 at 1-2, ¶¶ 7-8.)  Calls to NPS or any of the nine properties by prospective applicants are directed to the Main Office.  (DE 115-39 at 1-2, ¶¶ 9, 12.)  Only Penna and Lekic answer these calls and have authority to tell applicants the requirements for renting over the phone.  (DE 115-39 at 1-2, ¶¶ 9, 12.)

### ii.     Application Process

NPS has a standard application process in which each applicant must provide photo identification, a completed application form, and agree to submit to a credit check.  (116-24 at 4, ¶ 11.)  NPS, as part of its application process, evaluates the applicant's proof of income.  (DE 116-24 at 19, ¶ 39.)  The application process itself is the same for all applicants.  (116-24 at 4, ¶ 12.)  In considering whether an applicant is qualified to rent the apartment for which they have applied, NPS takes a look at (i) the applicant's credit history including delinquent accounts, bankruptcies, and collections, and (ii) the amount of the applicant's income.  (DE 116-24 at 4, ¶¶ 13-14.)

NPS uses an income-to-rent ratio as part of their screening process which has changed over the years ("Policy").  That is, the monthly income of the applicant compared to the posted monthly rent of the apartment.  Applicants must provide written proof of income when applying and these documents are stored in physical files at the Main Office.  (DE 116-24 at 21, ¶¶ 55-56.)  When an applicant is rejected, the application typically reflects a written notation in the top right corner stating the reason for the rejection, for example, "insufficient income" or "denied due to credit."  (DE 116-24 at 21, ¶ 57.)  NPS has accepted applicants that have a negative credit report history or did not meet their written or stated income-to-rent ratios.  (DE 116-24 at 4-5, ¶¶ 15, 20.)

### a.   Written Policy

Until late-2019 or early-2020, the written form provided to applicants reflected a 4-1 ratio of monthly income to monthly rent, and stated, "If Applicant's weekly income does not equal the monthly rent for the apartment herein, Landlord reserves the right to reject the applicant." (DE 115-39 at ¶ 40). The written form, amended sometime during 2019 or 2020, reflected a 2-1 ratio, and stated, "ALL APPLICATIONS MUST MEET INCOME REQUIREMENTS." (DE 115-39 at ¶ 42.) Superintendents are allowed to provide applicants with the information stated on the form. (DE 115-39 at ¶ 41.)

### b. Verbally Communicated Policy

To applicants that called NPS to inquire about application requirements, Penna or Lekic would verbally provide that information, which sometimes differed from the written Policy. (DE 115-39 at ¶ 43-44.) Until sometime in late-2018 (post-lawsuit) or in 2019, the Policy communicated by phone was a 2-1 ratio for all applicants. (DE 115-39 at ¶ 44.) Sometime thereafter, the Policy communicated verbally was that for applicant's using housing vouchers ("Voucher Applicants") the voucher would be considered the equivalent of one month's rent so that Voucher Applicants only had to show monthly income equivalent to one month's rent -- a 1-1 ratio -- otherwise as to other applicants, there was still a 2-1 ratio. (DE 115-39 at ¶¶ 45-46.) This Policy was not reflected on the written application and not otherwise communicated to applicants unless an applicant called the Main Office and asked about the Policy. (DE 115-39 at ¶ 46-48.)

### c. The "80% Rule"

Penna or Liu exercise the discretion to reduce the Policy to monthly income around 80% of the monthly rental amount for applicants ("80% Rule"). (DE 115-39 at ¶ 49.) For example, for a Voucher Applicant, seeking an apartment renting for $1,000 per month, instead of having to

show $2,000, the voucher would be treated as the equivalent of one month's rent, and then, instead of having to show a separate monthly income of $1,000, a monthly income of $800 would suffice. The 80% Rule can be applied to applicants with or without vouchers so that they would only need an income of 80% of the second monthly rent. (DE 115-39 at ¶ 49.)

### d. Policy in Practice

NPS does not apply the Policy strictly. Of the 56 unsubsidized applicants Defendants accepted at Defendant Properties from June 2015 to late 2019: (1) 13 had an income equal to or greater than the posted rental amount, (2) 23 provided proof of income reflecting income below 80% of the posted rental amount, (3) 9 provided no proof of income, and (4) 21 provided no proof of income or documents reflecting an income below 60% of the posted rental amount. (DE 115-39 at 21-22, ¶¶ 58-62.) The applicants who were denied for "insufficient income" did not apply at any different time(s) of the year than those applicants who did not meet the Policy but were nonetheless accepted. (DE 115-39 at 22, ¶ 64.)

In September of 2016, two Voucher Applicants applied to different Defendant Properties. (DE 115-39 at 22, ¶¶ 65-66.) The applicant with the lower income (36% of rental amount) was accepted for a complex with more vacancies than the complex for which the other applicant, with the higher income (67% of rent), applied, but the latter applicant was rejected. (DE 115-39 at 22, ¶¶ 65-66.) One accepted applicant represented in his application, which was reviewed and accepted by Liu and Penna, that he had no income but the voucher would cover the entire rent. (DE 115-39 at 22, ¶¶ 68-69.) Liu, when asked about why a Voucher Applicant whose income was 56% of the rental amount ($725 income v. $1300 rent) was accepted, testified that the applicant was accepted because it was less risky renting to them since most of the rental amount was paid by the voucher and so little of the rent was to be paid by them. (DE 115-39 at 22, ¶ 70.)

### iii. Housing Vouchers

There are a variety of programs through which an eligible individual may obtain a housing voucher to assist with covering their rent. The Department of Housing and Urban Development ("HUD") funds the Housing Choice Voucher Program. (DE 115-39 at ¶ 95.) The purpose of this program is to "assist very low-income families, the elderly, and the disabled to afford decent, safe, and sanitary housing in the private market." (DE 115-39 at ¶ 95.) To be eligible for a Housing Choice voucher, the family's income cannot exceed 80% of the median income for the applicable area the family decides to live in. (DE 116-24 at 25, ¶ 108.) Once a participant receives the Housing Choice voucher, they then go find housing in the private market. (DE 115-39 at ¶ 96.)

Housing Choice vouchers are administered at the local level by Public Housing Agencies ("PHAs") that determine the Payment Standard -- the outer bounds of monthly assistance for total rent and utilities ("Gross Rent") for a given unit. (DE 115-39 at ¶¶ 97-99.) A family typically pays up to 30% its adjusted monthly income for rent when the Gross Rent for a unit is lower than the Payment Standard set by the PHA, and up to 40% if it is higher. (DE 115-39 at ¶ 101.) The portion of the rent and utilities that the family is responsible for ("Tenant Share") is determined after considering a variety of factors including income, benefits, and any applicable deductions. (DE 115-39 at ¶ 102-103.) The PHA makes the monthly assistance payments directly to the property owner. (DE 115-39 at ¶¶ 106-107.)

SILO assists individuals with obtaining housing vouchers through certain disability specific housing voucher programs such as the Olmstead Housing Subsidy Program ("OHS"),

the Rapid Housing Transition Program ("RHTP"), and the Traumatic Brain Injury ("TBI") and Nursing Home Transition and Diversion ("NHTD") Medicaid Waiver Programs. (DE 115-39 at ¶¶ 110-36.) OHS aims to assist individuals with disabilities that live in institutional settings so they can live in community-based settings, operates similarly to the Housing Choice Voucher Program and is administered by New York Association on Independent Living ("NYAIL") a state-wide not-for-profit membership association. (DE 115-39 at ¶¶ 110-113, 116.)

SILO helps individuals that might be eligible for OHS with their applications, and once an individual is eligible, works with them to locate and apply for housing, go through leasing process, and to ensure they have the necessary services for independent living. (DE 115-39 at ¶¶ 118-19.) SILO gathers the documentation need for approval, including proof of income and Medicaid, and transfers it to NYAIL, and once approved by NYAIL, SILO offers additional services such as providing the individual with a housing and independent living specialist to assist with the housing search and obtain certain non-housing services and supports needed. (DE 115-39 at ¶¶ 118-19.)

Similarly, SILO assists individuals eligible for the RHTP voucher in obtaining the voucher, finding housing, and obtaining non-housing services and support. (DE 115-39 at ¶ 125.) The RHTP voucher works similarly to the Housing Choice voucher and OHS voucher with regard to calculating adjusted income, gross rent, the Tenant Share, and monthly assistance. (DE 115-39 at ¶ 123.) Through the RHTP program, administered through NYAIL, an individual may receive additional assistance with non-rent expenses such as utility payments, security deposits, moving expenses and other householder establishment purchases. (DE 115-39 at ¶ 124.) Amongst other things, to be eligible for the OHS and RHTP vouchers, an individual must

be enrolled in Medicaid, have a chronic disability, and have a low income.  (DE 115-29 at ¶¶ 115, 122.)

The NHTD and TBI programs are administered by the New York State Department of Health ("DOH") and are available to individuals who, *inter alia*, failed to obtain a Housing Choice voucher, is a Medicaid recipient, and needs nursing home level care.  (DE 115-39 at ¶¶ 127-28, 131.)  These programs operate similarly to the Housing Choice voucher program in that participants pay 30% of their adjusted income, minus deductions, towards rent, with the voucher paying the remainder.  (DE 115-39 at ¶ 129.)  However, instead of paying up to 40% if the Gross Rent for an apartment exceeds the Payment Standard for the apartment, participants do not have to pay more than a 30% Tenant Share and can seek approval for the increased costs from DOH.  (DE 115-39 at ¶ 130.)  Individuals participating in these programs are provided a service coordinator to assist them in locating housing and also to create a Service Plan which includes creating a budget worksheet listing the participant's income sources and monthly expenses, as well as non-housing benefits such as food stamps and utility subsidies, which is then reviewed by SILO.  (DE 115-39 at ¶¶ 133-34.)  Kelly Koerner is a Regional Resource Development Specialist, and Nicole Polidoro is the lead Regional Resource Development Specialist, for the TBI program at SILO.  (DE 115-39 at ¶ 127, 130.)  SILO, and the service coordinator, help participants with their monthly budgets and assist them in obtaining the programs and services necessary to pay for non-housing expenses.  (DE 115-39 at ¶ 135.)

The amount of rent paid by the vouchers is paid by the administering agencies to NPS directly, either by check or direct deposit, and other than the issue with payments to Holiday Square for disability-specific vouchers for a certain time after the acquisition, NPS has generally been able to collect rent from the administering agencies without difficulty.  (DE 116-24 at 22, ¶

71.)  Voucher holders can receive assistance through a variety of programs with certain non-rent expenses depending on their low-income status and whether they have a disability including utility costs, transportation services for medical appointments, free or lost cost transportation services, medical expenses, food, and obtaining free or low-cost household items and commodities.  (DE 119-13 at 2-7, ¶¶ 2-12.)

### iv.    Plaintiff Gerardi

Gerardi applied for an apartment at South Shore twice, first in 2017, and then again in November 2018.  (DE 115-39 at ¶¶ 86, 90.)  South Shore is a building typically for residents that are age 55 and over.  (DE 116-24 at 9, ¶ 34.)  Gerardi has a disability and uses a Mainstream Program housing voucher, which is provided to non-elderly persons with disabilities.  (DE 115-39 at ¶¶ 82-83.)  Gerardi only pays 30% of her income towards rent due to the voucher.  (DE 115-39 at ¶¶ 82-83.)  At the time Gerardi applied, her income, derived from Social Security, Supplemental Security Income and state disability benefits, amounted to approximately $857. (DE 115-39 at ¶¶ 81, 84.)  She also had assistance from Medicare, Medicaid and other programs to help pay for utilities, medical expenses, and her cell phone.  (DE 115-39 at ¶¶ 81, 84.) Gerardi lives with her son who is her live-in aide, is employed full time, and he pays for her cable and internet bill, and any food not covered by food stamps.  (DE 115-39 at ¶ 85.)

Gerardi's 2017 application was rejected because Lekic told her that she could not apply since NPS had reached its "quota" on accepting individuals using such subsidies.  (DE 115-39 at ¶ 87.)  Gerardi's 2017 application reflects a notation of "Section 8 CDC No" in the area where Defendants typically notate the reason for denying an applicant, and there is otherwise no other reason noted for the denial.  (DE 116-24 at 23, ¶ 88.)  Gerardi's application did not contain any information regarding income.  (DE 127-19.)  In November 2018 Gerardi applied for an

apartment that was renting at $1,750 a month and was told by Penna her income was insufficient to rent this apartment since, separate from a voucher, it was not equal to the rental amount. (DE 115-39 at 23, ¶ 91.) When Gerardi asked whether her son who is working and would be living with her would be factored in, Penna told her that her son is under the age of 55 so he cannot be put on the lease, and his income could not be used. (DE 116-24 at 24, ¶ 92; DE 127-20 at 3.)

### v. Plaintiff Kernozek

Doreen Kernozek applied for an apartment at Holiday Square on November 10, 2016, using an NHTD voucher that is only for individuals with disabilities. (DE 115-39 at ¶¶ 75, 76.) Kernozek pays between $165-$172 for out-of-pocket rent and the voucher pays the remainder. (DE 115-39 at ¶¶ 75, 76.) Kernozek visited the NPS Holiday along with her service coordinator from the NHTD program Cheryl Hecht, and Kernozek was using a cane during the visit. (DE 116-24 at 14, ¶ 66.) Kernozek was given a tour of the property by leasing agent Linda Eisenlau, following which Kernozek submitted an apartment application, which indicated she was on a subsidy, and gave a security deposit that was accepted by Eisenlau. (DE 116-24 at 14, ¶¶ 66-67.)

Kernozek's application was subsequently transferred to Penna and denied. (DE 116-24 at 15, ¶ 69.) Kernozek's application has a handwritten notation that it was "[d]enied due to credit." (DE 115-37 at ¶ 78.) Kernozek's credit report reflected that she had four credit accounts, two that had already been in a discharged Chapter 7 bankruptcy, one with $90 in debt collection, and one in good standing with a $68 credit limit. (*See* DE 125-13 at 8.)

### vi. NPS Statements

NPS purchased the Holiday Square property, which is designated for tenants that are aged 55 and older, in March of 2016 from Home Properties, Inc. (DE 116-24 at 7, at ¶ 25.) Eisenlau, who was previously employed by Home Properties but then hired by NPS because of her

familiarity with the subsidy programs used at Holiday Square, was eventually terminated because her expertise proved limited.  (DE 116-24 at 7, at ¶ 26.)  The period immediately following the acquisition was marked by difficulties, particularly for Penna who did most of the work.  (DE 116-24 at 7, at ¶ 26.)  Many Holiday Square voucher tenants used types of vouchers Penna was unfamiliar with, specifically the TBI and NHTD waiver programs, which are not Section 8 vouchers.  (DE 116-24 at 8, ¶ 30.)  Penna was familiar with Section 8 vouchers but struggled to learn how to complete paperwork for non-Section 8 vouchers, which were unfamiliar to her, were administered by different agencies, and required different paperwork.  (DE 116-24 at 8, ¶ 31.)  For several months after the acquisition, until sometime in 2017, the subsidy checks for voucher tenants at Holiday Square were still being endorsed to the prior owner.  (DE 115-39 at ¶ 38.)

In July 2016, when Penna submitted a housing packet, for an applicant seeking to use a voucher, to the subsidy administrator, she was informed that the packet could not be processed because the associated building permit was in the name of the prior owner.  (DE 116-24 at 8, ¶ 28.)  While the permit issue was ongoing, NPS was unable to process applications to Holiday Square from applicants with certain subsidies.  (DE 116-24 at 8, ¶ 29.)  Tenants using Section 8 vouchers applied and were accepted between July 2016 and May 2017, including tenants who disclosed on their applications that they were disabled, except for the period during which Holiday Square awaited a rental permit from the Town of Babylon.  (DE 116-24 at 10, ¶ 39.)  Penna was eventually able to get a building permit in NPS' name in December 2016, and Liu testified that after NPS obtained this rental permit, all issues with the SILO-administered housing vouchers were resolved, and NPS was able to accept applicants on these programs again.  (DE 115-39 at ¶ 38; DE 116-24 at 8, ¶ 29.)  Penna testified that it was "maybe … the beginning of

2017" when she no longer had difficulty with the new voucher programs and voucher checks. (DE 116-24 at 8, ¶ 33.)

A few months after the acquisition of Holiday Square in March 2016, Penna had instructed Lekic to tell prospective applicants using non-Section 8 vouchers that NPS had "met our quota" on those programs and was not accepting any more of these applicants ("Quota Statements"). (DE 116-24 at 8-9, ¶ 32.) Penna had previously used the word "quota" when people under the age of 55 attempted to apply for housing at South Shore, which is a building designated for people aged 55 and older. (DE 116-24 at 9, ¶ 34.) South Shore is permitted to have up to 10% of its occupancy filled by people under the age of 55 and if that threshold was met, Penna would tell younger callers that NPS had met its quota at that building. (DE 116-24 at 9, ¶ 34.) Penna informed Liu that Penna and Lekic would be making the Quota Statements to prospective tenants. (DE 115-39 at ¶ 17.) Penna never instructed Lekic to stop making the Quota Statements and Lekic never inquired if she could start telling prospective applicants that NPS could accept the relevant applications. (DE 115-39 at ¶ 18.) Lekic made the Quota Statements until at least July 2017. (DE 115-39 at ¶ 19.)

Lekic made the Quota Statements on at least three identifiable occasions in response to inquiries for housing made by applicants using disability-based vouchers. In June 2017, Lekic told Gerardi that NPS had reached its "quota" on accepting individuals with such subsidies. (DE 115-39 at ¶ 87.) On May 11, 2017, a tester from LIHS made a recorded phone call to NPS, and stated he was calling on behalf of his mother who would be transitioning out of a nursing home. (DE 115-39 at ¶ 21.) Lekic inquired whether the mother was "on any programs." (DE 115-39 at ¶ 22.) Lekic was told the mother would be using a NHTD voucher, to which Lekic responded that she was "familiar with" that program but also stated that NPS "is not accepting any

programs, because we have met our quota for programs right now, so there is—the list is closed." (DE 115-39 at ¶ 22.)

The following day, another LIHS tester called to inquire about a similar apartment, did not represent he would be using a voucher, and was informed by Lekic that there was an available apartment that he could apply for; he was also offered to schedule an appointment to see the apartment. (DE 115-39 at ¶ 24.) Liu, in response to an administrative complaint filed by LIHS with the New York State Division of Human Rights ("NYSDHR") prior to this action, represented that Lekic denied making such statements, and represented that NPS did not have any quotas. (DE 115-39 at ¶ 23.)

In July 2017, a SILO employee called NPS to ask about the availability of housing for individuals using OHS vouchers and was told that NPS had met its "quota" on accepting such applications. (DE 115-39 at ¶ 26-27.) This exchange was memorialized in an email to LIHS, and Lekic acknowledged that she would have told a SILO employee that NPS had "met [its] quota" if that SILO employee had called during the time period when she had been making the Quota Statements to prospective applicants using housing vouchers. (DE 115-39 at ¶ 28.)

### a. LIHS Testing at Northwood, Brightwaters and Lakeside

In 2016, plaintiff LIHS sent testers to Brightwaters Gardens, Northwood Village, and Lakeside Garden Apartments. (DE 116-24 at 10, ¶ 41.) Most of these testers interacted with Agim Gashi who is a superintendent that lives on site at Northwood. (DE 116-24 at 10, ¶ 42.) Gashi would sometimes experience interruptions in his home and while working on the property. (DE 116-24 at 11, ¶ 44.) Some of the testers also interacted with Shaban Xhema, a superintendent at Lakeside. (DE 117-34 at 25, ¶ 63.) Gashi and Xhema were not usually

together at the same property.  (DE 116-24 at 27-28, ¶ 71.)  Furthermore, superintendents were generally given minimal training.  (DE 117-34 at 41, ¶ 72.)

Superintendents, including Gashi, typically have no reliable way to know whether (i) apartments are available for rent at properties other than their own, or (ii) whether a pending application for an apartment is likely to be accepted or rejected.  (DE 116-24 at 11, ¶ 45.) Superintendents are authorized to share the basic application requirements, to hand out paper applications for available apartments, deliver applications to the NPS office for a decision, give apartment tours, and provide applicants with information about the number of bedrooms or whether the apartment is located upstairs or downstairs.  (DE 117-34 at 19, ¶ 46.)

### i.  April 19 and 20, 2016 Tests

In comparison tests conducted on April 19 and 20, 2016, Tester A (who is Black) and Tester B (who is White) both sought out Northwood's on-site superintendent, Gashi, to ask whether there was a one-bedroom apartment available at Northwood.  (DE 116-24 at 11, ¶ 47.) Gashi told both testers that there was no one-bedroom apartment available and that he could not give out an application.  (DE 116-24 at 11, ¶ 48.)  On April 19, 2016, Gashi spoke with the Black Tester through a Ring intercom, a type of intercom that has video functionality.  (DE 116-24 at 11, ¶ 49.)  Gashi told the Black Tester inquiring about the availability of one-bedroom apartments that none were available and that he could not give out an application.  (DE 119-13 at 16, ¶¶ 38-39)  The following day Gashi told a White Tester also inquiring as to the availability of a one-bedroom apartment, that none were available and that he could not give out an application, but there was a studio apartment in Brightwaters.  (DE 119-13 at 16, ¶ 40.)   Gashi gave the White Tester a tour of that apartment later that day.  (DE 119-13 at 16, ¶ 40.)

### ii.  September 1 and 2, 2016 Tests

During the September 1, 2016 test, a White Tester rang Gashi's Ring intercom and was told that Gashi did not have anything to rent. (DE 119-13 at 16-17, ¶¶ 43-44.) The White Tester asked if there were other locations or if she could speak with Gashi for a moment and Gashi came downstairs to have a face-to-face conversation. (DE 119-13 at 17, ¶ 45-46.) In response to whether he had anything available to rent right now, Gashi asked the White Tester what she was looking for. (DE 119-13 at 18, ¶¶ 47-48.) The White Tester stated she was looking for a one-bedroom apartment to move into by the end of September. (DE 119-13 at 18, ¶¶ 47-48.) Gashi subsequently informed her that a one-bedroom apartment might be available in a couple weeks, and after being asked about two-bedroom apartments, said a two-bedroom might be coming up in a couple of months at Brightwaters. (DE 119-13 at 18-19, ¶ 48.)

The White Tester had previously asked about a tour of the one-bedroom apartment, and before leaving asked if the two-bedroom was "large" (DE 119-13 at 19, ¶ 48.) After Gashi and the White Tester spoke more about the Brightwaters apartment and the White Tester began to leave, Gashi offered to show her a two-bedroom apartment and subsequently gave her a tour. (DE 119-13 at 19, ¶ 48.) When the White Tester called back the same day to ask further questions, Gashi asked her about her age because there were apartments available for tenants 55 and over at Lakeside, and stated that he thought she was only 50 years old in response to her statement that she was 70 years old. (DE 119-13 at 19, ¶ 50.) Gashi then gave the phone to Xhema who provided further information about the Lakeside apartment. (DE 119-13 at 20, ¶ 50.)

The following day, a Black Tester asked Gashi, while he was painting an apartment, both whether anything was available and when something might become available. Gashi told the Black Tester that nothing was available. (DE 119-13 at 20, ¶ 51-54.) The Black Tester did not

attempt to further engage Gashi; there was no conversation regarding Northwood or Brightwaters apartments.  In addition, Gashi did not offer to show any apartments or mention the Lakeside apartment.  (DE 119-13 at 20-21, ¶ 54-55.)  The Black Tester was 44 years old at the time of the interaction and ineligible for tenancy at Lakeside.  (DE 119-13 at 21, ¶ 55.)

### iii.   October 5 and 6, 2016 Tests

During the October 5, 2016 test, the White Tester from the September 1, 2016 test approached Gashi and asked about an apartment she had previously inquired about and was informed that it was rented the prior day.  (DE 119-13 at 21, ¶¶ 56-57.)  The White Tester asked if there was anything else and if any Brightwaters apartments were going to become available, Gashi confirmed that a two-bedroom was coming up at Brightwaters, and he further responded to inquiries about pricing.  (DE 119-13 at 21, ¶ 57.)  Gashi also voluntarily told the White Tester about a two-bedroom that would be available in Northwood in a couple weeks.  (DE 119-13 at 22, ¶ 57.)

The following day, Gashi told a Black Tester there were no apartments available right now, and he volunteered to, and did provide, the phone number to call the Main Office.  (DE 119-13 at 22, ¶ 58.)  When the Black Tester asked whether a two-bedroom or one-bedroom apartment was available, Gashi said there were none and did not mention the Brightwaters or Northwood apartments.  (DE 119-13 at 22, ¶ 59.)

### iv.   October 26 and 27, 2016 Tests

The October 26 and 27, 2016 tests involved interactions with superintendent Xhema at Lakeside.  On October 26, 2016, Xhema gave a White Tester a tour of the available one-bedroom apartment and provided him with an application to apply for it. (DE 119-13 at 25-27, ¶ 66.)  Xhema told the White Tester that for an applicant with excellent credit, the security deposit

was equivalent to one month's rent, but the security deposit was equivalent to two month's rent if the applicant had only good credit. (DE 119-13 at 26, ¶ 67.)   The White Tester asked what was needed to hold an apartment and Xhema said he could put in an application that, if approved, would require a security deposit to hold it.  (DE 119-13 at 25-27, ¶ 67.)

The same day, Xhema also gave a Black Tester a tour of the available one-bedroom apartment and provided her with an application to apply for it.  (DE 119-13 at 26, ¶ 68.)  Xhema told the Black Tester that they needed a two-month security deposit.  (DE 119-13 at 26, ¶ 68.) The Black Tester asked when she could move in, and Xhema said she needed to put in an application and that an application was pending on the apartment.  (DE 119-13 at 26-27, ¶ 68.) Xhema gave the Black Tester instructions on how to apply and made positive comments about her approximate income.  (DE 119-13 at 27, ¶ 68.)  When the Black Tester asked about two-bedroom apartments, Xhema told her they only had one-bedroom apartments.  (DE 119-13 at 27, ¶ 69.)  The following day, a different White Tester called to ask about the availability of a one-bedroom apartment, Xhema told them when they could come to view it, encouraged them to speak in person, and did not mention the pending application or make any statements regarding the security deposit.  (DE 119-13 at 27, ¶ 70.)

**vii.    Expert Testimony[3]**

    **a.  Plaintiffs' Expert**

Plaintiffs' expert, Nancy McArdle, analyzed whether the income-to-rent ratios create an adverse impact on individuals with disabilities that apply to Defendant Properties using housing vouchers.  (DE 115-39 at  ¶ 136.)  McArdle has over 30 years of experience in the analysis of

---

[3] This section provides an overview of the experts and their opinions, which are discussed in more depth *infra* III.C.iii.

housing demography, census data, and racial segregation. (DE 115-39 at ¶ 137.) McArdle's analysis involved a comparison of the share of renters with tenant-based housing vouchers in Suffolk and Nassau Counties that meet Defendants' Policy with those in the general population in the market area of Defendant Properties that could also meet the Policy. (DE 115-39 at ¶ 137.)

For her analysis, McArdle used data from numerous public housing authorities in Suffolk and Nassau Counties in addition to the publicly available demographic data from HUD and the U.S. Census Bureau's American Community Survey. (DE 115-39 at ¶ 138.) McArdle applied this data to each of the apartment types -- one and two bedroom apartments -- at each of Defendant Properties and NPS' remaining complexes. (DE 115-39 at ¶ 140.) McArdle stated that the 2-1 income-to-rent ratio resulted in a significant disparity adverse to applicants using housing vouchers for 21 of the 22 unit types, the 1-1 income-to-rent ratio led to the same result as to 13 of the 22 property types, and since a disproportionately large percentage of voucher households have at minimum, one member that has a disability, combined with the lower incomes of those households compared to those without a member that has a disability, the significant disparities identified resulting from income-to-rent ratios were even more pronounced for households with at least one member with a disability. (DE 115-39 at ¶¶ 140-44.)

### b. Defendants' Expert

Defendants' expert John Rollins was retained to explain the value of Defendants' income-to-rent ratio as a screening mechanism for Defendants to assess prospective tenants' financial ability to meet their rental obligations and to compare Plaintiffs' proposed alternative policy of an income-to-rent ratio that is tied to the portion of the monthly rent the tenant would actually pay to Defendants' current methodology. (DE 116-24 at 28, ¶ 146.) Rollins offers his

opinion that *inter alia,* considering an applicant's income buffer (amount of monthly income above the monthly rental amount), which allows tenants to meet their non-rent expenses, is "consistent with housing affordability standards." (DE 116-24 at 28, ¶ 147.) Rollins also opines that Plaintiffs' proposed alternative is not the equivalent of Defendants' income-to-rent metric. (DE 116-24 at 28, ¶ 147.)

## B. Relevant Procedural History

Plaintiffs brought this action on June 20, 2018 (DE 1) and filed a Second Amended Complaint on November 5, 2022. (DE 73.) Plaintiffs bring this action on behalf of a putative class.[4] Defendants filed their answers on September 6, 2018 (DE 20-24.) The parties engaged in discovery and on September 9, 2021, Judge Gujarati issued a Memorandum & Order which resolved the parties' three motions pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) seeking to exclude various proposed expert witness testimonies. (DE 103.) Plaintiffs' motions seeking to preclude Michael Salve and John Rollins' testimony were granted and denied respectively, and Defendants' motion seeking to preclude Nancy McArdle's testimony was denied. (DE 103 at 24-25.)

Subsequently, the parties filed cross-motions for summary judgment on March 29, 2022 (DE 115, 116).[5] The New York Attorney General filed an opposed motion for leave to file a brief as amicus curiae in support of Plaintiffs' motion for summary judgment.[6] (DE 118, 120.)

---

[4] A class has not been certified to date.

[5] The parties were granted leave on December 6, 2022, to electronically file certain exhibits in support of their motions with appropriate redactions, which were thereafter filed. (*See* DE 124-127.) Plaintiffs also filed a letter referencing supplemental authority in support of their motion, and Defendants filed a response. (DE 122, 126.)

[6] The New York State Attorney General's motion for leave to file an *amicus* brief (DE 118) on behalf of the State of New York is granted as the *amicus* brief and supporting declaration provide a unique perspective helpful to the court in assessing the issues before it. *See Verizon N.Y. Inc. v. Village of*

On August 22, 2022, the Hon. Diane Gujarati referred the instant motions to the undersigned for a Report and Recommendation. (Electronic Order dated Aug. 22, 2022.) For purposes of this Report and Recommendation, each claim is considered in turn, in the case that the District Court does not adopt one or more of the undersigned's recommendations as to a specific claim.

## II.     <u>LEGAL STANDARD</u>

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the movant to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim. *Celotex Corp. v. Catrett¸* 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Once the movant meets its initial burden, the nonmovant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York¸* 316 F.3d 93, 100 (2d Cir. 2002). The Court is to believe the evidence of the nonmovant and draw all justifiable inferences in his favor, *Anderson*, 477 U.S. at 255, but the nonmovant must still do more than merely assert conclusions that are unsupported by arguments or fact. *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996). The role of the court at the summary judgment stage is not to *resolve* disputed issues of fact, but merely undertake an analysis to determine whether triable issue of fact exist. That is, the court's function is "issue finding", not

---

*Westhampton Beach*, No. 11-cv-252, 2014 U.S. Dist. LEXIS 204569, at *3 (E.D.N.Y. Mar. 31, 2014) ("District courts have broad discretion to permit or deny an appearance as amici curiae in a case." (internal quotation marks omitted)).

"issue resolution." *Carolina Cas. Ins. Co. v. Cap. Trucking Inc.*, 523 F. Supp.3d 661, 668 (S.D.N.Y. 2021) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship* 22 F.3d 1219, 1224 (2d. Cir. 1994)).

In considering cross-motions for summary judgment like here, "the Court applies the same summary judgment standard as that used for deciding individual motions for summary judgment." *Quanta Lines Ins. Co. v. Investors Cap. Corp.*, No. 06-cv-4624 (PKL), 2009 WL 4884096, at *7 (S.D.N.Y. Dec. 17, 2009) (citing *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200 (2d Cir. 2008) (explaining that facts must be construed in the light most favorable to the non-moving party for each cross-motion for summary judgment)). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

Against this backdrop, the Court considers the parties' cross-motions for summary judgment.

### III.     DISCUSSION

#### A. Plaintiffs' Claims as to the Quota Statements

Plaintiffs seek summary judgment on their claim that Defendants violated the Fair Housing Laws by (1) rejecting applicants on the basis of source of income and disability; and (2) making statements expressing a limitation on applicants using disability-specific vouchers. (DE 115-37 at 1.) Defendants cross-move for summary judgment on these claims. Under the Fair Housing Laws, it is an unlawful and discriminatory practice to refuse to rent housing to a person because of the "lawful source of income of that individual" or their disability. Suffolk County Code § 528-9(A)(1). Lawful source of income includes "income derived from social security, or

any form of federal, state or local public assistance or housing assistance, including the Housing Choice Voucher Program." Suffolk County Code § 528-6. Moreover, it is an unlawful discriminatory practice to make "any statement . . . or to make any . . . inquiry in connection with the prospective . . . rental . . . which expresses, directly or indirectly, any limitation . . . because of the lawful source of income of such individual or individuals, or any intent to make any such limitation . . . ." Suffolk County Code § 528-9(A)(7).

The New York State Human Rights Law and the federal Fair Housing Act "(FHA")
provide the same protections. They protect against discriminatory rejections. *See* N.Y. Exec.
Law § 296(5)(a)(1); FHA, 42 U.S.C. § 3604(f)(1). And discriminatory statements expressing or
indicating a limitation. *See* N.Y. Exec. Law § 296(5)(a)(3); Fair Housing Act, 42 U.S.C. §
3604(c). Housing discrimination claims under these laws are analyzed under a similar
framework. *See Haber v. ASN 50th St. LLC*, 847 F. Supp. 2d 578, 588 & n.5 (S.D.N. Y. 2012)
("Section 1982, NYSHRL, and NYCHRL housing discrimination claims are analyzed under the
same standard as claims made under the FHA."); *Grant v. Cnty. of Suffolk*, No. 2:15-cv-4781
(DRH) (AYS), 2020 WL 2747984, at *5 (E.D.N.Y. May 27, 2020) (analyzing discrimination
claim under SCHRL § 528-8 under the same framework as NYCHR claim); *Echeverria v.
Krystie Manor, LP*, No. 07-cv-1369 (WDW), 2009 WL 857629, at *8 (E.D.N.Y. Mar. 30, 2009)
("The elements of a claim under the NYHRL are the same as under the Fair Housing Act.").

However, the Fair Housing laws differ as to what constitutes a protected class. First, as
Plaintiffs note, source of income as a protected class has only been covered under the New York
State Human Rights Law as of the April 2019 amendment. And thus, "Plaintiffs bring a claim of
source-of-income discrimination under the New York State Human Rights Law to the extent
Plaintiffs seek injunctive relief." (*See* DE 115 at 35 n.8; DE 73 at ¶ 148 n.8.) Defendants argue

that the most recent acts upon which Plaintiffs' Quota Statement related claims are based occurred in August of 2018, prior to this amendment, and thus, retroactive application of the amendment to Plaintiffs' claims is impermissible. (DE 116-1 at 23 (citing DE 73 at ¶ 105).) Plaintiffs in turn contend they are not seeking impermissible retroactive enforcement, rather, they bring claims under NYSHRL as part of their claim for injunctive relief only to the extent Defendants have continued using their Policy after the passage of the April 2019 amendment and will admittedly continue using this Policy in the future. (DE 117 at 28.)

However as to Plaintiffs' claims that Defendants unlawfully discriminated against prospective applicants on the basis of source of income by stating they were not accepting applicants using housing vouchers and rejecting those applicants, other than generally citing to the NYHRSL in the section of their briefing where they discuss these claims, Plaintiffs make no attempt to explain, nor do they provide admissible evidence of any post-amendment or ongoing violations, or relation to their claim for injunctive relief. In fact, Plaintiffs themselves concede Defendants *stopped* making these Quota Statements sometime after this lawsuit was initially filed. (*Cf.* DE 117-34 at 15, ¶ 36 ("NPS did not stop making this statement about a "quota" and rejecting applicants using certain housing vouchers until after this lawsuit was initially filed with the Department of Housing and Urban Development ("HUD") in August 2017.").)

Accordingly, the undersigned respectfully recommends that the Court deny Plaintiffs' motion for summary judgment, and grant Defendants' cross-motion for summary judgment as to Plaintiffs' NYSHRL claims regarding Defendants' Quota Statements and related rejection of applicants to the extent those claims are based on source of income discrimination.

Second, Defendants correctly point out that source of income is not a protected class enumerated under the FHA, (*see* DE 116-1 at 38 n.27). *See* 42 U.S.C. § 3604; *see also Short v.*

*Manhattan Apartments, Inc.*, 916 F. Supp. 2d 375, 392 (S.D.N.Y. 2012) ("None of these

provisions [42 U.S.C. §§ (d), (f)(1)-(2)] make it unlawful to discriminate on the basis of a

person's lawful source of income."); *Lachira v. Sutton*, No. 3:05-cv-1585 (PCD), 20017 WL

1346913, at *15 n.15 (D. Conn. May 7, 2007) ("The FHA does not include "source of income"

or Section 8 tenants in its list of protected classes.") Accordingly, the undersigned respectfully

recommends that the Court deny Plaintiffs' motion for summary judgment, and grant

Defendants' cross-motion for summary judgment, as to Plaintiffs' FHA claims to the extent

Plaintiffs seek to assert them on the basis of source of income discrimination.

The Court considers in turn Plaintiffs' remaining claims for unlawfully expressing a

limitation and rejecting applicants.

### i. The Statements Themselves

Plaintiff argues that the Quota Statements made by NPS Property Manager Lina Penna

and Rental Agent Deidre Lekic violated the prohibition on discriminatory statements. *See*

Suffolk County Code § 528-9(A)(7); N.Y. Exec. Law § 296(5)(a)(3); Fair Housing Act, 42

U.S.C. § 3604(c). Penna is one of the people responsible for reviewing rental applications. (DE

115-39 at ¶ 5; 116-25 at ¶ 5.) Sometime in 2016, Penna instructed Lekic to tell prospective

applicants using certain vouchers that NPS had "met [its] quota" and was not accepting any more

of these applicants. (DE 115-39 at ¶ 13.) Lekic made the Quota Statements on at least three

identifiable occasions in response to inquiries for housing using by applicants using disability-

based vouchers. (DE 115-39 at ¶¶ 21, 22, 87.) Plaintiffs thus argue that Defendants expressed a

limitation on applicants using vouchers.

First, the parties dispute whether the reasons behind why Penna and Lekic made the

Quota Statements are relevant to liability under these circumstances. Liability for statements

expressing a limitation based on a protected characteristic under the Fair Housing laws is evaluated in a nearly identical manner to liability under the FHA.  *See*, *e.g., Jackson v. Tryon Park Apartments, Inc.*, No. 18-cv-6238 (EAW), 2019 WL 331635, at *5 (W.D.N.Y. Jan. 25, 2019) ("We have consistently held that the standards for recovery under the New York Human Rights Law are in nearly all instances identical to federal law" (internal quotation marks and citations omitted)).  In order to determine liability as to a particular statement, courts look to whether the statement "suggests to an ordinary reader [or listener] that a particular [characteristic] is preferred or dispreferred for the housing in question."  *See Ragin v. N.Y. Times Co.*, 923 F.2d 995, 999 (2d Cir. 1991).

Plaintiffs state that an inquiry into intent is irrelevant here, since Defendants concede they made statements that "objectively express a limitation on providing housing to applicants using [] vouchers."  (DE 115-37 at 29.)  Defendants instead maintain that intent of the speaker is important, "because it helps determine the manner in which a statement was made and the way an ordinary listener would have interpreted it."  *Soules v. U.S. Dep't of Housing*, 967 F.2d 817, 825 (2d Cir. 1992).  Defendants offer a variety of benign reasons why Penna and Lekic made the statements (*see* DE 116-1 at 38-39).  Defendants argue that the use of the word "quota" would not indicate an impermissible preference of any kind because Penna and Lekic, who are the ideal measure of an ordinary listener since neither are lawyers or employees of housing advocacy groups, did not think as much.  (DE 116-1 at 39.)

The Court in *Ragin* stated that intent "may be relevant to a factual determination of the message conveyed, but the touchstone is nevertheless the message," and the statute outlaws all ads indicating an impermissible preference to an ordinary reader "whatever the advertiser's intent."  *Ragin*, 923 F.2d at 999.  The cases Defendants rely on show that intent may be relevant

where an otherwise facially neutral inquiry or statement is made. *See Soules*, 967 F.2d at 824–26 (involving a facially neutral inquiry into whether, and how many, children a prospective tenant has); *Mancuso v. Douglas Elliman LLC*, 808 F. Supp. 2d 606, 625 (S.D.N.Y. 2011) (involving a facially neutral statement regarding pets in general, which did not reference service dogs).

However, for example, "in cases where ads are clearly discriminatory, a court may look at an ad and determine whether it indicates an impermissible preference to an ordinary reader, and inquiry into the author's professed intent is largely unnecessary." *See Soules*, 967 F.2d at 824. "Openly discriminatory oral statements merit similarly straightforward treatment." *Thurmond v. Bowman*, 211 F. Supp. 3d 554, 566 (W.D.N.Y. 2016). In *Thurmond*, the Court found that there was "no issue of fact" that the defendant told plaintiff that they would "not be able to rent to [her] because of [her] two small children[.]" *Id*. The benign reasons proffered were irrelevant because the "motivation is irrelevant" since the "statements, in and of themselves, are enough to trigger liability" given that "intent of the speaker is not determinative of liability." *Id*.; *see also Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 53 (2d Cir. 2015) ("[S]ubsection 3604(c) prohibits all ads that indicate a disallowed . . . preference to an ordinary reader whatever the advertiser's intent.").

Here, Lekic made statements on three occasions in response to inquiries for housing using disability-based vouchers: (1) NPS "is not accepting any programs, because we have met our quota for programs right now, so there is—the list is closed."; (2) NPS had met its "quota" on accepting such applications; and (3) NPS had reached its "quota" on accepting individuals with such subsidies. (DE 115-9 at ¶¶ 22, 27, 87.) As far as source of income is concerned, these are not facially neutral statements or inquiries. An ordinary listener could discern that Defendants' statements expressed a limitation on renting to persons using housing vouchers,

which is an impermissible limitation on source of income. Thus, the undersigned respectfully recommends judgment on Plaintiffs' claims under Suffolk County Code § 528-9(A)(7) for statements expressing a limitation based on source of income in connection with rental inquiries.

Next, whether these statements express a limitation or preference based on disability presents a different question. In this regard, the Court's analysis in *Short* is particularly helpful. There, defendant made statements that indicated that particular rentals were not available to people on either "HASA" or other government assistance programs. *Short*, 916 F. Supp. 2d at 394. For example, one of those statements was "some apartments are for working people . . . and some are for program people[.]" *Id*. These statements directly relate to source of income. *See id*. However, the court found that although a person had to be disabled and living with Acquired Immunodeficiency Syndrome ("AIDS") in order to qualify under HASA, these statements would not be construed by an ordinary listener "to mean that the property is generally unavailable to persons with AIDS or other disabilities." *Id*. And the fact that the challenged statements also involved the use of different words and, as is the case here, sometimes simply used the term "program, which could refer to any number of government subsidies available to nondisabled persons, further undermine[d] Plaintiffs' claim." *Id.* at 395. The circumstances here are not analogous of course. For instance: there are no references to "working people" that in context fully undermine Plaintiffs' claim that the quota statements expressed a limitation based on disability.

Since the Quota Statements are not facially discriminatory as far as disabilities are concerned, an inquiry into intent becomes relevant. *See Mancuso*, 808 F. Supp. at 626 (noting that since the comments were not facially discriminatory the "Court must then inquire into whether [defendant's] intent was to make a discriminatory statement."). The types of vouchers

Penna gave this instruction for were disability-based housing vouchers, but the parties dispute whether Penna or Lekic were actually aware of the nature of these programs when they made these Quota Statements.

Defendants state that: (1) Penna and Lekic were not familiar with the non-Section 8 programs and did not know they were intended for use by people with disabilities; (2) Penna used the "quota," which she was accustomed to using to refer to the limit on applicants under the age of 55 at another complex; (3) Penna thought using "quota" would sound more professional than if she admitted her unfamiliarity; (4) Penna used the statements to buy time to catchup since she was overwhelmed with her new management responsibilities at the Holiday Square; (5) Penna and Lekic did not have the authority to institute a quota; and (5) there was a 5-month period where NPS was waiting for a new building permit in order to lawfully process any new subsidy programs for the Holiday Square complex.  (DE 116 at 37-38.)

Plaintiffs state the non-Section 8 programs Penna claims she was unfamiliar with were disability-based voucher programs.  (DE 117-34 at 42, ¶ 76.)  Moreover, the clear descriptions of the programs were in their titles, Lekic in fact stated she was familiar with a program one of the LIHS testers called about, the "Nursing Home Transition Medicaid Waiver," (DE 115-39 at ¶ 22), and NPS had interacted with SILO on multiple occasions prior to these statements being made (DE 116 at 8 n.8), and thus, it is "unbelievable" that Penna and Lekic did not know these voucher programs were for those with disabilities.  (DE 117 at 7 n.2.)

 Further, the record reflects that Liu testified that: Holiday Square's permit issue was resolved as of December 2016 (DE 115-39 at ¶ 37-38); Penna testified that maybe by the beginning of 2017 she no longer had difficulty with the voucher programs (DE 115-39 at ¶ 33); Lekic testified it is possible she continued to make Quota Statements for a few months after May

of 2017 (DE 116-24 at 17, ¶ 16); and Lekic made a Quota Statement to Gerardi in June 2017 when Gerardi submitted an application intending to use a voucher.  (DE 116-24 at 23, ¶ 86-88.)

Indeed, Plaintiffs recognize that Defendants' contention that Penna and Lekic did not know the voucher programs were for those with disabilities "may create a dispute of fact as to Plaintiffs' claims based on disability discrimination."  (DE 117 at 7 n.2.)  A reasonable juror could believe Penna and Lekic were genuinely unaware that the programs they were unfamiliar were disability-based voucher programs, or that given the circumstantial evidence and inconsistencies related to Defendants' proffered excuses, they were in fact aware and had a discriminatory intent, or even that the intent was only as to source of income.  A triable issue of fact remains as to whether Defendants had discriminatory intent with respect to applicants with disabilities.  Plaintiffs' claim that Defendants made unlawful discriminatory statements in violation of the Fair Housing Laws, to the extent that claim is based on disability, is thus inappropriate for resolution at the summary judgment stage.

Therefore, the undersigned respectfully recommends the Court deny the parties' cross-motions for summary judgment as to Plaintiffs' claims under 42 U.S.C. 3604(c), N.Y. Exec. Law § 296(5)(a)(3), and Suffolk County Code § 528-9(A)(7) to the extent they are premised on disability discrimination.

### ii.        Rejection of Applicants

Plaintiffs, except Kernozek, seek summary judgment on their claim that Defendants violated the Fair Housing Laws by *rejecting* applicants on the basis of source of income and disability.  *See* Suffolk County Code § 528-9(A)(1); N.Y. Exec. Law § 296(5)(a)(1); Fair Housing Act, 42 U.S.C. § 3604(f)(1).  To establish their disparate treatment plaintiffs must show through a "preponderance of evidence" that Defendants treated them differently based on their

membership in a protected class. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013). Plaintiffs can prove their disparate treatment claim in two ways: "(1) direct evidence of discriminatory intent or (2) indirect evidence creating an inference of discriminatory intent under the *McDonnell Douglas* burden-shifting framework." *United States v. Hylton*, 944 F. Supp. 2d 176, 187 (D. Conn. 2013), *aff'd*, 590 F. App'x 13 (2d Cir. 2014) (summary order) (citations omitted) (emphasis added); *see also Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003) (analyzing housing discrimination claims under the *McDonnell Douglas* framework).

 Plaintiffs offer multiple independent reasons for Defendants' alleged liability for disparate treatment, and each are addressed below.

Plaintiffs argue they have direct "smoking gun" evidence of Defendant denying housing because based on a protected characteristic, and thus, the usual *McDonnell Douglas* burden-shifting framework applied for indirect evidence, is unnecessary. (DE 115-39 at 26.) Namely, that Defendants rejected applicants because of their reliance on housing vouchers when they made the Quota Statements. (DE 115-39 at 27.) Defendants counter that Plaintiffs merely seek to subvert this analysis in an attempt to argue for a strict liability interpretation of the Fair Housing Laws that would hold Defendants liable for simply uttering *per se* discriminatory words or phrases without considering intent, which is a required element for a disparate treatment claim. (DE 116-1 at 43.) Defendants state that Plaintiffs cannot "point to any discriminatory business practice or policy promulgated by NPS (because no such policy or practice exists)." (DE 116-1 at 43-44.)

The *McDonnell Douglas* burden-shifting framework requires that a "plaintiff must first make out a prima facie case and the burden then shifts to the defendant to come forward with a

legitimate business justification for the challenged practice." *Short v. Manhattan Apartments, Inc.*, 916 F. Supp. 2d 375, 396 (S.D.N.Y. 2012) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)). However, that test is intended to make sure that a plaintiff "has his day in court despite the unavailability of direct evidence." *Id.* (internal quotations and citations omitted). This "test is inapplicable where the plaintiff presents direct evidence of discrimination." *Id.* However, in order to forgo the analysis, "the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." *Id.* (quoting *Raskin v. Wyatt Co.*, 125 F. 3d 55, 61 (2d Cir. 1997)).

Plaintiffs rely on *Short* where the Court did not analyze the plaintiff's source of income discrimination claims under the *McDonnell Douglas* framework because there was "direct evidence that the availability of most, if not all, of the rental units advertised by MA is dependent upon a prospective tenant's source of income." *Short*, 916 F. Supp. 2d at 396. The decision in *Short* occurred after a trial but the undisputed facts there and here have useful similarities. There, plaintiff mentioned he was on "HASA" and was told that the landlords that listed properties with defendant simply did not accept rental-assistance program. *Id.* This was undisputed and corroborated by testing showing that defendant's agent offered to help testers that were employed, not disabled, and did not need subsidies to rent. *Id.* The testers that stated a family member was receiving a subsidy were told the same thing plaintiff was: that defendant did not work with landlords accepting HASA. *Id.* Defendant also told plaintiff that "the listings were only for working people and were not available to 'people on programs,'" and this was corroborated by testing and audio recordings. *Id.* Ultimately, the court found that the audio recordings of defendant's agents "'stating that certain apartments were not for "programs,"

"people on programs," or for HASA clients,'" were in fact "smoking gun" evidence of source of income discrimination. *Id.* at 397.

Here, the facts are undisputed that Defendants rejected applicants seeking to apply for housing, and in doing so, stated that they had met their "quota" as to those programs. (DE 115-39 at ¶ 13.) Penna instructed Rental Agent Deidre Lekic, to tell applicants they had met their "quota" and were not accepting housing vouchers at that time. (DE 116-24 at 16, ¶ 13, 19.) These statements were made from sometime in 2016 to at least July 2017. (DE 116-24 at 16, ¶ 13, 19.) "There is nothing equivocal or ambiguous about these statements," which are also corroborated by testing and/or audio recordings. *See Short*, 916 F. Supp. 2d at 397 (noting that defendant's agents "were admitting, on tape, that these properties discriminated based on source of income" where defendant's agents said "certain apartments were not for 'programs,' [or] 'people on programs.'"); *see also Thurmond v. Bowman*, 211 F. Supp. 3d 554, 564 (W.D.N.Y. 2016) (granting summary judgment on plaintiff's familial status discrimination claim where plaintiff's evidence showed defendant admitted that "he told plaintiff he would 'not be able to rent to [her] because of [her] two small children. There is a disabled person living in the unit below and children that age will drive them nuts.'"). There is no genuine dispute of material fact supporting Plaintiffs' disparate treatment claim based on direct evidence of Defendants rejecting applicants that intended to use certain vouchers.

Defendants attempt to distinguish *Short* on nothing short of three grounds. First, Defendants argue that "[n]othing in *Short* supports the notion that a Court can impose strict liability based on the use of a specific word or words." (DE 116-1 at 43.) Defendants argue that Lekic's "use of the word 'quota' was not discriminatory because it was merely an error in judgment by Penna who did not understand the potential legal implications of the word." (DE

116 at 43-44.) Plaintiffs do not seek to impose strict liability on the use of a particular word. Defendants focus on the use of a particular word, or the actual existence of a quota system. However, Plaintiffs need only show that applicants were in fact rejected because of their reliance on disability-specific housing vouchers. (DE 115-37 at 27.)

Second, Defendants state that "[t]he decision in *Short* was issued after the Court had considered evidence presented on all elements of the *McDonnell-Douglass* analysis." (DE 116-1 at 43(citing *Short*, 916 F. Supp. 2d at 396–98).) A review of the decision shows that, as relevant here, the Court in *Short*, with respect to the plaintiff's source of discrimination claim, stated that plaintiff had met their burden to produce smoking gun evidence to avoid the *McDonnell Douglas* analysis, and proceeded to analyze the claim accordingly as noted above. *See Short*, 916 F. Supp. 2d at 396-98.

Third, Defendants argue that in *Short*, "although the plaintiff established that defendants had repeatedly and unequivocally stated that defendants (as real estate brokers) were not working 'with any landlords that accepted' certain housing subsidies and that apartments were for 'working people,' the court did not find that the statements constituted disability discrimination." (DE 116 at 43.) This is true. Similarly, here though, a reasonable jury could very well find that the statements constitute disability discrimination as discussed *supra* § III.A.i, the statements are not clearly direct evidence of disability discrimination, and thus, this claim is inappropriate for resolution at summary judgment. *See Short*, 916 F. Supp. 2d at 397 ("The Court agrees that Abba's statements regarding HASA and other government rental subsidies do not constitute direct evidence of disability discrimination.").

Further, Defendants argue that intentional discrimination is required for a disparate treatment claim so even if Plaintiffs could forgo the *McDonnell Douglas* framework, Defendant

still has the opportunity to present evidence that rejection was not motivated by or would have been the same irrespective of any discriminatory animus. (DE 119 at 19.) "Once a plaintiff produces direct evidence of discrimination, the burden of proof shifts to the defendants to show that they would have made the same decision regardless of discriminatory animus." *Thurmond v. Bowman*, 211 F. Supp. 3d 554, 564 (W.D.N.Y. 2016). Plaintiffs argue they could succeed even under the *McDonnell Douglas* framework, and Defendants contend they cannot. The parties' arguments on that point are also based on whether Defendants can establish a legitimate, nondiscriminatory reason for rejecting the applicants (*see* DE 117 at 10; DE 119 at 21.)

Defendants state Plaintiffs cannot prove the requisite discriminatory intent because "Lekic and Penna gave consistent, coherent, and unrebutted accounts of why Lekic told several callers that NPS had met its 'quota' on certain non-Section 8 subsidies even though there was never any such quota." (DE 119 at 18.) It is because "Penna was overwhelmed with all the challenges and new work that arose when Holiday Square transferred ownership." (*Id.*) Thus, "she simply did not recognize or know how to process the non-Section 8 subsidies; and she thought she could use the word 'quota' because she was accustomed to using that word in fielding inquiries from applicants younger than 55 who applied to the Senior Buildings under NPS management." (*Id.*) In essence, Defendants maintain that the reason Lekic made those statements was that she was instructed to do so by Penna since Penna simply was not "aware of the non-Section 8 subsidy programs and had difficulty finding out how to get those subsidies processed." (DE 119 at 22.) However, as Plaintiffs state, these concerns are inadequate to excuse discrimination here where there is direct evidence of discrimination. *See Thurmond*, 211 F. Supp. 3d at 564 (finding defendants' proffer that safety concerns motivated their refusal to rent did "not excuse the discrimination"); *see also Short*, 916 F. Supp. 2d at 398 (noting that

administrative burdens or bureaucratic delay are insufficient and finding that defendants did not make those excuses to the plaintiff or testers when making their statements).

Defendants offer a different, allegedly legitimate, nondiscriminatory reason specific to why they rejected Gerardi's 2017 application. Defendants state that they do not move for summary judgment on Gerardi's claims because although they contend Gerardi's 2017 application was "was denied for legitimate reasons," they "acknowledge that this claim involves an issue of material fact that must be determined at trial." (DE 116-1 at 41 n.29.) More specifically, Defendants state that "Gerardi's application appears to be incomplete, because it contains no income information whatsoever," and that "there is no indication in Gerardi's application that she intended to use a disability-related subsidy." (DE 116-1 at 41 n.29; DE 127-19.) Moreover, "Gerardi was under the age of 55 when she applied to South Shore . . . which is generally reserved for people ages 55 and over. (DE 116-1 at 41 n.29.) Accordingly, Defendants contend that Gerardi's 2017 application was denied for legitimate reasons." (DE 116-1 at 41 n.29.)

Plaintiffs seek summary judgment and respond that although Defendants assert Gerardi's application was denied because she was under the age of 55, Liu testified that this age restriction did not apply to applicants that had disabilities. (DE 117 at 7 n.1.) Liu testified that exceptions are made for those under the age of 55 with disabilities applying to live at a property for seniors that are 55 and older. (DE 117 at 42, ¶ 77.) Defendants in their reply do not offer any evidence to the contrary. Gerardi's 2017 application was rejected because Lekic told her that she could not apply since NPS had reached its "quota" on accepting individuals using such subsidies. (DE 115-39 at ¶ 87.) Gerardi's 2017 application reflects a notation of "Section 8 CDC <u>No</u>" in the area where Defendants

typically notate the reason for denying an applicant, and there is otherwise no further reason noted for the denial. (DE 116-24 at 23, ¶ 88; DE 127-19.) It is unclear whether Defendants were aware that Gerardi had a disability at the time she applied. Triable issues of fact thus remain as to whether Defendants' proffered reasons were pretextual.

Accordingly, the undersigned respectfully recommends granting summary judgment as to Plaintiffs LIHS and SILO's claims to the extent they are premised on source of income discrimination under Suffolk County Code § 528-9(A)(1) and denying Defendants' cross-motion as to the same. The undersigned further respectfully recommends denying Plaintiffs' motion for summary judgment on Plaintiff Gerardi's claim related to Defendant's rejection of her 2017 application.

## B. Plaintiff Doreen Kernozek's Claims

Defendants move for summary judgment to dismiss Plaintiff Doreen Kernozek's disparate treatment discrimination claims based on source of income and disability because they contend that there was a legitimate, non-discriminatory reason for the denial, and thus, Defendants have allegedly met their burden under *McDonnell Douglas*. (DE 116 at 45.) Plaintiff argues that summary judgment is inappropriate because there is a dispute of fact as to the basis upon which Kernozek's application was rejected. (DE 115-37 at 15 n.4.)

The *McDonnell Douglas* burden-shifting framework requires that a "plaintiff must first make out a prima facie case and the burden then shifts to the defendant to come forward with a legitimate business justification for the challenged practice." *Short v. Manhattan Apartments, Inc.*, 916 F. Supp. 2d 375, 396 (S.D.N.Y. 2012) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973*)); see also Babul v. Demty Assocs. Ltd. P'ship*, No. 17-CV-5993 (BMC), 2019 WL 79423, at *2 (E.D.N.Y. Jan. 2, 2019) (noting that the framework "applies to claims of

housing discrimination under the FHA, NYHRL, and NYCHRL").  To make out a prima facie

case Kernozek must show (1) she is a member of protected class, (2) was qualified for the

opportunity she sought, (3) was rejected, and (4) that rejection occurred under circumstances that

give rise to an inference of discrimination on the basis of her protected characteristic.  *See, e.g.*

*id*. (noting that a housing discrimination claim on the basis of disability requires showing four

things: "'(1) that a person residing in or intending to reside in the dwelling after its sale or rental

to the plaintiff had a handicap as defined in the FHA, (2) that the plaintiff sought and was

qualified to purchase or rent the housing, (3) that he was rejected, and (4) that the rejection

occurred in circumstances giving rise to an inference of discrimination on the basis of the

handicap of the person residing or intending to reside with the plaintiff.'" (quoting *Olsen v. Stark*

*Homes, Inc.*, 759 F.3d 140, 152 (2d Cir. 2014)).

Doreen Kernozek applied for an apartment at Holiday Square on November 10, 2016,

using an NHTD voucher that is only for individuals with disabilities.  (DE 115-39 at ¶¶ 75, 76.)

Kernozek pays between $165-$172 for out-of-pocket rent and the voucher pays the remainder.

(DE 115-39 at  ¶¶ 75, 76.)  Kernozek visited the NPS Holiday along with her service coordinator

from the NHTD program Cheryl Hecht, and Kernozek was using a cane during the visit.  (DE

116-24 at 14, ¶ 66.)  Kernozek was given a tour of the property by leasing agent Linda Eisenlau,

submitted an apartment application that indicated she was on a subsidy, and gave a security

deposit that was accepted by Eisenlau.  (DE 116-24 at 14, ¶¶ 66-67.)  Kernozek's application

was subsequently transferred to Penna and denied.  (DE 116-24 at 15, ¶ 69.)  Kernozek's

application had a handwritten notation that it was "[d]enied due to credit."  (DE 115-37 at ¶ 78.)

Kernozek's credit report reflected that she had four credit accounts, two that had already been in

a discharged Chapter 7 bankruptcy, one with $90 in debt collection, and one in good standing with a $68 credit limit. (*See* DE 125-13 at 8.)

Defendants argue that Kernozek cannot establish two parts of her *prima facie* case. (DE 116-1 at 45.) First, that she was qualified to rent the apartment she applied for, and second, that her application was rejected under circumstances giving rise to an inference of discrimination based on her status as a disabled person. (DE 116-1 at 45). Kernozek asserts that the following undisputed facts establish that Defendants unlawfully rejected Kernozek's application because she used a housing voucher: (1) Kernozek applied using an NHTD voucher, and this fact was communicated to Defendants at the time Kernozek applied; (2) Defendants were rejecting all applicants who used an NHTD voucher at that time; (3) Kernozek's bankruptcy had already been discharged and this was public information; and (4) Per Defendants' company policy they would not reject an applicant based on a discharged bankruptcy. (DE 117 at 45.)

The first and third elements of the *prima facie* case are not in dispute: Kernozek applied for housing using a voucher for persons with disabilities and was rejected. (DE 115-39 at ¶¶ 75, 76.) As to whether Kernozek was qualified to rent, this overlaps with Defendants' proffered legitimate nondiscriminatory reason for rejecting her discussed below -- insufficient credit. Kernozek's application has only a notation that it was "[d]enied due to credit." (DE 115-37 at ¶ 78.) Eisenlau also accepted Kernozek's deposit. (DE 116-24 at 14, ¶¶ 66-67.) This sufficiently raises an inference that Kernozek -- putting aside the insufficient credit -- was otherwise qualified.

However, genuine issues of material fact remain as to the points on which the parties take aim, namely whether Defendants' rejection of Kernozek was pretextual. Defendants contend that the unrebutted evidence shows that Kernozek's application was denied for issues with her

credit history.  Kernozek states that the "only way this argument can be sustained at summary judgment is by ignoring key facts, as Defendants have done.  *See supra* at 3-5 [citing statement of facts]."  (DE 117 at 45.)  Kernozek states it was Defendants' policy that a discharged bankruptcy was not grounds to deny an application thus that reason is pretext, however, Defendants note that Penna simply testified that "Bankruptcy, if it's been discharged, doesn't factor too much into the decision, no, because it's been discharged already." (*See* DE 119-13 at 13, ¶ 30; Penna Tr. 122:16-20).

Plaintiffs offer evidence that 19 of 56 (34%) applicants accepted at Defendant Properties had a debt in collection and 17 of them had debts larger than $90, which is further evidence that Defendants' reason is pretextual. (DE 117 at 45 n.25; DE 119-13 at 13.)  Penna also testified that she would have asked Liu about the credit report, however, Liu testified she never saw the report.  (DE 119-13 at 14, ¶ 31, 34.)  Moreover, starting sometime in March 2016 through at least July 2017, Defendants were rejecting applicants that were using housing vouchers.  (*See* DE 116-24 at 18, ¶ 31; 24, ¶ 98.)  Defendants provide alternate justifications for why they were rejecting applicants during that time period, for example, the pending approval of a building permit.  However, the NHTD voucher is a non-section 8 subsidy and Penna testified that the permitting issue would have only pertained to accepting Section 8 subsidies.  (DE 117-34 at 13, ¶ 29-30.)

Kernozek states that before Eisenlau became aware that Kernozek was a person with disabilities, she made a comment that tenants at Holiday Square with disabilities "bring their own set of problems" and allegedly stated that there were efforts being made to specifically limit the number of tenants with disabilities.  (DE 117 at 36; DE 73 at ¶ 83.)  Eisenlau, however, testified that "she would never say" that people with disabilities cause problems, and that it was

not her "experience that people, tenants with disabilities caused problems in the building." (DE 119-13 at 12, ¶ 27.) Defendants emphasize that Kernozek was using a cane and her security deposit was accepted. (DE 116 at 44-45.)

Defendants ultimately maintain that Kernozek's arguments that she was rejected on the basis of source of income or disability rest on "sheer speculation" rather than evidence, and Plaintiffs have not carried their burden to present evidence to enable a jury to find in Kernozek's favor, and thus the claim must be dismissed. (DE 119 at 23.) Plaintiffs state that Defendants have "either omitted or minimized key facts" regarding this claim, "that, if considered, demonstrate the high likelihood that Plaintiffs will succeed" on the claim "but at the least demonstrate genuine disputes of material fact that must be decided at trial." (DE 117 at 1.) As is apparent, whether Kernozek's application was rejected under circumstances giving rise to an inference of disability discrimination, and whether Defendants' proffered reason is pretextual are riddled with factual disputes and conflicting evidence. Resolving inferences in favor of the non-movant, if Plaintiffs' evidence were credited, a rational juror could find in favor of Kernozek as to these disputes. *See Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) ("Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.").

Accordingly, the undersigned respectfully recommend denying Defendants' motion for summary judgment as to Kernozek's claim related to her 2016 application.

## C. Plaintiffs' Claims Related to the Policy

Plaintiffs allege that Defendants used the Policy to discriminate against applicants on the basis of both (1) source of income, and (2) disability in violation of the Fair Housing Laws which make it unlawful to refuse housing on the basis of certain protected classes. *See* New

York State Human Rights Law § 296(5)(a)(1); Fair Housing Act, 42 U.S.C. § 3604(f)(1).

Plaintiffs seek to establish both a disparate treatment (requires a showing of intentional

discrimination), and disparate impact (requires a showing of discriminatory effect) claim.

Plaintiffs move for summary judgment on their disparate impact claim, whereas Defendants

cross-move for summary judgment on that claim but also seek summary judgment as to

Plaintiffs' disparate treatment claim.

As discussed more fully below, Plaintiffs have failed to carry their burden to show that

Defendants' Policy constitutes unlawful discrimination on the basis of disability under the Fair

Housing laws under either disparate treatment or impact theory.  As to source of income,

Plaintiffs can only assert that claim under SCHRL, and to the extent they seek injunctive relief

regarding Defendants' ongoing use of the Policy, under the NYSHRL.  Plaintiffs' have failed to

carry their burden insofar as they seek to establish a disparate treatment claim on this basis, but

there are genuine issues of material fact as to Plaintiffs' disparate impact claim that preclude the

parties' summary judgment motions.

     **i.**     **Standing**

As an initial matter, the Court addresses the Article III standing and ripeness issues raised

by Defendants with respect to Plaintiffs' claims related to the Policy.  The Constitution confines

federal courts to  resolving only actual cases and controversies.  U.S. Const. art. III.  Standing is

required for the Court to "decide the merits of the dispute or of particular issues," and the

constitutional minimum of standing requires that the plaintiff has "suffered an injury in fact . . .

which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or

hypothetical." *Rajamin v. Deutsche Bank Nat. Tr. Co.*, 757 F.3d 79, 84 (2d Cir. 2014) (citing

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  The closely related doctrine of

ripeness "prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." *United States v. Traficante*, 966 F.3d 99, 106 (2d Cir. 2020), *cert. denied*, 209 L. Ed. 2d 758, 141 S. Ct. 2634 (2021). A "claim is not ripe if it depends upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id*. (internal quotation marks and citation omitted)

Defendants aver that Plaintiffs lack standing to sustain their claims based on the Policy because those claims are unripe since Plaintiffs cannot establish actual or imminent injury from a Policy that Plaintiffs concede NPS does not use. (DE 116-1 at 18.) Therefore, Defendants argue that Plaintiffs pose a theoretical question rather than a concrete one. (DE 116-1 at 18.) Plaintiffs respond that Defendants repeatedly apply this policy even though they frequently ignore it -- for example it was applied to Gerardi's 2018 application which was denied pursuant to the Policy. (DE 117 at 13.) And that Gerardi represents a putative class of those who have also been denied housing at the Defendants' Properties for using a housing subsidy.[7] (*Id*.) Indeed, Defendants do not argue that the Policy is never applied or that it will not continue to be applied, they simply argue that Plaintiffs say the Policy has not always been applied strictly. (*See* DE 116-1 at 18.) For example, the parties do not dispute that Gerardi's second application was actually rejected on

---

[7] Defendants for the first time in their reply, state that Gerardi cannot allege past injury since she seeks injunctive relief, which requires her to show a likelihood that she will be injured in the future. (DE 119 at 5.) And that Plaintiffs do not have proof that any applicant's past rejection would be automatically followed by future rejection especially since Plaintiffs state that Defendants infrequently reject applicants that do not meet the Policy. (*Id*.) Again, Defendants do not state that they do not in fact apply the Policy, and thus, it logically follows that the likelihood that voucher holders would continue to be rejected because of it is very real. Nonetheless, the Court declines to consider this new argument raised for the first time in a reply brief. *See e.g., Playboy Enterprises, Inc. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) (citing cases).

the basis that her income did not satisfy the Policy (*see* DE 115-39 at ¶ 90-91)), therefore, any injury is not hypothetical or conjectural.

Moreover, the parties dispute whether LIHS and SILO have organizational standing. Plaintiffs maintain that LIHS and SILO have organizational standing because Defendants' alleged discriminatory use of the Policy in denying housing to class members frustrates their mission of ensuring lawful access to housing for both voucher holders and those with disabilities, and that LIHS and SILO have expended resources assisting those harmed by the Policy. (*Id.*) Defendants state that LIHS and SILO have not alleged or proven injury since they have not pled, nor is there record evidence, that they have either expended resources or had their missions frustrated as a result of the Policy. (DE 117 at 6.) Defendants argue that "[s]pecifically, neither LIHS nor SILO alleges (or has proven) that they have clients who have been rejected for insufficient income, or that they have conducted testing on this issue." (DE 117 at 6.)

In *Havens,* the Court found that an organization had standing where the Plaintiff alleged that Defendants' racial steering practices caused them to assist equal access to housing by providing certain counsel and referral services, and that Plaintiff had to devote a significant amount of their resources to counteract Defendants' practices. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The Court stated that Defendants' "steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact." *Id.*

Similarly, LIHS and SILO have standing to bring claims challenging Defendants' Policy. For example, SILO alleges it "expended time and resources" addressing Defendants' conduct because it attempted to place individuals with disabilities into the Defendant Properties even

though Defendants had no intention of permitting them to live there, and thus, SILO had to spend even more money and resources trying to place those individuals at other properties where they would not be discriminatorily rejected. (DE 73 at ¶ 22; *see also* DE 115-39 at ¶ 27 (undisputed that SILO employee called NPS.).) LIHS alleges it "expended time and resources" to both monitor and counteract the effects of Defendants' Policy by conducting fair housing testing and investigating Defendants' denial of housing opportunities. (DE 73 at ¶ 16-17; *see also* DE 115-39 at ¶¶ 21-22 (LIHS tester made call to NPS).)

Accordingly, Plaintiffs have standing to pursue their claims.

**ii.      New York State Human Rights Law**

Next, the Court addresses the question of deference raised by the parties that is unique to Plaintiffs' NYSHRL claim. The New York State Division of Human Rights ("NYSDHR"), the agency charged by the state legislature with enforcing the NYSHRL, published guidance titled "Guidance on Protections from Source of Income Discrimination in Housing Under the New York Human Rights Law" ("Guidance") (DE 75-2) which concerns the April 2019 amendment of New York State Human Rights Law that made discrimination on the basis of "lawful source of income" unlawful in the housing context. *See* N.Y. Exec. Law § 296(5). The NYSHRL claims based on source of income discrimination are only relevant to Plaintiffs' claims insofar as they seek injunctive relief for ongoing use of the Policy, as the matters in the complaint otherwise pre-date the 2019 amendment.

The parties disagree over whether the Court should defer to this guidance, and regardless, whether it renders Defendants Policy unlawful. The NYSHRL makes it an unlawful discriminatory practice to

"refuse to . . . rent . . . or other to deny to or withhold from any person or group of persons such a housing accommodation because of . . . lawful source of income . . . . of such person or persons . . . ."

N.Y. Exec. Law § 296(5)(a)(1). In relevant part, the Guidance states as to wealth or income requirements of housing providers:

> Any income or wealth requirements for vouchered tenants cannot be used as a subterfuge to avoid the law, or have the effect of frustrating the purpose of the Law. A housing provider cannot have a facially neutral income or wealth requirement that is equally applied but has the effect of excluding populations with rental subsidies.

> Housing providers cannot set unreasonable income formulas or wealth requirements for subsidized tenants. Persons receive vouchers because they have low income and lack wealth. Unreasonable wealth requirements could exclude everyone with a voucher and negate the intended protections of the law. N.Y. Exec. L. § 300.

> For example, a requirement of a certain level of income based on a formula tied to the rental cost, even though required of other tenants, would be unreasonable if applied to a tenant who has 70% to 100% of the rent paid by the vouchering agency. Likewise, a requirement of a certain amount of money in the bank, while reasonable for other tenants, may create a bar to a tenant who qualifies for a subsidy due lack of financial resources.

(DE 75-2 at 6.)

Plaintiffs ask the Court to afford the same deference to the NYSDHR that New York Courts do since the Court is required to apply state substantive law as to state law claims when exercising supplement jurisdiction over those claims, (DE 115-37 at 44.) *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 80). Courts in New York State defer to an administering agency's interpretation of the statute where "the interpretation of a statute involves specialized knowledge and understanding of underlying operational practices or entails an evaluation of factual data and inferences to be drawn therefrom . . . ." *Int'l Union of Painters & Allied Trades v. New York State Dep't of Lab.*, 32 N.Y.3d 198, 209–10 (2018). This

deference is only proper "as long as the agency provided a rational interpretation . . . not inconsistent with the plain language of the statute." *Id*. (internal quotation marks omitted).

However, courts can freely interpret from the statutory language and legislative intent "where the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, [because] there is little basis to rely on any special competence or expertise of the administrative agency." *Id*. Nonetheless, "[e]ven if no deference is owed to an agency's reading of a statute, a court can nevertheless defer to an agency's definition of a term of art contained within a statute." *Suffolk Reg'l Off-Track Betting Corp. v. New York State Racing & Wagering Bd.*, 11 N.Y.3d 559, 567 (2008).

The New York Court of Appeals has recognized "the division's expertise in evaluating discrimination claims and formulating appropriate remedies may not be lightly disregarded in view of its wide discretion, legislatively endowed, to weigh and assess the conduct of the parties and to reach conclusions based on what is fairly inferable from the facts." *Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. New York State Div. of Hum. Rts.*, 56 N.Y.2d 257, 261 (1982) "[W]ide powers have been vested in the commissioner in order that he effectively eliminate specified unlawful discriminatory practices" and discrimination, especially as a result of outwardly neutral policies, "is rarely so obvious or its practices so overt that recognition of it is instant and conclusive, it being accomplished usually by devious and subtle means." *300 Gramatan Ave. Assocs. v. State Div. of Hum. Rts.*, 45 N.Y.2d 176, 183 (1978).

Defendants argue that the Court need only apply the actual statutory language to the facts without need for special technical knowledge or expertise, and ask the Court not to accept the Guidance as a statement of law.[8]  (DE 116-1 at 24.)  The Guidance adds color to the meaning of

---

[8] Defendants also note that the cases Plaintiffs cite giving deference to the NYSDHR involve adjudication of discrimination complaints rather than guidance, and here the NYSDHR has not been asked to consider

the refusal to rent or "otherwise to deny to or withhold" housing in practice, which it explains encapsulates "any other practices that create a barrier to housing for subsidized tenants." (DE 75-2 at 6); N.Y. Exec. Law § 296(5)(a)(1). The application of those terms to screening practices such as wealth and income requirements maintained by housing providers arguably involves the NYSDHR's specialized knowledge with respect to identifying discriminatory practices. *See Bd. of Educ. of Farmingdale Union Free Sch. Dist.*, 56 N.Y.2d at 262 (affording weight to NYSDHR's determination that facially neutral system was discriminatory). NYSDHR's interpretation does not appear to run counter to the clear language of the statute, nor is it irrational given that the statute was meant to be "construed liberally for the accomplishment of the purposes thereof." N.Y. Exec. Law § 300 ("Exceptions to and exemptions from the provisions of this article shall be construed narrowly in order to maximize deterrence of discriminatory conduct.").

Defendants further contend that nonetheless, the Guidance does not state that Defendants' Policy is unlawful. (DE 116-1 at 24.) Defendants state that the Guidance does not declare that "an income guideline tied to the rental cost is *per se* unlawful; rather, it merely posits that such a requirement would be '*unreasonable* if applied to a tenant who has 70% to 100% of the rent paid by the vouchering agency.'" (DE 116-1 at 24 (citing DE 75-2 at 6) (emphasis in original).) Plaintiffs point out that the Guidance read as a whole leads to a different conclusion because it states that "[h]ousing providers *cannot set unreasonable* income formulas or wealth requirements for subsidized tenants" and that "a requirement of a certain level of income based on a formula

---

the facts of this case. (DE 116-1 25.) The income-to-rent policy provided in the Guidance is substantially similar to the Policy at hand. Nonetheless, the Court does not find this distinction controlling. *See Morrone v. Island Park Fire Dep't*, No. 20-cv-0204 (JMA) (SIL), 2021 U.S. Dist. LEXIS 66991, at *10 n.3 (E.D.N.Y. Mar. 31, 2021) ("The DHR's use of this form *is not akin to* a formal statement by the DHR interpreting the NYSHRL in a regulation, *guidance*, or litigation—interpretations that, at least conceivably, might warrant some deference or at least be considered persuasive authority." (emphasis added)).

tied to the rental cost, even though required of other tenants, would be *unreasonable* if applied to a tenant who has 70% to 100% of the rent paid by the vouchering agency." (DE 75-2 at 5.)

Defendants add that the Policy is more favorable to Voucher Applicants, so it is not facially neutral (DE 116-1 at 24), and that the Policy does not have "the effect of excluding populations with rental subsidies." (DE 116-1 at 24 (citing DE 75-2 at 6).) The Court declines the parties' alternative invitations to afford the Guidance blanket deference or ignore it wholly. The Court finds the Guidance persuasive and relevant to the Court's analysis of Plaintiffs' disparate impact claim. That analysis encompasses the parties' duplicative contentions regarding the existence of a facially neutral policy and the effect of the Policy on Voucher Applicants. Genuine issues of material fact remain as to that claim. *See infra* III.C.iii.

### iii. Disparate Impact

The parties cross-move for summary judgment on Plaintiffs' disparate impact claim on the basis of source of income and disability as related to Defendants' Policy. What Plaintiffs challenge is a series of income-to-rent policies used by Defendants over the years in its applicant screening process. These income-to-rent policies have differed in form -- verbal, written, and the as applied -- and substance at various times pre-dating this litigation, a as well as during it. (*See* DE 115-39 at ¶¶ 40-49.) The common denominator of these policies -- and the core of what Plaintiffs take issue with -- is that they all involve a formula that compares some percentage or multiplier of the applicant's monthly income against the full monthly rental amount ("Income-Rent Feature"). Plaintiffs propose that the relevant inquiry should be a Voucher Applicant's monthly income compared with the monthly amount of rent they would actually owe after considering the amount covered by the voucher ("Tenant Share").

Until late-2019 or early-2020, the written form provided to applicants reflected a 4-1 ratio of monthly income to monthly rent, and stated, "If Applicant's weekly income does not equal the monthly rent for the apartment herein, Landlord reserves the right to reject the applicant." (DE 115-39 at ¶ 40). The written form, amended sometime during 2019 or 2020, reflected a 2-1 ratio, and stated, "ALL APPLICATIONS MUST MEET INCOME REQUIREMENTS." (DE 115-39 at ¶ 42.) Superintendents are allowed to provide applicants with the information stated on the form. (DE 115-39 at ¶ 41.) To applicants that called NPS to inquire about application requirements, Penna or Lekic would verbally provide that information, which sometimes differed from the written Policy. (DE 115-39 at ¶ 43-44.) Until sometime in late 2018 (post-lawsuit) or in 2019, the Policy communicated by phone was a 2-1 ratio for all applicants. (DE 115-39 at ¶ 44.) Sometime thereafter, the Policy communicated verbally for applicant's using housing vouchers was that the voucher would be considered the equivalent of one month's rent so that Voucher Applicants only had to show monthly income equivalent to one month's rent -- a 1-1 ratio. (DE 115-39 at ¶¶ 45-46.) Otherwise as to other applicants, there was still a 2-1 ratio. (DE 115-39 at ¶¶ 45-46.) This Policy was not reflected on the written application and not otherwise communicated to applicants unless an applicant called the Main Office and asked about the Policy. (DE 115-39 at ¶ 46-48.)

Defendants, in their discretion, sometimes apply the 80% Rule -- where the Voucher Applicant need only have a monthly income equivalent to around 80% of the monthly rental amount. (DE 115-39 at ¶ 49; DE 116-3 at ¶¶ 200-209.) Defendants have inconsistently applied the Policy -- reflected by the fact that they have accepted applicants that did not meet the income-to-rent ratios reflected in their written or verbal policies. (*See* DE 115-39 at ¶¶ 58-62.)

A burden-shifting framework also applies to disparate impact claims. Plaintiffs must first establish their prima facie case to make their claim. *See Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016). Once established, the burden shifts to Defendants to show the "challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Id*. Upon such a showing, the burden is on Plaintiff to show that the "substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id*. (internal quotation marks and citations omitted).

### a. *Prima Facie* Case

To make their prima facie case, Plaintiffs must show "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *See Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d at 617. Plaintiffs do not need to show any discriminatory intent, however, they must "prove that the [challenged] practice 'actually or predictably results in . . . discrimination,'" and "a causal connection between the facially neutral policy and the alleged discriminatory effect." *Rivera v. Inc. Vill. of Farmingdale*, 784 F. Supp. 2d 133, 142 (E.D.N.Y. 2011) (citations omitted). Plaintiffs can make this showing through the use of "statistics or some other analytical method" but they must use the appropriate comparators, meaning "[t]hey must first identify members of a protected group that are affected by the neutral policy and then identify similarly situated persons who are unaffected by the policy." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575-76 (2d Cir. 2003).

Plaintiffs aver that through the report and testimony of their statistical expert Nancy

McArdle, which shows that Defendants' Policy has a significantly disproportionate impact on Voucher Applicants, they have established their *prima facie* case of disparate impact. (DE 115-39 at 33.) Plaintiffs point to Judge Gujarati's Memorandum and Order (DE 103), which resolved the parties' Federal Rule of Evidence 702 and *Daubert* motions seeking to exclude various proposed expert witness testimonies. There, Judge Gujarati noted:

> McArdle's methodology, which aligns with controlling disparate impact precedent, "is the product of reliable principles and methods;" McArdle has "has reliably applied the principles and methods to the facts of the case;" and McArdle's testimony will be relevant in that it will assist a trier of fact in determining whether Plaintiffs have demonstrated a *prima facie* case of disparate impact.

(DE 103 at 18.)

Defendants deploy a variety of arguments in an attempt to rebut Plaintiffs' *prima facie* case.[9] Defendants argue that Plaintiffs cannot show that Defendants have a facially neutral policy that is actually applied in a uniform manner in practice. Defendants state that the Policy is more stringent for unsubsidized applicants than subsidized because it requires the former to show monthly income equal to 200% of the monthly rent, whereas it requires the latter to show only monthly income equal to 80% of the monthly rent on top of their subsidy which is credited as equal to one month's rent. (DE 116-1 at 29.)

Plaintiffs contend that Defendants' Policy is facially neutral because the written versions of the Policy apply equally to all applicants. Moreover, Plaintiffs reason that the Policy requires all applicants to have a 2-1 ratio of monthly income to rent. (DE 117 at 16-17.) But Defendants credit a voucher as equal to the rental amount (1-1 ratio) such that the "residual income" (income above and beyond one month's rent) for all applicants must equate to one month's rent. (DE

---

[9] The Court rejects Defendants' recycled argument that McArdle failed to compare similarly situated groups (DE 116-1 at 31 n.22) -- the exact argument Judge Gujarati rejected in her well-reasoned and thorough analysis (*see* DE 103 at 12-18).

115-39 at ¶¶ 45-46.)  Defendants can then discretionally apply the 80% Rule to further only require monthly income equivalent to 80% of one month's rent.  (DE 115-39 at ¶ 49.)  Plaintiffs state that Defendants treat the voucher as one month's income so that the "residual income" requirement can be applied evenly to all applicants.  (DE 117 at 16-17; DE 115-39 at ¶ 49.) Plaintiffs' argument appears to be that Defendants Policy not only has a written facially neutral requirement, but the manner in which it is applied is not to be more lenient as to Voucher Applicants, but to be neutral in application.

Plaintiffs also argue that nonetheless, a strict facially neutral policy is not required to establish a disparate impact claim because allowing employers to slightly adjust their policies to make them seem modestly more favorable to the protected class, even though the policy still creates a disparate impact, would defeat the purpose of the Fair Housing Laws.  (DE 117 at 17 n.10.)[10]  To this end, Plaintiffs provide a persuasive hypothetical.  If an employer created a policy that required male employees to be 5'11" tall but female employees to be only 5'10" tall, the employer would escape liability even if the policy still had a disparate impact on female applicants based on height since the policy is not strictly facially neutral.  (*See* DE 117 at 17 n.10 (citing *Dothard v. Rawlinson*, 433  U.S. 321, 323-24 (1977) (finding that the district court correctly concluded that plaintiff established a *prima facie* case of sex discrimination based on a facially neutral height requirement and weight requirement).)

To impose a strict facial neutrality requirement would allow a defendant to evade the Fair Housing Laws whenever it employs a policy that is not deemed facially neutral because the policy's terms *technically differ* between the applicants that fall within a protected class and

---

[10] The Court notes that Defendants shrug this argument off in their reply, simply stating that whether Plaintiffs needs to prove a "strict facial neutrality requirement" "misses the point" and then redirecting the focus back to their other argument that Plaintiff cannot prevail on a Policy Defendants do not actually use.

other applicants, in a seemingly *favorable* manner, even when the policy has a discriminatory impact on the protected class. *Cf. Adams v. City of Indianapolis*, 742 F.3d 720, 731 (7th Cir. 2014) (stating that disparate impact claims "may be based on any employment policy, not just a facially neutral policy"). Regardless, there is not dispute that Defendants' written policies are facially neutral.

Defendants next contention, upon which they primarily rely, is that in Plaintiffs' attempt to rebut Defendants' business necessity defense, Plaintiffs not only concede but emphasize that Defendants do not strictly apply the Policy in practice. (DE 116-1 at 29-30.) And since McArdle's analysis is solely premised on a theoretical strict application of the Policy, without reviewing the actual applications rejected or accepted, rather than its flexible application in practice, Defendants conclude that McArdle's analysis cannot establish a causal connection between the Policy and its alleged impact on Voucher Applicants. (DE 116-1 at 29-30.) Defendants further point to the fact that as to applicants rejected for insufficient income between June 2016 and November 2019, Voucher Applicants were less likely to be rejected on that basis. (DE 117-34 at ¶ 20.)

Plaintiffs' expert, Nancy McArdle, analyzed whether the income-to-rent ratio creates an adverse impact on individuals with disabilities that apply to Defendant Properties using housing vouchers. (DE 115-39 at ¶ 136.) McArdle has over 30 years' experience in the analysis of housing demography, census data, and racial segregation. (DE 115-39 at ¶ 137.) McArdle's analysis involved a comparison of the share of renters with tenant-based housing vouchers in Suffolk and Nassau Counties that meet Defendants' Policy with those in the general population in the market area of the Defendants' Properties that could also meet the Policy. (DE 115-39 at ¶ 137.)

For her analysis, McArdle used data from numerous public housing authorities in Suffolk and Nassau Counties, in addition to the publicly available demographic data from the Department of Housing and Urban Development and the U.S. Census Bureau's American Community Survey. (DE 115-39 at ¶ 138.) McArdle applied this data to each of the apartment types -- one and two bedroom apartments -- at each of Defendants' Properties and NPS' remaining complexes. (DE 115-39 at ¶ 140.) McArdle stated that the 2-1 income-to-rent ratio resulted in a significant disparity adverse to applicants using housing vouchers for 21 of the 22 unit types, the 1-1 income-to-rent ratio led to the same result as to 13 of the 22 property types. (DE 115-39 at ¶¶ 140-44.) Since a disproportionately large percentage of voucher households have at minimum, one member that has a disability, combined with the lower incomes of those households compared to those without a member that has a disability, the significant disparities identified resulting from income-to-rent ratios were even more pronounced for households with at least one member with a disability. (DE 115-39 at ¶¶ 140-44.)

Though Defendants do not consistently apply the various iterations of the Policy that McArdle's data is based on, these Policies were reflected on the written application and are utilized. (*See, e.g.*, DE 115-39 at 23, ¶ 91 (rejecting Gerardi's application because income separate from the voucher did not equal one month's rent).) Defendants' argument seems to suggest that one can evade liability for housing discrimination for written or stated policies, that on their face have a statistically disproportionate impact on a protected class, by applying those policies in an inconsistent manner -- in essence, that one may cherry pick when they apply those policies to certain individuals. The Policies analyzed by McArdle are those that were written on the applications that contain language indicating they are mandatory, and those that Defendants apply albeit in an inconsistent manner.

Plaintiffs rebut that McArdle need not review the application forms submitted to Defendants because they have established their prima facie case using the statistical data relied on by McArdle, which consist of relevant demographic data on potential applicants to Defendants Properties that shows a disparate impact on Voucher Applicants, (DE 117 at 18). Indeed, general population statistics and demographic data that accurately reflect the pool of applicants can be used to show disparate impact. *See Mandala v. NTT Data*, *Inc.*, 975 F.3d 202, 210 (2d Cir. 2020) (noting that "[g]eneral population statistics" may be used where "there is reason to think that they 'accurately reflect the pool of qualified job applicants"). As Plaintiffs note, use of such statistics is especially appropriate where, as here, the written policies would deter Voucher Applicants from filing an application because those policies on their face indicate a strict application, (DE 117 at 18). *See Dothard*, 433 U.S. at 330 ("The application process might itself not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory.").

Here, the parties have offered conflicting evidence as to whether Defendants' Policy, as written and as applied, truly has a significant disproportionate impact on Voucher Applicants. A triable issue of fact remains as to whether Plaintiffs have sufficiently established their prima facie case of disparate impact. A rational juror weighing the evidence may conclude that given inferable deterrence effect of the written policy on applicants, (2) the significant disproportionate impact on members of the protected class if the Policy were strictly applied, and the frequency with which the Policy is applied to applicants, that Defendants' Policy does have a significant disproportionate impact on Voucher Applicants. On the other hand, a rational juror could conclude that given the "flexibility" with which the Policy is implemented in practice, the actual

impact is not significant. The Court declines to weigh the evidence at this stage in one way or the other.

The undersigned respectfully recommends denying the parties' cross-motions for summary judgment on Plaintiffs' disparate impact claim based on source of income.

Moreover, as already discussed, Plaintiffs cannot maintain a claim for source of income discrimination under the FHA because that is not a protected class under the statute. Thus, Plaintiffs must, to the extent they rely on the FHA, show that either the Defendants intentionally discriminated by using the Policy or that use of the Policy had a disparate impact on individuals with disabilities. Defendants contend that Plaintiffs cannot maintain claims for disability discrimination premised on their use of the Policy under either theory of discrimination because Defendants' Policy is solely based on income, and so, Plaintiffs' attempt to conflate two separate protected classes. (DE 116 at 19.) Defendants generally argue that a housing subsidy, such as a voucher, is not an inherent characteristic of people with disabilities, but rather it is an economic circumstance, and that just because someone has a disability, it does not mean they will have to use a subsidy in order to pay for housing. (DE 116 at 19.) Defendants state that the notion that alleged discrimination against housing subsidy users some of which happen to be disabled, does not itself equate to discrimination against those with disabilities. (DE 116 at 19 (citing *Short*, 916 F. Supp. 2d at 393-394 ("The fundamental flaw in Plaintiffs' FHA disparate impact analysis is that it conflates disability, which is a protected status under the FHA, with source of income, which is not. Defendants' policies may have a disproportionate impact on persons with government rental subsidies. However, not all persons with government rental subsidies are disabled.")).

Plaintiffs have moved for summary judgment on this claim and hold the burden of establishing a prima facie case.  Plaintiffs concede their disparate impact claim does not conclusively establish a prima facie case based on disability alone.  (DE 117 at 38 n.21.)Thus, Plaintiffs cannot be granted judgment in their favor as a matter of law on this claim.  Further, Plaintiffs cannot survive a cross-motion for summary judgment on the basis that they can obtain testimony which would be sufficient to establish their claim at trial.  Plaintiffs' assertions that summary judgment is improper because they can provide evidence at trial and the Court "has already ruled that" such evidence shows a violation based on disability "could be shown at trial", misconstrues their burden.  (DE 117 at 38 n.21.)

Plaintiffs attempt to rely on Judge Gujarati's Memorandum and Order (DE 103) which stated that "it may be the case that at a later stage, Plaintiffs will provide statistical evidence concerning the correlation between subsidized renters with a disability and all renters with a disability." (DE 103 at 18 n.9.)  This is a later stage, and that evidence has not been proffered. "A party opposing a motion for summary judgment simply cannot make a secret of his evidence until the trial." *Francis v. Costco Wholesale Corp.*, No. 19-CV-01979 (LAK), 2021 WL 1298616, at *3 (S.D.N.Y. Apr. 7, 2021) (citation omitted).  For example, it is insufficient to point to "hypothetical testimony" that may be offered at trial because the Court has no idea what the testimony would show or whether that evidence would be sufficient for a plaintiff to carry their burden at the summary judgment stage.  *Id*. at *3.

Accordingly, the undersigned recommends that Plaintiffs' motion for summary judgment as to their disparate impact claims premised on disability discrimination be denied, and that Defendants' cross-motion be granted.

### b. Business Necessity Defense and Less Discriminatory Alternative

Assuming Plaintiffs establish their prima facie case, the Court turns next to whether Defendants have rebutted it by showing that the "challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Mhany Mgmt., Inc.*, 819 F.3d at 617. The "subjective belief that a practice is necessary, without any supporting evidence, is insufficient to justify a discriminatory practice." *See Banks v. City of Albany*, 953 F. Supp. 28, 36 (N.D.N.Y. 1997). Defendants can make their showing by presenting "convincing expert testimony demonstrating that a challenged practice is in fact required to achieve the desired goal." *Id*. Upon such a showing, the burden is on the Plaintiffs to show that the "substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Mhany Mgmt., Inc.*, 819 F.3d at 617 (internal quotation marks and citations omitted).

Defendants state that using the Policy as part of their screening process is necessary to their interest in decreasing the risk of tenant default by ensuring rent payments. The feature of the Policy that Plaintiffs take issue with is that it tethers the monthly income of Voucher Applicants to the full rental amount ("Income-Rent Feature"). *Is that business practice necessary to decrease the risk of default?* To this end, Plaintiffs argue that the undisputed facts show that Defendants have accepted tenants that do not meet the Policy, and that Voucher Applicants are less financially risky, and the record does not support, and actually controverts this assertion. Plaintiffs do not appear to dispute the validity of Defendants' interest in managing against the risk of default through the use of a screening mechanism that measures the applicant's income, rather they dispute the necessity of the Policy's Income-Rent Feature to achieve that interest.

Defendants' expert, John Rollins, was retained to explain the value of Defendants' income-to-rent ratio as a screening mechanism for Defendants' in assessing prospective tenants' financial ability to meet their rental obligations, as well as to compare Plaintiffs' proposed alternative policy of an income-to-rent ratio that is tied to the portion of the monthly rent the tenant would actually pay to the current methodology used by Defendants. (DE 116-24 at 28, ¶ 146.) Rollins offers his opinion that *inter alia,* considering an applicant's income buffer (amount of monthly income above the monthly rental amount), which allows tenants to meet their non-rent expenses, is "consistent with housing affordability standards." (DE 116-24 at 28, ¶ 147.) Rollins also opines that Plaintiffs' proposed alternative is not the equivalent of Defendants' income-to-rent metric. (DE 116-24 at 28, ¶ 147.)

The testimony of Defendants' expert, John Rollins, generally reflects that screening requirements are beneficial to landlords and tenants, and that its important from a business perspective that landlords find reliable tenants. (DE 116-1 at 32; DE 116-35.) Defendants point to Rollins's opinion that a 3-1 ratio of monthly income to monthly rent is designed to prevent prospective applicants from "entering into housing contracts they cannot afford." (DE 116-1 at 32; DE 116-35) And that Rollins stated the "residual income" (amount of income exceeding one month's rent) represents an income buffer which shows the amount of income available to pay for other household expenses. (DE 115-1 at 32-33; DE 116-35.)

Plaintiffs seek to discredit Rollins's testimony on the basis that: (1) Rollins never reviewed the evidence (applications) in this case nor did he consider the application of the Policy in practice (DE 115-39 at ¶ 151), (2) Rollins's opinion that renting to very low income tenants was financially risky is not relevant as to voucher tenants because Rollins did not consider the large amount of the rent guaranteed by vouchers, (3) Rollins's opinion did not consider the

operation of housing vouchers at all (DE 115-39 at ¶ 155), which is why Judge Gujarati ruled his opinion was only "relevant to the question of [the Policy's] application in 'theory'" (DE 103 at 23 (quoting *Mhany,* 819 at F.3d at 617), and (4) Rollins testified his request to see Penna's deposition testimony was denied (DE 115-39 at ¶ 154), and Penna is an employee responsible for applying the Policy whose testimony reflects that Defendants rent to Voucher Applicants that failed to satisfy the Policy. (DE 115-37 at 38-39.)

There is no dispute that Defendants have accepted applicants that do not meet the Policy. Plaintiffs aver that this inconsistency renders Defendants' so-called business necessity defense unsupported by the record. (DE 115-37 (citing *Stender v. Lucky Stores*, Inc., 803 F. Supp. 259, 335 (N.D. Cal. 1992) (finding defendants business necessity defense unsupported, in part, where plaintiffs offered proof that defendant inconsistently applied its policies).) Defendants respond that they apply the Policy flexibly and that, when balancing the financial risk of applicants against other business factors such as vacancy rates and time of year, applicants with moderate risk factors "may at certain times" be better than no tenant. (DE 116-1 at 33-34.) It is unclear why this makes the Income-Rent Feature of the Policy necessary to manage business risk, or how it rebuts Plaintiffs' point that the Policy is applied inconsistently to routinely accept Voucher Applicants who do not have a monthly income equivalent to one month's rent. Defendants' rationale only supports the notion that Defendants need the flexibility to steer from their income requirements, whatever they may be and however they are calculated, in *certain* situations. It does not explain the necessity of the Income-Rent Feature or explain the percentage of total Voucher Applicants that were accepted even though they failed to satisfy the Policy.

Of the 56 unsubsidized applicants Defendants accepted at Defendant Properties from June 2015 to late 2019: (1) thirteen had an income equal to or greater than the posted rental

amount, (2) twenty-three provided proof of income reflecting income below 80% of the posted

rental amount, (3) nine provided no proof of income, and (4) twenty-one provided no proof of

income or documents reflecting an income below 60% of the posted rental amount. (DE 115-39

at 21-22, ¶¶ 58-62.) The fact that so many of the accepted Voucher Applicants failed to meet the

written, verbally communicated, or as applied, income-to-rent ratios, calls into the question the

necessity of the Income-Rent Feature as a method of screening applicants to meet Defendants'

interest of ensuring rent payments and managing the risk of default.

The remainder of the parties' arguments overlap both in briefing and in substance with

whether Plaintiffs' proposed alternative, an income-to-rent requirement that assesses only the

monthly portion of rent to be paid by Voucher Applicants themselves, adequately serves

Defendants' business interest in managing the risk of default with less discriminatory effect.

Plaintiffs state that the alternative policy would not require Defendants to alter their business

since they already accept tenants that do meet the requirements of their current Policy but would

meet the alternative policy. (DE 115-37 at 40.) The only practical effect, Plaintiffs assert, would

be that Defendants could continue accepting these same applicants without being able to reject

identically situated applicants because they allegedly lack sufficient income. (DE 115-37 at 43.)

Plaintiff also points the Court to a list of authorities (DE 115-37, Ex. A) reflecting that ten other

states have all declared that this alternative policy is one that housing providers can and should

implement. (DE 115-37 at 41.)

The parties' arguments largely fall into two categories: (1) whether Voucher Applicants

pose less of a financial risk, and (2) whether the Income-Rent Feature is unnecessary because

subsidy administrators have pre-evaluated Voucher Applicants ability to pay the Tenant Share.

First, the parties quibble over the factors to be considered when assessing tenant default statistics, and the correct comparators to be used. Plaintiffs note that between voucher tenants that do not meet the Policy, and other tenants, voucher tenants owe far lower on average in unpaid rent, and the same goes for all voucher tenants compared to all other tenants. (DE 117 at 21.) Moreover, the average amount of unpaid rent for voucher tenants that had an income below 80% of the rental amount was one third of the average of those without vouchers. (DE 115 at 37.) Defendants state that rather than comparing subsidized tenants who do not meet the Policy against subsidized tenants with incomes that exceed the Policy and also unsubsidized tenants like Plaintiffs do, the correct measure should include all subsidized applicants, whether or not their income is below the Policy. (DE 119 at 15.)

Defendants assert that the proper measure is the absolute number – the number of subsidized and unsubsidized tenants in arrears, comparative to the total number of such tenants in general, rather than the actual number in arrears, because that reflects that 96 of 165 subsidized tenants were in arrears, and only 112 of 373 non-subsidized tenants were in arrears. Defendants also offer an example of arrearage history at three of their properties which shows that subsidized tenants (1) are a disproportionate percentage of all that tenants that have been in arrears, (2) were almost twice as likely to be in arrears at least once, (3) spent a higher percentage of tenancy months in arrears, (4) were more likely to have owed non-trivial amounts of money, and (5) were more likely to owe a higher amount of money as well as spend a higher number of tenancy months in arrears. (DE 116-1 at 33.) Defendants note that these are the arrearage statistics based on the current Policy, and the alternative policy which would force them to only consider the Voucher Applicant's income against the Tenant Share, would create an even higher risk of arrearages. (DE 116-1 at 34.)

Plaintiffs retort that the amount of time spent in arrears is irrelevant because it does not have anything to do with the unpaid amounts actually owed and that since voucher tenants' rent obligations are comparatively lower than other tenants, even if a voucher tenant spent more time in arrears, they could still owe less. (DE 117 at 22.) Plaintiffs state that actual amounts owed by tenants is also the correct measure rather than only the tenants who owe a "non-trivial amount" of at least $1,000 or $2,000 as Defendants assert. (DE 117 at 22.) Plaintiffs state, for example, that the handful of voucher tenants who did not meet the Policy and owed more than $1,000 turned out to owe less, on average, than the other tenants, but were nonetheless treated the same in Defendants' calculations. (DE 117 at 22.) Plaintiffs also highlight that no voucher tenant who was below the Policy ever owed more than $2,000, and that taken together, all of their statistics demonstrate that voucher tenants are the least financially risky and that accepting these tenants actually would decrease financial risks. (DE 117 at 23.)

Defendants further propose disregarding the methods of analysis used by Plaintiffs and assert that an analysis of risk has to account for (1) the risk or odds of falling into arrears, (2) and when in arrears both the amount and frequency of arrears. (DE 119 at 13.) Plaintiffs' method, say Defendants, improperly focuses only on the likely amount of arrears because, even though subsidized tenants in arrears owe less than unsubsidized tenants in arrears on average, subsidized tenants are far more likely to be in arrears in the first place and spend a greater number of tenancy months in arrears. (DE 119 at 13.) Defendants maintain that an accurate risk analysis should take into account not just the amounts owed by 112 of the 374 unsubsidized tenants in arears, but the 262 that were not in arrears(DE 119 at 13)  Further, Defendants assert that, when choosing their method of risk analysis, subsidized tenants during the relevant period had a risk-adjusted average high-point balance of $742.98 and a risk-adjusted average percentage months

late of 18.24% (2.19 months per year), as compared to $408.46 and 8.44% (1.01 months per year) for unsubsidized tenants.  (DE 119 at 14.)

Second, Defendants maintain that the Policy ensures Voucher Applicants have an income buffer above rent that can cover non-rent expenses such as prescriptions, car insurance, phone, transportation, food, etc.  (DE 119 at 16.)  Rollins explains that the income buffer is a reasonable business practice to ensure non-rent expenses can be afforded by applicants.  (DE 115-35 at 13-17.)  Rollins states that the current Policy, even without the 80% Rule as applied to Voucher Applicants, looks at a 2-1 ratio of income to rent, which would mean an applicant is 50% rent burdened (rental cost as percentage of income), which aligns with HUD's classification of a "severely rent burdened household."  (DE 115-35 at 14)  And the more rent burdened a household is, the less income they have leftover for non-rent expenses.  (DE 115-35 at 14.)

Rollins further opines that a ratio tied to Tenant Share is not an equivalent of the current Policy and is untenable as a tool for risk management.  Rollins provides an example of a situation where the monthly rent is $1,600, the voucher covers $1,599, and the Voucher Applicant's Tenant Share and income buffer is only $1, which under a 2-1 ratio would only require an income of $2 under Plaintiffs' alternative policy. (DE 115-35 at 19.)  In short, Rollins states that using the alternative policy results in much lower income buffers, and that Defendants do not know the exact subsidy amount until after the relevant paperwork is completed with the relevant agency. Therefore, Defendants would not be able to evaluate that applicant's ability to pay rent as well as non-rent expenses. (DE 115-35 at 20-21.)

Plaintiffs state that Defendants can estimate the amount of rent covered by a subsidy because it is, at most, 30% of the tenant's income when the rent is below the payment standard. (DE 115-37 at 42.)  That Defendants can anticipate the range of rent an applicant will be

responsible for is supported by the record, as Liu testified that voucher's cover "normally a percentage somewhere between 10 and 40 percent." (DE 115-39 at ¶ 70; DE 115-6 at 118:20-119:5; DE 115-35 at 16 (noting that Defendants' rents are in accordance with market rates and are approximately at or below applicable payment standards and fair market rents).) Plaintiffs also note that, if it turns out the tenant pays less than 30%, the result is always in Defendants' favor since more of the rent is then guaranteed to be paid directly to them. (DE 115-37 at 42.)

Plaintiffs point out that in the example Rollins lays out, a Voucher Applicant with a $1 Tenant Share is far less risky since $1,599 of the $1,600 in rent is guaranteed by a voucher and not subject to the typical risk factors like irresponsible financial habits and loss of employment. (DE 115-37 at 25.) Moreover, Plaintiffs argue that Defendants have previously accepted applicants like this without issue, citing Liu's testimony that an applicant with only a $78 Tenant Share was "less risky." (DE 115-39 at ¶ 70.) The NYAG additionally notes that an applicant with $1 in Tenant Share would necessarily have such a low income that they would qualify for public assistance benefits which would directly pay the Tenant Share to the Defendants. (DE 118-2 at 16.)

The parties dispute whether the alternative policy allows Defendants to mitigate risk through an adequate income buffer, and whether subsidy administrators adequately assess a voucher tenant's ability to pay non-rent expenses. Plaintiffs argue that Defendants have not provided any factual basis to support their assertion that low income tenants cannot afford to pay for their expenses. Plaintiffs also take a 'none of your business' stance as to whether or not potential applicants can pay for non-rent expenses. Plaintiffs further contend that the subsidy administrators have already, after evaluating the necessary factors such as financial and other documentation, made a determination as to what amount of the Voucher Applicant's income

should be spent on rent.  (DE 115-37 at 42.)  Plaintiffs cite to the NYSDHR Guidance which states that:

> With regard to vouchered or other subsidized tenants, a determination of ability to pay the tenant's or applicant's portion of the rent has already been made by the vouchering agency. If the housing provider found the person unqualified based on the same information obtained by the vouchering agency this would have the effect of negating the Law.

(DE 72-5 at 5.)

Defendants are of the opinion that a ruling in Plaintiffs' favor would substitute the judgment of subsidy administrators for the business judgment of landlords.  (DE 119 at 16.) Defendants state that PHAs determine whether an individual is eligible for a voucher, and to that extent evaluate whether their income is below a certain threshold.  (DE 117 at 34-35.)  Since Voucher Applicants typically have to cover at most 30% of the rent, as their Tenant Share decreases so does their income buffer because, for example, an individual with $999 in monthly income would have at most a tenant share of $333 with $666 income buffer for non-rent expenses and an individual with a $150 monthly income would have a $50 Tenant Share with only a $100 income buffer for non-rent expenses.  (DE 117 at 34-35.)  Thus, Defendants propose that Voucher Applicants with lower incomes (and lower income buffers) pose a higher risk of allocating money from their income to non-rent expenses and foregoing their Tenant Share.  (DE 117 at 34-35.)

Plaintiffs point to the fact that Voucher Applicants who have low incomes usually have an array of programs available to them to pay for non-rent expenses such as "food, utilities, medical care, prescription drugs, transportation, cell phones and data plans, and household goods, which just like housing vouchers are provided to ensure they can live safely in the community."  (DE 117-34 at 28-32, ¶¶ 1-12, 19-20.)  Defendants maintain that the availability of

these other programs to Voucher Applicants is simply immaterial because Defendants have not established that the subsidized tenants at Defendant Properties actually apply for and receive such benefits, or that Defendants have some method of knowing whether a subsidized tenant will apply for and receive them.  (DE 117 at 17; DE 119-3.)

The Court notes, however, that Plaintiff Kernozek applied to Defendants' Properties, and though not denied for insufficient income, receives additional assistance through food stamps, Medicare, Medicaid, and other benefits which help with utility payments, cellphone bills, and affordable transportation to medical appointments.  (DE 119-13 at 9, ¶ 19.)  The NYAG's brief add some additional background -- for Voucher Applicants who rely wholly on public assistance, aside from the voucher amount paid by the subsidy program, the Tenant Share is set to the public assistance shelter allowance and is also paid directly to the landlord by the local social services department, which results in no out of pocket rent expenses.  (DE 118-2 at 8.)

For Housing Choice Voucher Program  participants, the costs of utilities are baked into the gross rent for calculation purposes and a utility allowance is subtracted from the gross rent to calculate the Tenant Share.  (DE 118-2 at 8; DE 119-13 at 2, ¶ 2.)  In calculating a Voucher Applicants income, state and federal programs reduce the monthly income by certain pre-determined expenses, such as medical expenses and child care (e.g. deduction per dependent and reasonable childcare expenses), thereby somewhat accounting for an income buffer for non-rent expenses.  (DE 118-2 at 7; DE 119-13 at 4, ¶ 5.)   Moreover, on top of Voucher Applicants typically having access to financial assistance for a myriad of incidental housing related expenses, they are aided by not-for-profits that are in contact with landlords if any problems were to arise during the tenancy, as well as provide tenancy support services aimed at ensuring Voucher Applicants keep their housing.  (DE 118-1 at ¶¶ 9, 14; DE 119-13 at 2-7, ¶¶ 2-12.) The

New York subsidy programs also provide funds for "security deposits, moving expenses, utility start-up payments, and household establishment purchases (furniture, household goods, etc.)." (DE 118-2 at 9; DE 118-1.)

Defendants further argue that Plaintiffs concede that PHAs do not evaluate whether Voucher Applicants can even actually afford the 30% Tenant Share, rather they seem to only evaluate whether or not the applicant's income is not too high for them to receive a voucher. (DE 116-1 at 35.) By way of example, Defendants point to the deposition testimony of Kelley Koerner and Nicole Polidoro, who process subsidies administered through SILO and work for SILO. Koerner testified that even if the budget worksheet submitted by an individual seeking a voucher showed that they would have negative income after paying rent and all expenses, the subsidy would nonetheless be approved. (DE 116-8 at 47:22-48:7, 57:9-58:18.) Polidoro was unable to recall any instance where a SILO-administered subsidy was not approved simply because of the information contained in the budget worksheet or for a lack of income. (DE 116-9 at 36:22-38:12.)

Defendants additionally support their argument that deference to subsidy administrator's judgment of an applicant's ability to pay rent is not convincing by noting that nearly 60% of voucher tenants at three of their properties had at least once failed to meet rent obligations, 15.8% were in arrears for at least half of their tenancy and 13.3 % both owed at least $1,000 once throughout their tenancy and were in arrears for at least half of their tenancy. (DE 116-1 at 36.)

Plaintiffs respond that whether or not PHAs conduct a personal budget analysis of individuals seeking vouchers is irrelevant because other applicants without a voucher do not have to undergo such an analysis and that in any event, organizations like SILO assist Voucher Applicants with managing their budgets and obtaining benefits to pay for non-rent expenses. (DE

117 at 23; 115-39 at ¶¶ 118, 125, 135; 117-34 at ¶¶ 10-11, ¶ 23.) Thus, Plaintiffs state that this adds more support for their argument that voucher tenants that fall below the current Policy are the least financially risky tenants at Defendants' Properties. (DE 117 at 23.)

In sum, the parties engage in a fact heavy battle of conflicting hypotheticals, statistics, and methodologies of calculating risk to prove whether Voucher Applicants do in fact carry a lower or higher financial risk compared to other applicants, and whether the Policy Defendants maintain is necessary or can be replaced by Plaintiffs' proposed alternative. Plaintiffs' dispute the relevancy of Rollins's testimony to the current Policy as it is applied. Nonetheless, Rollins's testimony cites to authority that is consistent with his methodology, and the question of the weight it should be given considering the totality of the evidence proffered by the parties is properly for the fact finder.

A rational juror could find that Defendants' contentions are undermined by the inconsistent application of the Policy, the lower financial risk posed by Voucher Applicants under Plaintiffs' proposed methodology of viewing the risk of default, and the fact that NPS President Liu's testimony reflects that she views Voucher Applicants with a small Tenant Share as "less risky." (DE 115-6 at 118:20-122:12 (concerning a Voucher Applicant that pays less than 10 percent of the rent).) However, a rational juror could also find that even if Defendants' Policy is unnecessary to their purported interest, Plaintiffs' proposed alternative fails to meet that interest.

In short, triable issues of fact remain as to whether Defendants' Policy is necessary to their legitimate business interest of ensuring rental payments and managing risk, and whether Plaintiffs' proposed alternative mandating the use of a ratio tied to Tenant Share only, suffices to

meet that interest.  Accordingly, the undersigned recommends denying the parties' cross-motions for summary judgment.

### iv.  Disparate Treatment

Defendants move for summary judgment on Plaintiffs' claim that Defendants intentionally discriminated on the basis of source of income and disability through their Policy by rejecting applicants.  (DE 116 at 27-28.)  Plaintiffs oppose summary judgment by summarily arguing that they have established a *prima facie* case by raising an inference that Voucher Applicants were denied for insufficient income.  (DE 117 at 30-31.)  For this claim, Plaintiff relies on the *McDonnell Douglas* framework, (DE 117 at 30.)  To make out a prima facie case Plaintiffs must show (1) they are a members of protected class, (2) were qualified for the opportunity they sought, (3) were rejected, and (4) that rejection occurred under circumstances that give rise to an inference of discrimination on the basis of a protected characteristic.  *See Babul v. Demty Assocs. Ltd. P'ship*, No. 17-CV-5993 (BMC), 2019 WL 79423, at *2 (E.D.N.Y. Jan. 2, 2019).  Plaintiffs do not explain how they have established their *prima facie* case as to the Policy.  The parties do not dispute that at least some applicants using housing vouchers are denied housing pursuant to Defendants' Policy because their income is insufficient.  However, Plaintiffs fail to establish that those applicants were qualified for the opportunity they sought.

Moreover, Plaintiffs cannot ultimately establish intentional discrimination.  The parties' arguments revolve primarily around whether Plaintiffs can ultimately show pretext and produce any evidence of discriminatory intent.  Defendants argue that there simply is no evidence provided by Plaintiffs which  shows that the Policy is motivated by discriminatory intent and that Plaintiffs' contention that Defendants do not apply strictly adhere to the policy undermines any

argument to the contrary.[11]  Defendants aver that Plaintiffs must be dismissed because no reasonable juror can return a verdict in their favor without actual evidence of disparate treatment and Plaintiffs have failed to prove that "that [an] impermissible criterion played some part in the decision-making process" regarding Defendants' use of the Policy. (*See* DE 119 at 17-18 (citing *LaBarbera v. NYU Winthrop Hospital*, 527 F. Supp. 3d 275, 290-92 (E.D.N.Y. 2021)).

Plaintiffs rely primarily on their disparate impact arguments for the proposition that Defendants have a discriminatory motive.  (DE 117 at 31.)  Plaintiffs argue that where a Policy has a foreseeable disparate impact that is probative in proving discriminatory intent(DE 117 at 31-32.)  And that Defendants acknowledge that "it is almost self-evident" the Policy would operate to exclude Voucher Applicants, yet they use the Policy anyway, and thus, Plaintiffs "have demonstrated connivingly that Defendants' income policy is purposefully implemented" to limit Voucher Applicants at Defendant Properties and is used to hide their discriminatory motive. (DE 117 at 32.)

However, that is insufficient alone to establish their claim.  *See S. Camden Citizens in Action v. New Jersey Dep't of Env't Prot.*, No. CIV.A. 01-702 (FLW), 2006 WL 1097498, at *36 (D.N.J. Mar. 31, 2006) (noting that even assuming plaintiffs are correct that the disparate impact of the policy was foreseeable to defendant, "such a foreseeable impact is of no aid to Plaintiffs at this juncture because it, alone, is insufficient to establish a constitutional violation") (cited in DE 117 at 31).  Plaintiffs naked reliance on the disparate impact to conclusively establish

---

[11] Defendants also point out that there are other ways they could more effectively achieve the goal of discrimination, if that was their goal, such as implementing an even stricter policy and/or applying their Policy without any exceptions at all.  The Court notes that an argument that one could discriminate more effectively through stricter, more obvious, measures, is hardly persuasive evidence, if evidence at all, that one has not in fact discriminated.  Simply beacue there may be more effective ways one could employ in an attempt to discriminate, does not excuse the less effective mode utilized if it was discriminatory.

Defendants' discriminatory motive of *intentional* housing discrimination as to Voucher

Applicants does not carry their burden. *See Bryan v. Koch*, 492 F. Supp. 212, 220 (S.D.N.Y

1980) (noting that even if the result of the disparate impact may have been foreseeable, given

that defendants have offered non-discriminatory reasons, "[u]nless these motivations are refuted

by other indicia of discriminatory purpose, the alleged disparate impact is entitled to little, if any

weight.") (cited in DE 117 at 32), *aff'd*, 627 F.2d 612 (2d Cir. 1980).  This is so especially where

Defendants have proffered non-discriminatory reasons for using their Policy, such as the need to

ensure tenants can afford their rent (DE 119 at 17-18).  Plaintiffs only point to Defendants

inconsistent application of the Policy as to Voucher Applicants and the assertion that Voucher

Applicants that do not meet the Policy pose the least financial risk.  (DE 117 at 31.)  Defendants

continue to accept Voucher Applicants, and explain that though Voucher Applicants may owe

comparatively less when in arrears they spend a higher percentage of tenancy months in arrears

and take longer to repay debts than other applicants (*see* DE 119 at 13).  Whether or not

Defendants proffered reasons establish the Policy is necessary, does not show an *intent* to

discriminate.

Defendants ultimately argue that a movant cannot sustain their burden at summary

judgment by an assertion that their claim is self-evident since the Policy is used as one part of the

application review process, and thus, does not plainly operate to intentionally exclude voucher

holders.  (DE 119 at 17.)  Yet, Plaintiffs have not moved for summary judgment on this claim,

Defendants have.  (*See* DE 117 at 32.)  Regardless, Defendants carry the initial burden to

demonstrate the absence of a genuine issue of material fact, they can discharge that burden by

pointing to a lack of evidence supporting the nonmovant's claim, as they have done here. *See*

*Celotex Corp. v. Catrett*¸ 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138,

148 (2d Cir. 2004). Therefore, Plaintiffs must point to evidence that creates a genuine issue of material fact as to their disparate treatment claims. Plaintiffs have not established their *prima facie* claim, nor have they shown a genuine dispute as to a material issue of fact regarding discriminatory motive.

Further, Defendants argue that Plaintiffs are conflating disability with source of income as to this theory. Plaintiffs state that "an inference can also be raised that Defendants are using this income policy as a limitation based on disability, not just source of income." (DE 117 at 31 n.18.) Plaintiffs argue that the evidence creates a "clear factual dispute" regarding Defendants' intent to discriminate on the basis of disability. [12] (DE 117 at 36.) (citing *Wright v. Stern*, 450 F. Supp. 2d 335, 369 (S.D.N.Y. 2006) ("There is nothing inconsistent in acting with intent to discriminate while adopting a facially neutral policy that has a disparate impact; the two are not mutually exclusive.")). Plaintiffs refer to "clear evidence" that Defendants aimed to limit housing availability to those with disabilities since they used the policy to deny housing to Voucher Applicants and those with extremely low incomes, and individuals with disabilities indisputably represent a larger share of Voucher Applicants whose income is below the NPS rental amounts. (DE 117 at 36.) This argument, however, fails to rebut Defendants' contention that there is no evidence of discriminatory motive on the basis of *disability*. It simply is another version of Plaintiffs' disparate impact argument offered to create a clear factual dispute about Defendants' intentional discrimination under a theory of disparate treatment.

---

[12] Plaintiffs' briefing conflates their claims for disparate treatment arguments and related evidence regarding their challenge to Defendants alleged rejection of applicants on the basis of disability such Kernozek, and their challenge to Defendants' use of the Policy. (DE 117 at 36.) The arguments raised by Defendants in this section only relate to their Policy and assertion that Plaintiffs' disability claims as they relate to the Policy must be dismissed. (DE 116 at 19.) Thus, the Court addresses the relevant arguments separately in their appropriate sections.

Plaintiffs have not offered evidence relevant to their disparate treatment claim to show that Defendants' impermissible motive in their decision to use the Policy as to voucher holders was disability discrimination. Though Plaintiffs cite to *Wright* to make the connection between the evidence they cite and a "clear factual dispute" regarding Defendants' intent to discriminate on the basis of disability, that argument falls short. (DE 117 at 36.) Tellingly, Plaintiffs cite to the portion of the decision that analyzes the *disparate impact* claim and rejects defendants' contention that plaintiffs have not truly alleged a disparate impact claim since Plaintiffs did not identify a facially neutral policy and allege that defendants acted with discriminatory intent. *Wright v. Stern*, 450 F. Supp. 2d 335, 369 (S.D.N.Y. 2006).

To the extent that Plaintiffs rely primarily on their disparate impact claim to show discriminatory motive on the basis of disability, as discussed, Plaintiffs have conceded that their disparate impact claim does not even conclusively establish a *prima facie* case based on disability alone. Thus, their disparate treatment claim on the basis of disability cannot rest on it. Plaintiffs bear the ultimate burden of demonstrating that disability discrimination was the real reason behind Defendants' Policy. *See Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003). Defendants have shown an absence of evidence to support that element. Plaintiffs have not pointed to evidence from which a reasonable jury could conclude that the actual reason behind Defendants' Policy was, wholly or in part, disability discrimination. *See id*. ("Summary judgment is appropriate if no reasonable jury could find that the defendant's actions were motivated by discrimination.").

Accordingly, the undersigned similarly recommends that the Defendants' motion for summary judgment as to Plaintiffs' claim for disparate treatment related to the Policy be granted.

## v.        Permanent Injunctive Relief

Plaintiffs' motion for summary judgment seeks permanent injunctive relief to prevent Defendants' continued use of the Policy as it is applied to applicants that use housing vouchers and have disabilities.  (*See* DE 115 at 25 n.4; DE 115 at 49 n.21.)  Defendants cross-move for summary judgment as to Plaintiffs' request for injunctive relief as to the same.  (*See* DE 119 at 2 n.2; *see also* DE 73 at ¶ 160 (describing injunctive relief sought).)

In light of the undersigned's recommendation that Defendants' motion for summary judgment be granted on Plaintiffs' disparate treatment claim related to the Policy, as well as the parties' motions for summary judgment be denied as to the related disparate impact claim, it is respectfully recommended that permanent injunctive relief at this juncture is unwarranted and should be denied.  Nevertheless, if the District Judge disagrees with the foregoing analysis of the claims and defenses, below is an analysis of the claim for permanent injunction.

Defendants argue that Plaintiffs must, and cannot make the necessary showing to for a permanent injunction which requires "the movant demonstrates (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." (DE 116 at 25 (citing *Alpha Cap. Anstalt v. Shiftpixy, Inc.*, 432 F. Supp. 3d 326, 338 (S.D.N.Y. 2020) (citations omitted)).  Further, Defendants state that for mandatory injunctive relief – relief that would "alter rather than maintain the status quo," Plaintiff must also show actual success on the merits.  (DE 116 at 25 n.19 (citing *New York Civil Liberties Union v. New York City Transit Authority*, 684 F.3d 286, 294 (2d Cir. 2012) (internal quotation marks and citations omitted)).

Plaintiffs respond that a finding that Defendants' Policy is unlawful alone ends the inquiry without need to consider the permanent injunction factors but that the factors favor Plaintiffs' request, nonetheless, (DE 119 at 33). In addition, the cases Defendants cite for their assertion did not involve unlawful discrimination whatsoever. *See Alpha Cap. Anstalt v. Shiftpixy, Inc.*, 432 F. Supp. 3d 326, 338 (S.D.N.Y. 2020) (breach of contract); *New York Civil Liberties Union v. New York City Transit Authority*, 684 F.3d 286, 290 (2d Cir. 2012) (violation of First Amendment right of access to government proceedings). Defendants make no attempt to address the authority offered by Plaintiffs in support of their assertion that a finding of unlawful discrimination is sufficient to enter an injunction.

In *Albemarle Paper Co.* the Court there found defendants engaged employment discrimination on the basis of race in violation of Title VII and did not undertake an inquiry of the permanent injunction factors. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) ("Where racial discrimination is concerned, the (district) court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." (internal quotation marks omitted)); *see also United States v. City of New York*, 717 F.3d 72, 95 (2d Cir. 2013) ("Once liability for racial discrimination has been established, a district court has the duty to render a decree that will eliminate the discretionary effects of past discrimination and prevent like discrimination in the future.").

The Court notes that "[t]he Fair Housing Act authorizes courts to award injunctive relief against individuals who have violated the Act." *United States v. Space Hunters, Inc.*, No. 00-cv-1781 (RCC), 2004 WL 2674608, at *8 (S.D.N.Y. Nov. 23, 2004) (entering an injunction without going through the factors where defendants' conduct violated the FHA by engaging in housing

discrimination on the basis of disability), *aff'd*, 429 F.3d 416 (2d Cir. 2005); *see also Short v. Manhattan Apartments, Inc.*, 916 F. Supp. 2d 375, 402 (S.D.N.Y. 2012) (entering a permanent injunction where defendants engaged in housing discrimination on the basis of disability.)

As to the factors, Defendants argue that (1) there is no irreparable injury because they can compensate Plaintiffs through monetary damages, (2) given the increased risk of default posed by Voucher Applicants, they would face more hardship if forced to change their Policy, and (3) the public interest would be disserved because landlords would incentivized to jack up prices in response to this injunction and that would put more buildings out of reach for Voucher Applicants. (DE 116-1 at 25-26.) Plaintiffs contend that (1) allowing Defendants to continue to use their unlawful policy with the caveat that they pay damages to rejected applicants is inadequate for future applicants who are unaware of why they were rejected, (2) accepting Voucher Applicants would decrease, not increase, financial risk to Defendants, (4) Gerardi and other Voucher Applicants are being prevented from obtaining housing, and (3) the public interest is served by enjoining the Policy because otherwise, low-income applicants would have greater hardship in integrating into communities and would be relegated to assisted living facilities, homeless shelters, and the streets -- the type of harm antidiscrimination statutes set out to prevent. (DE 117 at 34-35.)

Assuming actual success on the merits, the public interest would certainly not be disserved if the Court entered an injunction preventing the enforcement of a unlawful policy that has a disparate impact on Voucher Applicants and serves as a barrier to their ability to integrate into communities and find housing. What more of a textbook example of irreparable could there be? *See, e.g., Olivierre v. Parkchester Pres. Co., L.P. et al*, No. 0452058/2022, at 8 (N.Y.S. July 28, 2022) ("As for the issue of whether there will be irreparable harm without the ordering

of an injunction, this is exactly the type of case that injunctive relief is meant for, as 'a remedy at law would be inadequate' and the brutality of homelessness is too great a risk.").

The parties' arguments regarding the financial risk posed by Voucher Applicants is addressed above, and triable issues of fact remain as to that contention. However, even if Defendants faced a greater financial risk by accepting Voucher Applicants based on Plaintiffs' proposed alternative policy, they already accept Voucher Applicants that meet that policy, and would continue to receive voucher payments from the administering agencies. On the other hand, Voucher Applicants including low-income individuals with disabilities seeking to integrate into community environment, that continue to be denied housing, would face a greater hardship in comparison. The equities here, in the undersigned's view, decidedly tip in Plaintiffs' favor.

### D.  LIHS' Race Discrimination Claims

Defendants move for summary judgment on LIHS' race discrimination claims. (DE 116 at 46.)  Plaintiffs argue that summary judgment is inappropriate given the genuine issues of material fact that remain.  (DE 117 at 40.)  LIHS alleges racial discrimination in violation of the FHA under which, in relevant part, it is unlawful to "refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race"; to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling"; to make any statement "that indicates a preference, limitation, or discrimination based on race"; and to "represent to any person because of race . . . that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."  42 U.S.C. § 3604(a)-(d).

LIHS' race discrimination claims are premised on tester interactions with two of Defendants' on-site superintendents, Agim Gashi and Shab Xhema, in 2016.  (DE 117 at 38-39.)

LIHS alleges that these tests demonstrate that Defendants' agents favored white applicants over black applicants. These claims do not hinge on direct evidence, and thus, are analyzed under the familiar *McDonnell Douglas* framework which the reader is at this point no stranger to. *See infra* II.B.

Plaintiffs can make out a prima facie case of racial discrimination under the FHA by showing that "(1) plaintiffs are members of a protected class; (2) plaintiffs requested information on the availability of a particular type of apartment; (3) defendants failed or refused to provide truthful information as to the availability of such apartments; and (4) white applicants were provided with truthful information." *Open Hous. Ctr., Inc. v. Kessler Realty, Inc.*, No. 96-cv-6234 (ILG), 2001 WL 1776163, at *6 (E.D.N.Y. Dec. 21, 2001) (citation omitted). The first and second elements are readily met: the LIHS testers were African American (protected class) and requested information regarding particular apartments.

Plaintiffs have provided evidence showing that on three separate occasions, Northwood superintendent Gashi gave information regarding the potential availability of apartments to Black Testers which he failed to provide to White testers. In comparison tests conducted on April 19 and 20, 2016, Tester A (who is Black) and Tester B (who is White) both sought out Northwood's on-site superintendent, Gashi, to ask whether there was a one-bedroom apartment available at Northwood. (DE 116-24 at 11, ¶ 47.) Gashi told both testers that there was no one-bedroom apartment available and that he could not give out an application. (DE 116-24 at 11, ¶ 48.) On April 19, 2016, Gashi spoke with the Black Tester through a Ring intercom, a type of intercom that has video functionality. (DE 116-24 at 11, ¶ 49.) Gashi told the Black Tester inquiring about the availability of one-bedroom apartments that none were available and that he could not give out an application. (DE 119-13 at 16, ¶¶ 38-39) The following day Gashi told a White

Tester also inquiring as to the availability of a one-bedroom apartment, that none were available and that he could not give out an application, but there was a studio apartment in Brightwaters. (DE 119-13 at 16, ¶ 40.)   Gashi gave the White Tester a tour of that apartment later that day. (DE 119-13 at 16, ¶ 40.)

During the September 1, 2016 test, a White Tester rang Gashi's Ring intercom and was told that Gashi did not have anything to rent.  (DE 119-13 at 16-17, ¶¶ 43-44.)  The White Tester asked if there were other locations or if she could speak with Gashi for a moment and Gashi came downstairs to have a face-to-face conversation.  (DE 119-13 at 17, ¶ 45-46.)  In response to whether he had anything available to rent right now, Gashi asked the White Tester what she was looking for.  (DE 119-13 at 18, ¶¶ 47-48.)  The White Tester stated she was looking for a one-bedroom apartment to move into by the end of September. (DE 119-13 at 18, ¶¶ 47-48.)  Gashi subsequently informed her a one-bedroom apartment might be available in a couple weeks, and after being asked about two-bedroom apartments, said a two-bedroom might be coming up in a couple of months at Brightwaters.  (DE 119-13 at 18-19, ¶ 48.)

 The White Tester had previously asked about a tour of the one-bedroom apartment, and before leaving askedif the two-bedroom was "large"  (DE 119-13 at19, ¶ 48.)  After Gashi and the White Tester spoke more about the Brightwaters apartment and the White Tester began to leave, Gashi offered to show her a two-bedroom apartment and gave her a tour.  (DE 119-13 at 19, ¶ 48.)  When the White Tester called back the same day to ask further questions, Gashi asked her about her age because there were apartments available for tenants 55 and over at Lakeside, and stated that he thought she was only 50 years old in response to her statement that she was 70 years old.  (DE 119-13 at 19, ¶ 50.)  Gashi then gave the phone to Xhema who provided further information about the Lakeside apartment.  (DE 119-13 at 20, ¶ 50.)

The following day, a Black Tester asked Gashi, while he was painting an apartment, both whether anything was available and when something would be available, and was told nothing was available. (DE 119-13 at 20, ¶¶ 51-54.) The Black Tester did not attempt to engage Gashi any further, there was no conversation regarding Northwood or Brightwaters apartments, and Gashi did not offer to show any apartments or mention the Lakeside apartment. (DE 119-13 at 20-21, ¶¶ 54-55.) The Black Tester was 44 years old at the time of the time and ineligible for tenancy at Lakeside. (DE 119-13 at 21, ¶ 55.)

During the October 5, 2016 test, the White Tester from the September 1, 2016 test approached Gashi and asked about an apartment she had previously inquired about and was informed it was rented the prior day. (DE 119-13 at 21, ¶¶ 56-57.) The White Tester asked if there was anything else and if any Brightwaters apartments were going to become available, Gashi confirmed that a two-bedroom was coming up at Brightwaters, and responded to inquiries about pricing. (DE 119-13 at 21, ¶ 57.) Gashi also voluntarily told the White Tester about a two-bedroom that would be available in Northwood in a couple weeks. (DE 119-13 at 22, ¶ 57.)

The following day, Gashi told a Black Tester there were no apartments available right now and Gashi volunteered to, and provided, the phone number to call the Main Office. (DE 119-13 at 22, ¶ 58.) When the Black Tester asked whether a two-bedroom or one-bedroom apartment was available, Gashi said there were none and did not mention the Brightwaters or Northwood apartments. (DE 119-13 at 22, ¶ 59.) The October 26 and 27, 2016 tests involved interactions with superintendent Xhema at Lakeside. On October 26, 2016, Xhema gave a White Tester a tour of the available one-bedroom apartment and provided him with an application to apply for it. (DE 119-13 at 25-27, ¶ 66.) Xhema told the White Tester that for an applicant with excellent credit the security deposit was equivalent to one month's rent and two months if the

applicant had only good credit. (DE 119-13 at 26, ¶ 67.)  The White Tester asked what was needed to hold an apartment and Xhema said he could put in an application, that if approved, would require a security deposit to hold it.  (DE 119-13 at 25-27, ¶ 67.)

The same day, Xhema also gave a Black Tester a tour of the available one-bedroom apartment and provided her with an application to apply for it.  (DE 119-13 at 26, ¶ 68.)  Xhema told the Black Tester that they needed a two-month security deposit.  (DE 119-13 at 26, ¶ 68.) The Black Tester asked when she could move in, Xhema said she needed to put in an application and that an application was pending on the apartment.  (DE 119-13 at 26-27, ¶ 68.)  Xhema gave the Black Tester instructions on how to apply and made positive comments about her approximate income.  (DE 119-13 at 27, ¶ 68.)  When the Black Tester asked about two-bedroom apartments, Xhema told her they only had one-bedroom apartments.  (DE 119-13 at 27, ¶ 69.)  The following day, a different White Tester called to ask about a one-bedroom apartment, Xhema told them when they could come to view it, encouraged them to speak in person, and did not mention the pending application or make any statements regarding the security deposit.  (DE 119-13 at 27, ¶ 70.)

Defendants assert that Plaintiffs cannot establish a race discrimination claim because LIHS has not pointed to "any action by Defendants that constituted a rejection, a misstatement about the availability of housing, or any other statement or action indicating any kind of preference based on race."  (DE 116 at 46-47.)  Defendants state that at the time of each test there was no available apartment at Northwood, Gashi never actually lied to any protected tester or prevent them from applying for housing, and even if he answered questions about upcoming vacancies, that is not the same as a present vacancy.  As Plaintiffs note, a statement need not be a lie to be covered by the Fair Housing laws, omitting or withholding relevant information is also

covered.  *See Open Hous. Ctr., Inc. v. Kessler Realty, Inc.*, No. 96-cv-6234 (ILG), 2001 WL

1776163, at \*6 (E.D.N.Y. Dec. 21, 2001) (noting plaintiff's can make out a prima facie case in

part by showing that "defendants failed or refused to provide truthful information as to the

availability of such apartments").

Defendants attempt to downplay this proposition by stating that *Open Hous. Ctr.* is

distinguishable since there were actually available apartments whereas here there were no vacant

or available apartments at Northwood of the type that the testers inquired about at the time they

conducted testing.  (DE 119 at 25 n. 26).  Nothing in that case hinged the proposition that a

prima facie case can be established in part by showing that the defendant omitted or withheld

relevant information about apartment availability on the basis of race on whether or not that

omission or misstatement is made as to present or future apartment availability.  *See generally

Open Hous. Ctr. Inc*,  2001 WL 1776163.

 Nonetheless, there the Court found that Plaintiff had made a prima facie case in part

where defendants engaged in *differential treatment* regarding apartment availability -- showing

apartments to the White testers during the same time period when they stated no apartments were

available or did not show apartments to Black testers, which indicated availability.  *Id.*  Here, its

undisputed that the superintendents discussed the upcoming potential availability of upcoming

apartments at Northwood and other complexes with White testers but not with Black testers,

(*see, e.g.,* DE 119-13 at 21-22, ¶¶ 56-58 (reflecting that Gashi mentioned a two-bedroom that

would be available in Northwood in a couple weeks to a White Tester but made not mention to

the Black Tester).

Defendants' arguments drawing the distinction between future and present vacancies are

unpersuasive distinctions that are not relevant to explaining the *differential treatment* between

Black and White Testers with regard to availability, whether it be present or future. *See, e.g.*, *Fair Hous. Just. Ctr., Inc. v. Broadway Crescent Realty, Inc.*, No. 10-cv-34 (CM), 2011 WL 856095, at *5 (S.D.N.Y. Mar. 9, 2011) (noting that the third prong was met because defendant told plaintiff in August no apartments were available even though one *would* be available in September). Nor is the difference between an "available" and "vacant" apartment meaningful. *See Fair Hous. Ctr. of Washtenaw Cnty., Inc. v. Town & Country Apartments*, No. 07-cv-10262, 2009 WL 497402, at *7 (E.D. Mich. Feb. 26, 2009), *as amended* (Feb. 27, 2009) (noting that regardless of whether the distinction between "available" and "vacant" was a real distinction, "some units were reported as available or potentially available to white testers but not to African-American testers"). Such a narrow construction of the FHA would allow landlords to escape liability based on mere semantics, wordplay and linguistic gymnastics with respect to how they describe the availability of apartments.

Defendants aver that Gashi and Xhema provided "truthful and complete information" about the availability of apartments at the relevant buildings. (DE 119 at 24.) First, Plaintiffs have presented evidence reflecting that they provided differing information to Black and White Testers on various occasions in response to similar questions or failed to provide the same information. Second, Plaintiffs argue there is also a genuine dispute of material fact as to whether Gashi even always provided "truthful" information to the Black testers because despite the Black testers asking broad questions about units of varying sizes, units at other locations, or those that would be available in the future, he failed to provide responsive information when White Testers were given that same information. *(See, e.g.*, DE 119-13 at 21-22, ¶¶ 56-59 (reflecting that Gashi did not inform the Black Tester who asked about apartments at other locations about the upcoming two-bedroom apartment in Brightwater or Norwood)).

The parties also disagree as to whether Gashi was able to see the testers that he only spoke to via the Ring intercom, and thus, whether he was aware of their race. For instance, the April 2016 interaction where the Black Tester spoke to Gashi only through the intercom. Plaintiff states that Gashi testified that he was using a Ring doorbell, a common type of intercom that streams video to your cellphone. (*See, e.g.*, DE 119-13 at 16-17, ¶¶ 43-44.) Defendants do not rebut this assertion with factual evidence of their own. They instead state that Plaintiffs have not shown that Gashi uses the video functionality or saw the testers when they rang his doorbell. Resolving inferences in Plaintiffs' favor, a rational juror could reasonably infer from Plaintiffs' evidence that Gashi was not forthcoming in response to similar questions or that he was able to view the LIHS testers from his Ring doorbell, and thus had knowledge of their race. *Cf. Sassower v. Field*, 752 F. Supp. 1182, 1189 (S.D.N.Y. 1990) ("The disputed testimony regarding the defendants' knowledge and intent raise factual issues requiring a trial on the merits.").

As to the Lakeside tests, there is a dispute of material fact as to whether Xhema intentionally discouraged the Black Tester from applying. Xehma provided differing information regarding security deposits to the testers, made differing statements by telling only one there was a pending application on the apartment but also provided the Black Tester with instructions on how to apply and made positive comments about their approximate income. (DE 119-13 at 26-27, ¶¶ 68-69.) Defendants contend that Xhema was unauthorized to offer a one-month rent for security, and simply that "it is unclear why he would do so." (DE 116-1 at 48 n.31.)

Further, Defendants ask the Court to attach no significance to Xhema informing a Black Tester that an application was pending on an apartment where he did not make any such statement to a White tester. Defendants point to Gashi's testimony that he would occasionally

inform prospective tenants if an application was already pending and it did not mean that NPS was not giving out other applications thereafter.  (DE 116-1 at 15.)  Plaintiffs argue that although this would explain Gashi's behavior in that regard, it does not explain why Xhema made the statement to a Black Tester but not to White Testers.  (DE 117 at 43.)  And that Defendants admission that superintendents had no reliable way of knowing about the likelihood of whether any given pending application would be accepted, make the selective statement more suspect.  (DE 117 at 43-44; DE 117-34 at 19, ¶ 46.)  The parties do not dispute that Gashi was not aware of whether it was Xhema, or any other superintendents practice of telling applicants there was a pending application.  (DE 119-13 at 28, ¶ 73.)

The essence of the role in considering an application for summary judgment is to identify triable issues of fact, not to "resolve" them; that's for trial.  Given the evidence offered by the parties, and drawing inferences in favor of the non-movant at this stage, the authorities cited by Plaintiffs reflect that at a minimum, a reasonable juror could conclude Plaintiffs have established their prima facie case raising an inference of discrimination.  *See, e.g*, *Fair Hous. Just. Ctr. Inc.,* 2011 WL 856095, at *8 (finding that discrepancies in treatment such as volunteering more helpful information to the unprotected tester "could lead a reasonable juror to conclude that [defendant] intentionally hindered and discouraged black applicants from applying for available units."); *see also Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1529 (7th Cir. 1990) ("A point-blank refusal is not necessary; any effort to discourage will do."); *Hous. Rts. Ctr. v. Sterling*, 404 F. Supp. 2d 1179, 1192 (C.D. Cal. 2004) (noting that claims have been sustained under section 3604(b) for "providing disparate 'rental charges, security deposits and the terms of lease' based on tenants' race, color or national origin." (citation omitted)).

In short, viewing the evidence most favorably to Plaintiffs and drawing all permissible inferences in their favor, a rational fact finder could find that Plaintiffs' evidence establishes a prima face case and raises an inference of discrimination.

There are also genuine material factual disputes relevant to the reasons Defendants have offered to explain the superintendents' conduct. Defendants argue that there are legitimate non-discriminatory reasons for Gashi and Xhema's conduct. Mainly, Defendants argue that Gashi's interactions can be explained by what he happened to be in the middle of doing when approached by a prospective applicant. (DE 116-1 at 49.) For example, due to his job, "Gashi experienced frequent interruptions when he was in his home, when he was off duty, or when he was performing other work on the property." (DE 116-1 at 49; DE 116-24 at 11, ¶ 44.) Thus, Gashi was less likely to be warm and talkative when he was occupied, which Defendants state makes even more sense in light of the LIHS's tests, given there were no available apartments, and thus, "no purpose in him prolonging interactions with the testers or any other person who made inquiries about the apartment." (DE 116-1 at 49.)

Plaintiffs question the truthfulness of these statements and reference the September 2016 tests. (DE 117 at 40-41.) During the September 2016 tests, Gashi came down and spoke with a White Tester who rang his doorbell while he was at home, and amongst other things, provided her information about an upcoming one-bedroom apartment at Northwood and two-bedroom apartment at the Brightwaters. ( DE 119-13 at 16-17, ¶¶ 43-50.) Gashi, amongst other things, did not provide the same information to a Black tester. (*Id.*) Gashi testified that he did not feel the need to tell people about an apartment coming up when disturbed in his apartment because he was not on duty, and his demeanor might change depending on his mood or if he was working. (DE 117-9; DE 119-13 at 25, ¶¶ 63-66.) Gashi also testified that his response would not matter

if he was painting an apartment because he was disturbed more in his own apartment and not by working in an apartment.  (*Id*.)  Plaintiffs have provided sufficient evidence to call into question whether Defendants' explanation is a legitimate nondiscriminatory reason.  In short, Defendants have not sufficiently shifted the burden to Plaintiffs because disputes of material fact exist as to the veracity of Defendants' proffered reasons given the conflicting evidence.

Defendants also state that the Main Office has a central list of vacancies and handles all apartment applications.  (DE 116-1 at 49.)  Even though superintendents may sometimes have up-to-date apartment vacancy information and application status, that is simply the exception not the rule.  (DE 116-1 at 49.)  Thus, Defendants argue, irrespective of whether Gashi or Xhema gave mistaken information, it is because they had mistaken information and that LIHS cannot prove otherwise. (DE 116-1 at 49.)  This fails to explain why that information, mistaken or not, was provided in a differential manner to Black and White testers, and regardless, these conclusory assertions do not create an absence of otherwise genuine dispute of material fact as to whether there was a legitimate non-discriminatory reason for the behavior in question.

Defendants also argue the discrepancies in information provided to Black and White testers can be explained by one of the White Testers being "much more assertive and friendly than the" Black Testers in pursing information about the apartments, and that explains why that tester was able to extract more information from Gashi and had a longer interaction with him. (DE 119 at 24.)  On the other hand, Defendants describes the White Tester as having "aggressively pursued" the information.  (DE 116-1 at 47.)  The inference that Gashi actually provided more information to the White Tester on that basis alone is not the only inference to be made.

Defendants attempt to neutralize the fact that Gashi provided information about potential upcoming apartments that could have become available after the tester site visits by stating that the evidence shows that "anticipated vacancies were never a sure thing" and the NPS office was the one that kept "master list of upcoming vacancies at the Defendant Properties, and the on-site supers generally were not privy to the specific status of any apartment." (DE 119 at 25.) Again, Defendants' argument misses the point. Regardless of whether the future vacancies Gashi provided information about would have become available, this would not explain why Gashi provided this information to White Testers but not to similarly situated Black Testers.

Defendants further assert that LIHS's claims are incorrectly based on the personal demeanors of the on-site superintendents since the anti-discrimination laws are not intended to function as a "general civility code." (DE 117 at 48.) Defendants cite to *Wilson v. Family Dollar Stores of New York, Inc.*, 2008 WL 4426957, at *8 (E.D.N.Y. Sept. 25, 2008), *aff'd*, 2010 WL 1559091 (2d Cir. Apr. 20, 2010) and *Lai v. Delorio Foods, Inc.*, 2018 WL 987258, at *5 (N.D.N.Y. Feb. 20, 2018) for the proposition that LIHS's race discrimination claims should be dismissed, and in particular, reference the portions of those cases that reflect rude behavior is not evidence of discrimination. (DE 116 at 49-50.) Put into context, the *Lai* Court stated, in relation to plaintiff's hostile work environment claim, that plaintiff's vague allegations, without any examples, that her immediate supervisor displayed anger and aggression when speaking to her were insufficient without more to permit an inference of racial discrimination. *Lai*, 2018 WL 987258, at *5. And the *Wilson* Court stated, in relation to plaintiff's hostile work environment claim, that plaintiff's allegation that plaintiff's manager engaged in favoritism and displayed angry facial expressions may indicate "personal enmity" but did not support a claim for discrimination. *Wilson*, 2008 WL 4426957, at *8. The cases are inapposite in this context and

the personal demeanor argument is unconvincing, nonetheless. Surely the personal demeanor of the superintendents is irrelevant *without* more. As Plaintiffs note, this does not explain the differences in treatment between the testers. (DE 117 at 44.)

Finally, Defendants argue that in any event, racial motivation cannot be shown because Defendant Properties' population is diverse -- for example, Gashi testified that 90% of the tenants in his building were non-Caucasian. (DE 119 at 24.) But this statistic alone is an insufficient defense to show lack of racial motive since equal opportunity must be afforded to *each* applicant regardless of the remainder of the workforce or population. *Cf. Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579 (1978) ("It is clear beyond cavil that the obligation imposed by Title VII is to provide an equal opportunity for each applicant regardless of race, without regard to whether members of the applicant's race are already proportionately represented in the work force."); *see also Fair Hous. Ctr. of Washtenaw Cnty., Inc.*, 2009 WL 497402, at *7 (noting in response to an argument that "diverse tenant population" showed lack of discrimination in an FHA case that "the line of Supreme Court Title VII cases that make clear that an equal opportunity must be provided to each applicant, regardless of race and regardless of what balance may exist in the work force" (citations omitted)).

Plaintiffs have presented evidence that on multiple occasions that similarly situated Black and White Testers were provided differing information regarding apartment availability. Whether done intentionally to discriminate or for innocuous reasons, and whether the specific justifications proffered by Defendants are the genuine, the plethora of arguments the parties make are riddled with genuine issues of material fact that are appropriate for a jury to resolve after weighing the evidence, hearing testimony, and making credibility determinations, not for the Court to resolve at this stage. *See Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)

("Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment."). Those issues are more properly determined by a trier of fact, either judge or jury, but not by a judge on summary judgment.

Accordingly, the undersigned respectfully recommends Defendants' motion for summary judgment be denied to the extent they seek to dismiss LIHS' race discrimination claims.

## IV. <u>CONCLUSION</u>

Accordingly, the undersigned respectfully recommends the parties' cross-motions be decided as follows: (i) grant Defendants' motion for summary judgment as to Plaintiffs' FHA claims to the extent Plaintiffs seek to assert FHA claims on the basis of source of income discrimination, and deny Plaintiffs' motion as to the same, (ii) grant Defendants' motion for summary judgment as to Plaintiffs' NYSHRL claims regarding Defendants' Quota Statements and related rejection of applicants to the extent those claims are based on source of income discrimination, and deny Plaintiffs' motion as to the same (iii) grant Plaintiffs' motion for summary judgment on their claims under Suffolk County Code § 528-9(A)(7) for statements expressing a limitation in connection with rental inquiries, and  Suffolk County Code § 528-9(A)(1) for refusing to rent housing, to the extent those claims are based on source of income discrimination related to the Quota Statements and related rejection of applicants, and deny Defendants' motion as to the same, (iv) grant Defendants' motion for summary judgment as to Plaintiffs' disparate impact claims related to the Policy to the extent those claims are premised on disability discrimination, and deny Plaintiffs' motion as to the same, (v) grant Defendants' motion for summary judgment as to Plaintiffs' claim for disparate treatment related to the Policy, (vi) deny

the parties' cross motions for summary judgment on Plaintiffs' disparate impact claim related to the Policy to the extent premised on source of income discrimination, (vii) deny Defendants' motion for summary judgment on Plaintiffs' race discrimination claim, (viii) deny Defendants' motion for summary judgment on Kernozek's claims based on the rejection of her 2016 application, and (ix) deny Plaintiffs' motion for summary judgment on Gerardi's claims based on the rejection of her 2017 application.

## **OBJECTIONS**

A copy of this Report and Recommendation is being electronically served on counsel. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report. 28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals. *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("failure to object timely to a magistrate's report operates as a waiver of any

further judicial review of the magistrate's decision"); *see Monroe v. Hyundai of Manhattan &*

*Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (same).


Dated:          Central Islip, New York
                January 24, 2023



                                        **Respectfully recommended,**

                                        /S/ *James M. Wicks*
                                        ─────────────────────
                                        JAMES M. WICKS
                                   United States Magistrate Judge