# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

LONG ISLAND HOUSING SERVICES,
INC.; SUFFOLK INDEPENDENT LIVING
ORGANIZATION, INC.; DOREEN
KERNOZEK; LORI GERARDI,

                Plaintiffs,

vs.

NPS HOLIDAY SQUARE LLC;
NORTHWOOD VILLAGE, INC.;
BRIGHTWATERS GARDENS, INC.;
LAKESIDE GARDEN APARTMENTS
LLC; AND NPS PROPERTY CORP.,

                Defendants.

NO. 18-CV-03583-DG-JMW

# PLAINTIFFS' OBJECTIONS TO REPORT AND RECOMMENDATION

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................................ 1

II.    STANDARD OF REVIEW ................................................................................ 2

III.   ARGUMENT ...................................................................................................... 3

     A.     Plaintiff Lori Gerardi's Claim Stemming from Her 2017 Application.................. 3

     B.     Plaintiffs' Disparate Impact Claim Under Suffolk County and New York State Law ........................................................................................................... 5

          1.     Prima Facie Case....................................................................................... 6

          2.     Business Necessity.................................................................................... 9

     C.     Plaintiffs' Challenge to the Income Policy Under the NYSDHR Guidance ........ 14

     D.     Plaintiffs' Disparate Treatment Claim Regarding the Income Policy .................. 17

IV.   CONCLUSION.................................................................................................. 22

# TABLE OF AUTHORITIES

Page

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)......................................3, 13

*Artista Recs., LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010)........................................................................................2

*Banks v. City of Albany*,
953 F. Supp. 28 (N.D.N.Y. 1997)..............................................................................9

*Brown v. City of New York*,
No. 16 CV 1106(NG) (RER), 2017 WL 1102677 (E.D.N.Y. Mar. 23, 2017)........................20

*Brown v. City of Oneonta*,
221 F.3d 329 (2d Cir. 2000)...............................................................................17, 19

*Chabra v. Maplewood Partners, L.P.*,
No. 12-CV-1113(JS)(ARL), 2016 WL 868207 (E.D.N.Y. Mar. 7, 2016)................................3

*Chen-Oster v. Goldman, Sachs & Co.*,
No. 10CIV6950ATRWL, 2022 WL 814074 (S.D.N.Y. Mar. 17, 2022)..............11, 12, 14, 15

*Coyle v. United States*,
954 F.3d 146 (2d Cir. 2020)........................................................................................3

*Dothard v. Rawlinson*,
433 U.S. 321 (1977)................................................................................................5, 7

*Griggs v. Duke Power Co.*,
401 U.S. 424 (1971)...............................................................................................7, 20

*Hack v. President & Fellows of Yale Coll.*,
237 F.3d 81 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz v. Sorema
N.A.*, 534 U.S. 506 (2002)......................................................................................8, 9

*Int'l Union of Painters & Allied Trades v. New York State Dep't of Lab.*,
32 N.Y.3d 198 (2018)...............................................................................................14

*Johnson v. Wing*,
178 F.3d 611 (2d Cir. 1999).......................................................................................19

*Lax v. 29 Woodmere Blvd. Owners, Inc.*,
812 F. Supp. 2d 228 (E.D.N.Y. 2011) .....................................................................12

# TABLE OF AUTHORITIES

Page

*Legg v. Ulster Cnty.*,
   820 F.3d 67 (2d Cir. 2016)........................................................................................21

*Lopa v. Fireman's Fund Ins. Co.*,
   No. 11-CV-2973(SJ)(VMS), 2014 WL 1311531 (E.D.N.Y. Mar. 31, 2014)...........................2

*Mandala v. NTT Data, Inc.*,
   975 F.3d 202 (2d Cir. 2020)....................................................................................5, 6, 7

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973).............................................................................................20, 21

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
   819 F.3d 581 (2d Cir. 2016)....................................................................................8, 9

*Mitchell v. Shane*,
   350 F.3d 39 (2d Cir. 2003)......................................................................................21

*Mugabo v. Wagner, Joan Fam.*,
   No. 20-CV-1390-A, 2022 WL 954403 (W.D.N.Y. Mar. 30, 2022) ..........................................2

*Olsen v. Stark Homes, Inc.*,
   759 F.3d 140 (2d Cir. 2014)....................................................................................18

*P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ. (Region 4)*,
   819 F. Supp. 2d 90 (E.D.N.Y. 2011), aff'd, 526 F. App'x 135 (2d Cir. 2013) .......................2

*Quarles v. Gen. Motors Corp. (Motors Holding Div.)*,
   758 F.2d 839 (2d Cir. 1985) (per curiam)...................................................................13

*Ragin v. Harry Macklowe Real Est. Co.*,
   6 F.3d 898 (2d Cir.1993)........................................................................................5

*Ramirez v. Selsky*,
   817 F. Supp. 1090 (S.D.N.Y. 1993).........................................................................13

*Sanchez v. Thompson*,
   No. 07-CV-0531, 2011 WL 890763 (E.D.N.Y. Mar. 11, 2011).........................................20, 21

*St. Mary's Honor Ctr. v. Hicks*,
   509 U.S. 502 (1993)...............................................................................................18

*Stender v. Lucky Stores, Inc.*,
   803 F. Supp. 259 (N.D. Cal. 1992) ..........................................................................11

*Striker Sheet Metal II Corp. v. Harleysville Ins. Co. of N.Y.*,
  No. 216CV05916ADSAYS, 2018 WL 654445 (E.D.N.Y. Jan. 31, 2018) ............................11

*Tex. Dep't of Cmty Affs. v. Burdine*,
  450 U.S. 248 (1981) .................................................................................................18

*Tsombanidis v. W. Haven Fire Dep't*,
  352 F.3d 565 (2d Cir.2003) .....................................................................................12

*United States v. Space Hunters, Inc.*,
  429 F.3d 416 (2d Cir. 2005) ......................................................................................4

*United States v. Tortora*,
  30 F.3d 334 (2d Cir. 1994) ........................................................................................2

*Vernon v. Port Auth. of N.Y. and N.J.*,
  No. 95 CIV. 4595 (PKL), 2002 WL 1072225 (S.D.N.Y. May 22, 2002) ...............18

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) .................................................................................................19

*Wanamaker v. Columbian Rope Co.*,
  108 F.3d 462 (2d Cir. 1997) .....................................................................................18

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) .................................................................................................17

**STATUTES**

28 U.S.C. § 636(b)(1) ....................................................................................................2

Fair Housing Act ......................................................................................................5, 12

New York Human Rights Law ...............................................................................1, 5, 14

Suffolk County Human Rights Law .......................................................................3, 4, 5

Suffolk County Local Law, No. 51-2006 § 1 .................................................................5

**OTHER AUTHORITIES**

24 C.F.R. § 100.500(b)(2) (2013) .................................................................................9

Fed. R. Civ. P. 72(b) ....................................................................................................2

# TABLE OF AUTHORITIES

Page

Federal Rule of Civil Procedure 56 ....................................................................................3

https://www.budget.ny.gov/pubs/archive/fy20/exec/artvii/elfa-artvii-ms.pdf (last visited
    Feb. 27, 2023) ............................................................................................................15

*Implementation of the Fair Hous. Act's Discriminatory Effects Standard*, 78 Fed. Reg.
    11460 (Feb. 15, 2013)...................................................................................................8

*Soc. Sec. Admin.*, Monthly Statistical Snapshot, January 2022,
    https://www.ssa.gov/policy/docs/quickfacts/stat_snapshot/2022-01.pdf (2022).....................16

# I.     INTRODUCTION

Plaintiffs object to the Magistrate Judge's January 24, 2023 Report & Recommendation ("R&R"), ECF. No. 128, based on four discrete errors of fact or law.  First, the R&R recommended denying Plaintiff Lori Gerardi's motion for summary judgment stemming from the rejection of her 2017 application, where Defendants stated they had met their "quota" on applicants with vouchers, finding it was unclear whether Defendants knew Ms. Gerardi had a disability and was therefore qualified for the particular housing she sought.  The R&R overlooked the evidence indisputably establishing that Defendants knew of Ms. Gerardi's disability when she applied.  The R&R also failed to apply the correct legal standard and binding Second Circuit authority holding that statements like Defendants' are themselves violations of the law, regardless of whether the applicant is qualified for the housing sought.

Second, the R&R misapplied the correct legal framework in recommending denial of Plaintiffs' motion for summary judgment on Plaintiffs' disparate impact challenge to Defendants' minimum income policy.  The R&R failed to adhere to binding Supreme Court and Second Circuit authority supporting the evidence presented by Plaintiffs as sufficient to establish their *prima facie* case.  The R&R then conflated the second (business necessity) and third (less discriminatory alternative) steps in the burden-shifting analysis.  Because Defendants cannot meet their burden under the second step, the R&R should not have then placed the burden back on Plaintiffs to establish liability under the third step.

Third, the R&R recommended denying Plaintiffs' motion for summary judgment on Plaintiffs' challenge to Defendants' income policy as a violation of the New York State Human Rights Law, as set forth in Guidance issued by the New York State Division of Human Rights. The R&R's conclusion was based on an incomplete reading of that Guidance, the complete reading

of which conclusively establishes that Defendants' income policy is a violation of New York State law.

Fourth, the R&R recommended granting Defendants' motion for summary judgment on Plaintiffs' intentional discrimination claim challenging Defendants' selective use of their income policy to limit the number of tenants with vouchers living in their properties. The R&R ignored certain relevant facts, including that Defendants stated they maintained a "quota" on tenants with vouchers and provided no rational basis for applying their income policy on a selective basis, which creates a clear dispute as to whether Defendants' use of their income policy occurred under circumstances giving rise to an inference of intentional discrimination.

## II.    STANDARD OF REVIEW

When reviewing an R&R, the District Court has full discretion to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). For any dispositive matter, such as a motion for summary judgment, "any part of the magistrate judge's recommendation that has been properly objected to must be reviewed by the district judge *de novo*." *Artista Recs., LLC v. Doe 3*, 604 F.3d 110, 116 (2d Cir. 2010) (citing Fed. R. Civ. P. 72(b)). "A *de novo* determination entails an independent review of all objections and responses to the magistrate's findings and recommendations." *Lopa v. Fireman's Fund Ins. Co.*, No. 11-CV-2973(SJ)(VMS), 2014 WL 1311531, at *1 (E.D.N.Y. Mar. 31, 2014) (citing *United States v. Tortora*, 30 F.3d 334, 337 (2d Cir. 1994)); *see also P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ. (Region 4)*, 819 F. Supp. 2d 90, 97 (E.D.N.Y. 2011), aff'd, 526 F. App'x 135 (2d Cir. 2013).

Objections that "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection" and which are supported by legal authority warrant review *de novo*. *Mugabo v. Wagner, Joan Fam.*, No. 20-CV-1390-A, 2022 WL 954403, at *1 (W.D.N.Y. Mar. 30, 2022). Objections must "point to any

evidence or law that [the magistrate judge] overlooked." *Chabra v. Maplewood Partners, L.P.*, No. 12-CV-1113(JS)(ARL), 2016 WL 868207, at *2 (E.D.N.Y. Mar. 7, 2016).

Under Federal Rule of Civil Procedure 56, summary judgment should be granted if "there is no genuine dispute as to any material fact and … the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 2248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). When considering whether this burden has been met by the moving party, the Court "draw[s] all factual inferences and resolve[s] all ambiguities in favor of the non-moving party." *Coyle v. United States,* 954 F.3d 146, 148 (2d Cir. 2020).

## III. ARGUMENT

### A. Plaintiff Lori Gerardi's Claim Stemming from Her 2017 Application

The R&R did not fully consider the evidence presented and the applicable law when ruling on Plaintiff Lori Gerardi's claim as to her 2017 application. The R&R properly granted summary judgment in favor of Plaintiffs Long Island Housing Services ("LIHS") and Suffolk Independent Living Organization ("SILO") for claims made under Suffolk County Code § 528-9(A)(7), based on the statements NPS representatives made to applicants that NPS had met its "quota" on disability-based voucher programs (the "Quota Statements"). R&R at 35-39. As the R&R also correctly notes, Plaintiff Lori Gerardi applied to an NPS property in 2017 using a Mainstream Program housing voucher, which is provided exclusively to non-elderly persons with disabilities, and Ms. Gerardi's application was denied based on the same Quota Statement made to LIHS and SILO. R&R at 12, 15, 32. However, the R&R denied Ms. Gerardi's motion for summary judgment because Ms. Gerardi did not meet the age restriction for the 55+ property to which she applied, and while NPS does not apply that age restriction to applicants with disabilities, the R&R held that

"[i]t is unclear whether Defendants were aware that Gerardi had a disability at the time she applied." *Id*. at 38-39. On this basis, the R&R concluded that a triable issue of fact remained as to whether NPS had a legitimate reason for denying her 2017 application. *Id*. at 39.

The undisputed facts, however, establish that NPS knew at the time Ms. Gerardi applied in 2017 that she had a disability and was therefore exempt from the age limit policy. On her application form, under "Occupation," Ms. Gerardi wrote, "Disabled." ECF No. 127-20. It is therefore beyond dispute that NPS rejected Ms. Gerardi's application based solely on the Quota Statement made to her, not because she was not qualified to live at the property to which she applied.

Separately, and more fundamentally, the R&R correctly held that Defendants were liable under Suffolk County law *for making the Quota Statements*, as it is unlawful to make "any statement … or to make any … inquiry in connection with the prospective … rental … which expresses, directly or indirectly, any limitation … because of the lawful source of income of such individual or individuals, or any intent to make any such limitation …." R&R at 25, 30 (citing Suffolk County Code § 528-9(A)(7)). There is no dispute that Defendants made the unlawful Quota Statement to Ms. Gerardi. *See* R&R at 12, 15, 32. Defendants are therefore liable under Suffolk County law, regardless of Ms. Gerardi's eligibility for the housing she sought. *See United States v. Space Hunters, Inc.*, 429 F.3d 416, 424-25 (2d Cir. 2005) (finding a violation of identically worded federal statute based on the statement itself, as "[n]othing in this language limits the statute's reach to … statements that directly effect a housing transaction. Indeed, this language does not provide any specific exemptions or designate the persons covered, but rather ... applies on its face to anyone who makes prohibited statements. … [The statute] protects the right to inquire about the availability of housing without being subjected to … discriminatory statements. … In

fact, we have permitted plaintiffs to recover for discriminatory advertising even when the plaintiffs were not in the market for housing.") (internal quotation marks omitted) (citing *Ragin v. Harry Macklowe Real Est. Co.,* 6 F.3d 898, 903–04 (2d Cir.1993)). *See also* Suffolk Cnty. Local Law, No. 51-2006 § 1 (Suffolk County Human Rights Law is "substantially equivalent to the federal Fair Housing Act").

Ms. Gerardi's motion for summary judgment should therefore be granted as to her 2017 application.

**B.     Plaintiffs' Disparate Impact Claim Under Suffolk County and New York State Law**

The R&R did not apply the proper legal standards and burden-shifting framework when ruling on Plaintiffs' disparate impact challenge to NPS's minimum income requirement under Suffolk County and New York State law.[1]  First, the R&R mistakenly held that triable issues of fact remain as to Plaintiffs' *prima facie* case, despite binding authority that the unrebutted statistical analysis presented by Plaintiffs is sufficient to establish a *prima facie* case. *See* R&R at 53-60; *Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977); *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 210 (2d Cir. 2020).  Second, the R&R improperly conflated the second (business necessity) and third (less discriminatory alternative) parts of the disparate impact analysis, departing significantly and unjustifiably from the well-established three-step burden-shifting framework governing this claim. *See* R&R at 61-73.  Because Defendants fail to establish that their minimum income policy as applied to applicants with vouchers is justified by any actual business necessity,

---

[1] Plaintiffs understand that claims alleging source-of-income discrimination under New York law only pertain to actions taken by Defendants after "source of income" was added to the Law as a protected class in April 2019.

Plaintiffs have established liability and no shift of the burden back to Plaintiffs to provide a less discriminatory alternative to that policy is warranted.

The Magistrate, therefore, should have recommended the entry of judgment in favor of Plaintiffs on their Suffolk County and New York State law claims under a disparate impact theory of liability.

### 1. *Prima Facie* Case

The R&R correctly found that Plaintiffs had established their *prima facie* disparate impact claim by presenting unrebutted statistical evidence that NPS's income requirement, as it is stated on the face of its rental application documents and as it is utilized to reject certain applicants with vouchers, results in a statistically significant impact adverse to applicants with vouchers. R&R at 57. The R&R goes on to conclude that Defendants should not be permitted to "evade liability" for a disparate impact claim by "cherry pick[ing] when they apply those policies to certain individuals." *Id*. However, the R&R then concludes, without explanation, that it is still possible that a trier of fact could conclude that Plaintiffs have not established their *prima facie* case because the "actual impact" of NPS's policy may not be statistically significant, given that Defendants selectively and arbitrarily apply this policy. R&R at 58-59. Yet that conclusion allows for precisely the kind of manipulation of the disparate impact analysis, and of civil rights laws more broadly, that the R&R cautions against, and is directly contradicted by Supreme Court and Second Circuit authority establishing how a *prima facie* case can be made. *See infra* at 7-8.

First, the R&R misconstrues which *policies* are at issue in the disparate impact challenge Plaintiffs make. Plaintiffs do not challenge NPS's minimum income requirement to the extent that Defendants ignore the policy and accept applicants with vouchers who do not meet the requirement. Instead, Plaintiffs challenge the policy as stated on NPS's application documents and as it is applied to reject applicants with vouchers in those instances Defendants elect to apply

the requirement. It would be anathema to the civil rights laws if a company can selectively enforce a discriminatory policy on some occasions and, in doing so, evade accountability for its unlawful conduct entirely.

For example, suppose that in the wake of the Supreme Court's ruling in *Griggs*, in which the Court ruled that Duke Power Company's minimum education requirement resulted in an unlawful disparate impact adverse to Black applicants, Duke Power responded by maintaining that same policy on its written application form but only applying it six months of the year. *See generally Griggs v. Duke Power Co.*, 401 U.S. 424 (1971). Clearly, that policy would still have an adverse impact on Black applicants who either do not apply because they are dissuaded by the application form or who are rejected during the times when the policy is in effect. But according to the R&R's conclusion, there would still be a triable question as to whether a plaintiff made out a *prima facie* case because the actual impact on all Black applicants may not be statistically significant when accounting for those who are accepted during the interim period when the policy is suspended. Defendants should not be permitted to obscure the disparate impact inquiry, and thereby skirt the anti-discrimination laws, through a practice of selective enforcement of a policy that otherwise causes an adverse impact on those applicants to whom it was applied, then after the fact claim that the policy's actual impact is not significant (due solely to that selective enforcement).

Second, while the R&R cites the Supreme Court and Second Circuit authority holding that a *prima facie* case can be established based on general demographic data of an applicant pool, rather than actual applications, and that this case warrants such an analysis, the R&R nevertheless concluded that Plaintiffs' *prima facie* case still presented a triable issue. R&R at 58 (citing *Dothard*, 433 U.S. at 330, and *Mandala*, 975 F.3d at 210). The R&R should have remained faithful

7

to that authority by concluding that Plaintiffs had established their *prima facie* case based on statistics regarding the pool of potential applicants that Plaintiffs' expert used.

Third, a *prima facie* case can also be established if a policy will "predictably result[]" in a future disparity, rather than based on the actual results of a present disparity. *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 98 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ("A prima facie case of disparate impact housing discrimination is established by showing that a particular facially-neutral practice actually *or predictably* imposes a disproportionate burden upon members of the protected class.") (emphasis added); *see also Implementation of the Fair Hous. Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15, 2013) ("[P]laintiff first bears the burden of proving its prima facie case that a practice results in, *or would predictably result in*, a discriminatory effect on the basis of a protected characteristic.") (emphasis added). Courts routinely have found that plaintiffs make out a *prima facie* case when a defendant's challenged policy is predicted to have a disparate impact on a protected group in the future. *See*, *e.g.*, *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 620 (2d Cir. 2016) ("[P]laintiffs more than established a prima facie case" based on "potential" future outcome of zoning policy.). Plaintiffs' *prima facie* case can therefore be based either on actual disparities or the disparities that would predictably result from the future implementation of Defendants' income requirement.

The future implementation of Defendants' income requirement is a certainty, which is why one main component of Plaintiffs' disparate impact claim seeks to permanently enjoin the enforcement of the income requirement outright. And even though Defendants selectively enforced the income requirement in the years leading up to this lawsuit, the undisputed record shows that Defendants plan to consistently apply this income policy in the future. *See generally*

Declaration of Haley Cole (ECF No. 91-9). *Before* Plaintiffs brought claims in March 2019 challenging the income requirement, Defendants routinely ignored the income requirement and accepted applicants with vouchers who would be ineligible under their written policy. *Id*., Attachment A at 5 (bolded line demarcating applicants who did not meet the income requirement). Then, *after* these claims were brought, Defendants began strictly applying the policy on a consistent basis. *Id*., Attachment A 5-10 (all applicants with vouchers accepted after the lawsuit was filed met the income requirement). Defendants will continue implementing the income requirement in the future on a consistent basis, as they have since the policy was challenged in this case, with the predictable result of causing an actual disparity adverse to applicants with vouchers.

The fact that Defendants have in the past "cherry pick[ed]" when they apply their minimum income requirement to applicants with vouchers should have no bearing on whether Plaintiffs can establish their *prima facie* disparate impact claim. R&R at 57. Instead, this undisputed fact establishes that the policy *is not required* to advance Defendant's actual business needs.

### 2. Business Necessity

The R&R correctly noted that once Plaintiffs establish their *prima facie* case, the burden shifts to Defendants to show, through "supporting evidence," that the challenged policy is "*in fact required* to achieve" a legitimate business need. R&R at 61 (quoting *Banks v. City of Albany*, 953 F. Supp. 28, 36 (N.D.N.Y. 1997) (emphasis added). *See also Hack*, 237 F.3d at 100 ("[T]he defendant must show that the challenged action is *demonstrably* necessary to meet an important business goal.") (emphasis added); *Mhany*, 819 F.3d at 617 (instructing that the challenged policy must further a business need "in theory and *in practice*") (emphasis added); 24 C.F.R. § 100.500(b)(2) (2013) (stating that a valid business necessity "must be *supported by evidence* and *may not be hypothetical or speculative*").

The R&R also correctly found, as did the District Court in a prior ruling, that Defendants' business necessity expert opined only on the *theoretical* necessity of an income policy to evaluate the general financial risk of nonpayment of rent, but not the actual necessity of the policy as it relates to applicants who use housing vouchers that cover a significant portion or all of the rent. R&R at 62-63 (citing ECF No. 103 at 23). It is no surprise, of course, that this expert was never shown the incomes and voucher amounts of the tenants actually living at Defendants' properties, some of whom have incomes well below what the expert considered necessary—less than $1,000 per month in income (consistent with Supplemental Security Income benefit amounts)—or no income at all. *See* Declaration of Haley Cole (ECF No. 91-9). Knowledge of this essential fact would have altered the expert's opinion of the financial risk associated with renting to such individuals and whether Defendants in fact needed their income requirement to prevent the risk that monthly rents would not be paid, especially when NPS's President admitted in her deposition that renting to such individuals is "less risky" because of the high proportion of the rent that is paid through their vouchers. SUF ¶¶ 70, 154 (ECF No. 115-39); *see also* R&R at 63. As the R&R recognized, Defendants' business necessity expert's opinion is of limited value and does not establish a defense of this policy. *See* R&R at 62-64.

Not only have Defendants failed to provide evidence supporting their business necessity defense, but the undisputed facts establish conclusively that such a defense cannot be made. The R&R properly rejected Defendants' attempts to explain why so many of its tenants with vouchers do not meet the income requirements they claim to be a necessity. *Id*. at 63-64. Given the inconsistent manner in which Defendants apply the very policy they claim to be a necessity and their concession of its flexible enforcement, no reasonable trier of fact could conclude that this policy is justified by a legitimate business need when applied to applicants with vouchers.

The R&R's analysis of Defendants' business necessity defense should have ended there, as Plaintiffs' claims succeed if Defendants are unable to provide "*supporting evidence*" proving that the policy is "*in fact required*," and that it is necessary "*in practice*" to achieve a legitimate business goal that is not "*hypothetical or speculative*." *See supra* at 9 (citing authority); *see also Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 335 (N.D. Cal. 1992) (finding that plaintiffs had proven their disparate impact claim where "[d]efendant argued that its decision making policies [we]re necessitated by the nature of the … business" but "plaintiffs have offered proof that defendant does not consistently follow the policies that it has established"). The burden does not then shift back to Plaintiffs to show a less discriminatory but comparable alternative exists. However, the R&R goes on to analyze the third factor in the burden-shifting framework, stating that this argument "overlap[s]" with the second factor. *Id*. at 64. The R&R concludes that a reasonable juror could find that "even if Defendants' Policy is unnecessary to their purported interest, Plaintiffs' proposed alternative fails to meet that interest," and therefore summary judgment should not be granted. *Id*. at 72. Yet if Defendants cannot prove their policy is necessary, Plaintiffs need not make that showing of a proposed alternative—liability is already established.[2] *See*, *e*.*g*., *Chen-Oster v. Goldman, Sachs & Co.,* No. 10CIV6950ATRWL, 2022 WL

---

[2] The R&R also overlooks that Defendants have abandoned altogether any arguments in defense of their income requirements in effect before this lawsuit was filed (but during the statutory period of this case) and that are still stated on the NPS application forms, in which applicants must have an income, separate from any vouchers, equivalent to either four times the rent (NPS's previous application forms) or two times the rent (previously applied and currently stated on NPS application forms). And the fact that Defendants have stated they no longer apply these income requirements negates any possible business necessity defense that could have been made. *See* SUF ¶ 45 (ECF No. 115-39). With no defense raised, Plaintiffs' motion challenging these income requirements should be granted. *See Striker Sheet Metal II Corp. v. Harleysville Ins. Co. of N.Y.*, No. 216CV05916ADSAYS, 2018 WL 654445, at *11 (E.D.N.Y. Jan. 31, 2018) ("In the Second Circuit, a party that fails to raise an argument in its opposition papers in a motion for summary judgment has waived that argument.").

814074, at *28 (S.D.N.Y. Mar. 17, 2022), *on reconsideration in part*, No. 10CIV6950ATRWL, 2022 WL 3586460 (S.D.N.Y. Aug. 22, 2022) (refusing to proceed under a similar line of analysis, stressing that "no authority [exists] allowing parties to skip to the final step of a burden-shifting framework without first carrying their burden in an intervening step," and that merging the steps would "turn the burden-shifting framework on its head" by demanding plaintiffs rebut a presumption that should not apply in the first place).[3]

Even if the R&R had not mistakenly merged the second and third steps in the disparate impact analysis, which alone warrants a rejection of its Recommendation, its review of the arguments regarding Plaintiffs' less discriminatory alternative improperly accounted for irrelevant facts presented by Defendants. In its continued analysis, the R&R goes on to discuss the relative risks associated with Defendants' policy against Plaintiffs' proposed alternative, concluding that the "parties engage in a fact heavy battle of conflicting hypotheticals, statistics, and methodologies of calculating risk." *Id*. at 72. Yet the evidence of risk, on its face, shows conclusively that tenants with vouchers living at NPS properties who did not meet NPS's income requirement pose less financial risk than other tenants, based on the only metric that could possibly matter—the average amount owed in unpaid rent.

Despite this evidence, the R&R reviewed Defendants' contrived methodology for assessing risk, using baseless, unsupported, and attorney-manufactured metrics such as "risk-adjusted high-point analysis" and the length of time a tenant is in arrears, to conclude that factual issues remain. But a closer look at Defendants' metrics reveal that they have no value whatsoever.

---

[3] "Courts, including the Second Circuit, have consistently relied on Title VII cases in their analysis of housing discrimination under the FHA." *Lax v. 29 Woodmere Blvd. Owners, Inc.*, 812 F. Supp. 2d 228, 234 n.4 (E.D.N.Y. 2011) (citing *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir.2003) ("When examining disparate impact claims under the [Fair Housing Act] and ADA, we use Title VII as a starting point.") (alterations original)).

For example, a tenant with a voucher owing $10 in unpaid rent for a year is presented by Defendants as more financially risky than a tenant without a voucher who fails to pay the full rental amount of $2,000/month for ten months (owing a total of $20,000), given the former is in arrears for longer. No reasonable trier of fact could make that same conclusion. Tellingly, this "risk analysis" was performed solely by Defendants' counsel, not by the expert Defendants had retained to conduct a business necessity and risk analysis. Such attempts to muddy the waters with irrelevant facts should be dismissed out of hand. *See, e.g., Anderson*, 477 U.S. at 248 ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact. … Factual disputes that are irrelevant or unnecessary will not be counted" towards a summary judgment determination.) (emphasis added); *Quarles v. Gen. Motors Corp. (Motors Holding Div.)*, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam) ("[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment."); *Ramirez v. Selsky*, 817 F. Supp. 1090, 1099 (S.D.N.Y. 1993) ("A dispute over irrelevant or unnecessary facts will not preclude summary judgment.").[4]

In these respects, the R&R did not apply the proper analysis to Plaintiffs' disparate impact claim. Application of the relevant facts to the proper legal framework supports a finding in Plaintiffs' favor at summary judgment.

---

[4] Defendants' counsel's "risk analysis" of the tenants living in NPS's properties also does nothing to counter the indisputable fact that Defendants have *assumed any risk* associated with renting to such tenants, as Defendants have repeatedly accepted applicants with vouchers who fail the income requirement despite any purported risk in doing so. Therefore, the NPS income requirement still has no *actual business necessity* as applied to these applicants.

**C.      Plaintiffs' Challenge to the Income Policy Under the NYSDHR Guidance**

In analyzing the level of deference owed to the New York State Division of Human Rights ("NYSDHR") in its interpretation of the New York Human Rights Law, the R&R did not fully analyze the language in the NYSDHR Guidance ("Guidance"). Had it done so, a ruling in Plaintiffs' favor would have been warranted.[5]

In addressing whether this Court should "afford the same deference to the NYSDHR that New York Courts do," R&R at 48, the R&R correctly noted that the NYSDHR is charged by the State Legislature with enforcing New York's fair housing laws, and deference to the NYSDHR Guidance is proper if the Agency provided a (1) rational interpretation that is (2) not inconsistent with the plain language of the statute. R&R at 47, 49 (citing *Int'l Union of Painters & Allied Trades v. New York State Dep't of Lab.*, 32 N.Y.3d 198, 209-10 (2018). The R&R then properly held that the NYSDHR Guidance met these criteria. *Id*. at 50. On this basis alone, the R&R should have concluded that the NYSDHR Guidance should be afforded the same deference the Agency would be given in New York State Court.

The R&R goes on, however, to provide an overview of both sides' arguments regarding the proper interpretation of the Guidance itself and whether it states that income requirements like Defendants' are unlawful. R&R at 50-51. While the R&R does not provide any conclusion on this argument, no reasonable reading of the plain language of the Guidance could possibly lead to a conclusion that NPS's income requirement is lawful. The Guidance states, in no uncertain terms, that companies "cannot" set income requirements like Defendants'. Guidance at 5 (ECF No. 91-

---

[5] To the extent Plaintiffs seek to permanently enjoin Defendants' continued use of its income requirement on applicants with vouchers, should the Court rule in Plaintiffs' favor on its claim under a disparate impact theory, it need not rule on the arguments made under the NYSDHR Guidance, and vice versa, as these are alternative methods of establishing liability and enjoining continued use of this policy.

16).  The entire purpose of the Guidance is to spell out what is and is not allowed under the statute, and directly points to income requirements equivalent to Defendants' as something companies "cannot" do under the statute.

The R&R goes on to recite Defendants' argument that the NPS income requirement is not "facially neutral," and therefore the Guidance may not apply to NPS's requirement.  *Id*. at 51.  Yet another section of the R&R appears to dismiss these very same arguments.  R&R at 55-56.  More importantly, the R&R does not address another clause within that section of the Guidance.  To be found unlawful, the income requirement could either be "facially neutral … [with] the effect of excluding populations with rental subsidies," *or* "*have the effect of frustrating the purpose of the law*."  Guidance at 5 (ECF No. 91-16) (emphasis added).  As the New York Attorney General's Amicus Brief in support of Plaintiffs' Motion for Summary Judgment explains, the purpose of the law is to prevent source-of-income discrimination that "disproportionately impacts the most vulnerable New Yorkers" and "keeps individuals and families in homeless shelters or substandard housing for longer periods of time and prevents New Yorkers from accessing low-poverty, high opportunity neighborhoods."  Amicus at 11 (ECF No. 118-2) (citing N.Y. State Div. of the Budget, Memorandum in Supp. of NY 2020 N.Y. State Exec. Budget: Educ., Labl. & Fam. Assistance Art. VII Legislation 24).[6]  It is beyond dispute that an income policy that is used to reject the most vulnerable New Yorkers, despite their use of a voucher that pays all or nearly all their rent, would frustrate the purpose of the source-of-income fair housing law.  Indeed, if NPS's income requirement were found to be lawful, Defendants—and by extension, any property within this District Court's jurisdiction—could implement income requirements that restrict thousands of

---

[6] Available at https://www.budget.ny.gov/pubs/archive/fy20/exec/artvii/elfa-artvii-ms.pdf https://www.budget.ny.gov/pubs/archive/fy20/exec/artvii/elfa-artvii-ms.pdf (last visited Feb. 27, 2023).

New Yorkers whose incomes do not meet these requirements, but who can in reality afford to live in these properties through the use of their vouchers. This action has the effect of relegating these individuals and families to substandard and segregated housing, homeless shelters, and assisted living facilities, negating the very purpose for which housing vouchers and the source-of-income legal protections were implemented.[7]

And in yet another part of the Guidance, the NYSDHR states that "[i]f the housing provider found the [applicant] unqualified based on the same information obtained by the vouchering agency this would have the effect of negating the Law." Guidance at 5 (ECF No. 91-16). That is indisputably what has occurred in this case—Defendants reject applicants with vouchers based on the same income information these applicants provide to the agencies approving and dispensing their vouchers. No reasonable trier of fact would conclude that the NYSDHR's statement that this practice would "negat[e] the Law" is not equivalent to stating this practice is unlawful.

A full reading of the NYSDHR Guidance, which should be given the deference it is owed under state law, conclusively establishes that NPS's income requirement is prohibited under New York law.

---

[7] For example, Supplemental Security Income, which is provided to the elderly, blind, and those with disabilities preventing them from working, was generally set at $793/month in 2021, which was far lower than NPS's minimum income requirement for any of its apartments during the same period. *See generally* Declaration of Haley Cole (ECF No. 91-9). Over 5 million people rely solely on Supplemental Security Income nationwide. *See Soc. Sec. Admin.*, Monthly Statistical Snapshot, January 2022, https://www.ssa.gov/policy/docs/quickfacts/stat_snapshot/2022-01.pdf (2022).

### D. Plaintiffs' Disparate Treatment Claim Regarding the Income Policy[8]

The R&R failed to apply the proper disparate treatment legal framework to the facts in this case. Plaintiffs challenge NPS's practice of rejecting applicants with vouchers through the selective use of its minimum income policy, on the basis that each individual rejection constitutes intentional discrimination. The R&R misconstrued Plaintiffs' legal arguments and the proper analysis for intentional discrimination claims when ruling in Defendants' favor on Plaintiffs' disparate treatment challenge. R&R at 73-77. Specifically, the R&R found that Plaintiffs failed to establish their *prima facie* disparate treatment claim or a discriminatory motive on Defendants' part. R&R at 76. This conclusion is contradicted by the facts alleged and the proper burden-shifting framework applicable to those facts, which the R&R did not apply.

Plaintiffs' disparate treatment claim is far simpler than the R&R makes it out to be. Plaintiffs challenge Defendants' selective use of an income requirement they do not need (at least for applicants with vouchers), as a means of intentionally limiting the number of tenants with vouchers living in its buildings. *See Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000) ("[A] plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner.") (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886)). Indeed, the record has already established that Defendants stated they maintained a "quota" on the number of tenants with vouchers and disabilities in its properties, and a reasonable jury could certainly conclude that an unnecessary income requirement was simply another means of achieving that goal.

---

[8] Plaintiffs recognize that if their Motion for Summary Judgment as to their disparate impact claim is granted, Plaintiffs' disparate treatment claim need not be addressed, as these are two separate theories of liability for overlapping claims.

The facts alleged fit perfectly into the burden-shifting framework for disparate treatment claims. First, Plaintiffs establish a *prima facie* case of housing discrimination by showing they (1) are members of a protected class; (2) sought and were qualified to rent the housing; (3) were rejected; and (4) that the rejection occurred under circumstances giving rise to an inference of discrimination. *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 152 (2d Cir. 2014). Plaintiffs' burden to demonstrate their *prima facie* case is "not onerous," *Tex. Dep't of Cmty Affs. v. Burdine*, 450 U.S. 248, 253 (1981); indeed, it is "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993), or "slight," *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 465 (2d Cir. 1997).

Plaintiffs easily make out a *prima facie* case: they (1) are members of protected classes (disability and source-of-income); (2) sought and were otherwise qualified for the apartments they sought, save for the income requirement they challenge as unlawfully applied to them; (3) were rejected; and (4) were rejected under circumstances giving rise to an inference of discrimination.

In direct contradiction with its analysis of Plaintiffs' disparate impact claim, the R&R found that a *prima facie* case could not be met because Plaintiffs "fail to establish that those applicants were qualified for the opportunity they sought" because "their income [wa]s insufficient." R&R at 73. Yet Plaintiffs' entire argument is that the selective, arbitrary and unnecessary use of an income policy as a means of denying applicants with vouchers is, itself, discriminatory. ECF No. 117 at 36. It was wholly improper for the R&R to find that Plaintiffs were not qualified for the housing they sought based on the very practice they challenge as unlawfully being used to reject them. *See, e.g.*, *Vernon v. Port Auth. of N.Y. and N.J.*, No. 95 CIV. 4595 (PKL), 2002 WL 1072225, at *5 (S.D.N.Y. May 22, 2002) (rejecting the argument that the plaintiff was not qualified for the position because he did not possess a license, as the plaintiff had put forth evidence that the licensing requirement was a pretext for discrimination).

Moreover, these rejections occur under circumstances giving rise to a clear inference of discrimination for multiple reasons, any one of which would be sufficient to establish a *prima facie* disparate treatment claim, and none of which the R&R properly considered. First, it is undisputed that Defendants do not consistently apply the income policy Plaintiffs challenge. R&R at 56. And while Defendants counter that they are sometimes willing to overlook the income requirement for certain reasons, the R&R properly rejected those rationales when addressing Plaintiffs' disparate impact claim. R&R at 63. Defendants' lack of a rationale for selectively applying their income requirement merely reinforces Plaintiffs' argument that the policy is a being used as a means to intentionally reject applicants because of their use of a voucher and limit the number of such tenants at their buildings.[9] Second, Defendants acknowledge "it is almost self-evident" the income requirement would operate to exclude voucher holders, establishing that Defendants understood this policy would provide a means to limit the number of voucher holders at their properties. *See* ECF No. 117 at 32. *See also Brown*, 221 F.3d at 337 ("A plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus") (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977); *Johnson v. Wing*, 178 F.3d 611, 615 (2d Cir. 1999)). Third, NPS representatives made recorded statements that the company maintained a "quota" on admitting certain tenants with vouchers. Any rational trier of fact could find that an income requirement Defendants knew would be useful in rejecting tenants with vouchers and limit the number of such tenants in their properties, and which had no actual value as a screening mechanism for these applicants, was part of the

---

[9] The R&R opines that "[w]hether or not Defendants['] proffered reasons establish the Policy is necessary, does not show an *intent* to discriminate." R&R at 75 (emphasis original). The R&R is mistaken—this dispute over the *necessity* of the policy raises the specter that Defendants' proffered reasons are not the true reasons, and are instead a cloak disguising their intentional discrimination.

company's effort to maintain this intended "quota." And fourth, testimony from Plaintiff Doreen Kernozek and a corroborating witness regarding statements about limiting the number of people with disabilities at Defendants' buildings, PRSUF ¶ 27 (ECF No. 117-34), further establish Defendants' unlawful intent of limiting the number of tenants with vouchers in its buildings. The evidence overwhelmingly supports Plaintiffs' *prima facie* case.[10]

Having established their *prima facie* case, the burden then shifts to Defendants to come forward with a legitimate, nondiscriminatory reason for the rejection of these applicants with vouchers, at which point the burden shifts back to Plaintiffs to demonstrate that this justification is a pretext for discrimination. *Sanchez v. Thompson*, No. 07-CV-0531, 2011 WL 890763, at *7 (E.D.N.Y. Mar. 11, 2011) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)). Defendants argue that the non-discriminatory reason for the rejections is the income requirement, which they apply to ensure that tenants can pay their rent. R&R at 75. Just as it improperly found that applicants with vouchers were not "qualified" for the apartments they sought based on their income, the R&R treats this assertion as if it was not in dispute. *Id*. This, again, is

---

[10] The R&R incorrectly found that Plaintiffs' disparate treatment claims are based on a "naked reliance" on their disparate impact claim as a way to "conclusively establish" intentional discrimination. R&R at 74-75. In addition to ignoring all the indicia of intentional discrimination outlined above, the R&R misapplied the legal standard: Plaintiffs need not "conclusively establish" liability, but instead need only establish, at the summary judgment stage, that there are circumstances giving rise to an inference of discrimination, and that questions of fact remain as to whether Defendants' non-discriminatory rationale was pretextual.

Separately, "there is nothing inherently inconsistent in advancing both disparate treatment and disparate impact theories based on the same facts, as these theories are simply alternative doctrinal premises for a statutory violation." *Brown v. City of New York*, No. 16 CV 1106(NG) (RER), 2017 WL 1102677, at *5 (E.D.N.Y. Mar. 23, 2017) (internal quotations omitted). For example, using the hypothetical scenario taken from *Griggs* discussed above, *supra* at 7, imagine Duke Energy decided after the Supreme Court ruled its education requirement was unlawful that it would still use this requirement in a selective fashion (and even said in other contexts that it wanted a "quota" on African American employees). Any reasonable factfinder could find that to be intentional discrimination, just as it could in this case.

a complete departure from the R&R's disparate impact analysis, which raised a multitude of concerns about the legitimacy of Defendants' arguments as to its income policy. *See generally id.* at 61-73. Clear evidence establishes that Defendants have no need for this requirement as applied to applicants with vouchers, as the R&R discusses. *Id.* At the very least, a reasonable trier of fact could find that the income policy is simply a pretext for Defendants' intentional discrimination against those with vouchers. *See Legg v. Ulster Cnty.*, 820 F.3d 67, 75 (2d Cir. 2016) ("a plaintiff could establish pretext and intentional discrimination by pointing out significant inconsistencies in the [defendant's] justification"). Indeed, accepting the R&R's recommended holding would give housing providers free reign to implement wholly arbitrary and unnecessary barriers to housing, with the blanket defense that the barrier is justified without any evidentiary support needed.[11]

Defendants' lack of a business necessity defense to Plaintiffs' disparate impact claim is directly applicable to the credibility of Defendants' proffered justification for their use of an income requirement under a disparate treatment analysis. And when it comes to a defendant's intent, this is precisely the kind of dispute of fact which makes this claim unsuited to summary adjudication. "Summary judgment is appropriate if no reasonable jury could find that the defendant's actions were motivated by discrimination." *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003)).

---

[11] In another clear departure from the applicable legal standard, the R&R held that "[w]hether or not Defendants proffered reasons establish the policy is necessary, does not show an *intent* to discriminate." R&R at 75 (emphasis original). But that is exactly what it shows, under the *McDonnell Douglas* burden shifting framework: Whether or not Defendants in fact need to apply their income requirement to applicants with vouchers shows whether that policy is a legitimate non-discriminatory reason for rejecting these applicants or simply a *pretext* for intentional discrimination. The R&R appears to require evidence of intentional discrimination tantamount to the smoking gun Quota Statements that Defendants used to reject other applicants with vouchers. No such requirement is warranted for this claim.

Plaintiffs are confident that the factfinder will ultimately find that Defendants' use of an income requirement—for which it has no need to apply to applicants with vouchers, as it has no bearing on the risk associated with renting to such tenants—is a means by which Defendants have unlawfully and intentionally limited the number of tenants with vouchers in its buildings. At the very least, issues of fact remain on Plaintiffs' claim of intentional discrimination, and the R&R's conclusion on this claim should be rejected.

## IV.    CONCLUSION

For the foregoing reasons, the Court should (1) enter summary judgment in favor of Plaintiff Lori Gerardi for her claim stemming from her 2017 application; (2) enter summary judgment in favor of Plaintiffs for their disparate impact claims under New York State and Suffolk County law; (3) enter summary judgment in favor of Plaintiffs for their claim under New York State law based on the NYSDHR Guidance; and (4) deny summary judgment in favor of Defendants on Plaintiffs' disparate treatment claim challenging Defendants' selective use of their income requirement.

Dated: March 10, 2023

Respectfully submitted,

*/s/ Brian Corman*
Joseph M. Sellers
Brian Corman
Megan Reif
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
(202) 408-4600
jsellers@cohenmilstein.com
bcorman@cohensmilstein.com
mreif@cohenmilstein.com

*/s/ Thomas Silverstein*
Thomas Silverstein

Edward G. Caspar
Lawyers' Committee for Civil Rights Under Law
1500 K St. NW, Ste. 900
Washington, DC 20005
(202) 662-8600
ecaspar@lawyerscommittee.org
tsilverstein@lawyerscommittee.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 10, 2023, I electronically filed *Plaintiffs' Objections to Report and Recommendation* with the Clerk of the Court using the ECF, who in turn sent notice to all parties.

/s/ Brian C. Corman
Brian C. Corman